**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| AMERICAN AIRLINES, INC.,<br><br>  Plaintiff,<br><br> v.<br><br>TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, and AIRLINE MECHANIC AND RELATED EMPLOYEE ASSOCIATION TWU/IAM,<br><br>  Defendants. | Civil Action No. |

## COMPLAINT FOR INJUNCTIVE RELIEF

Dee J. Kelly, Jr. (S.B. # 11217250)
Lars L. Berg (S.B. # 00787072)
Elizabeth A. Cuneo (S.B. # 24100166)
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Tel.: (817) 332-2500
Fax: (817) 878-9280
dee.kelly.2@kellyhart.com
lars.berg@kellyhart.com
elizabeth.cuneo@kellyhart.com

Robert A. Siegel (*pro hac vice* forthcoming)
Mark W. Robertson (*pro hac vice* forthcoming)
Sloane Ackerman (*pro hac vice* forthcoming)
O'Melveny & Myers LLP
7 Times Square
New York, New York 10036
Tel.: (212) 326-2000
Fax: (212) 326-2061
rsiegel@omm.com
mrobertson@omm.com
sackerman@omm.com

*Attorneys for Plaintiff American Airlines, Inc.*

Plaintiff American Airlines, Inc. ("American"), for its Complaint against the Transport Workers Union of America, AFL-CIO ("TWU"), International Association of Machinists and Aerospace Workers ("IAM"), and Airline Mechanic and Related Employee Association TWU/IAM (collectively, the "Union"), states as follows:

## INTRODUCTION

1.      The Railway Labor Act, 45 U.S.C. § 151 *et seq.* (the "RLA"), prohibits airline employees from changing their normal behavior on a concerted basis in order to disrupt operations and obtain leverage in contract negotiations.  When a union has instigated or encouraged such concerted behavior, or failed to take all reasonable measures to stop it, federal courts have acted swiftly and unequivocally in issuing injunctions to stop the union's illegal conduct.  *See, e.g.*, *United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257 (7th Cir. 2009); *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300 (11th Cir. 2001); *United Air Lines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO*, 243 F.3d 349 (7th Cir. 2001); *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59 (D.D.C. 2017); *Spirit Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 2017 WL 2271500 (S.D. Fla. May 9, 2017); *US Airways, Inc. v. US Airline Pilots Ass'n*, 813 F. Supp. 2d 710 (W.D.N.C. 2011); *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 1999 WL 88778 (N.D. Tex. Feb. 10, 1999).

2.      In order to gain leverage in ongoing contract negotiations, the Union and its officers and members are engaged in the exact type of concerted behavior that courts have repeatedly held warrants an injunction to protect the traveling public.  Between February 4 and May 13, 2019, the Union's campaign has caused approximately 644 flight cancellations and over 270 maintenance delays of two hours or longer—disrupting the travel plans of more than 125,000 members of the traveling public.

3.      As detailed below, this concerted slowdown has significantly intensified in the past weeks.  American estimates that, for each day that the slowdown continues into the summer, it will disrupt the travel plans of approximately 3,400 additional passengers per day.  Accordingly, American is asking this Court to issue an expedited preliminary injunction to stop the Union's illegal slowdown campaign.

4.      The Union's slowdown involves a concerted and statistically significant change in its members' normal behavior since February.  By way of example:

- Mechanics are en masse taking an inordinately long time to repair aircraft, resulting in a dramatic increase in outstanding maintenance write-ups and contributing to a spike in aircraft out of service.  The odds of this being random as opposed to concerted activity is less than one-in-one billion.
- Mechanics are en masse refusing to work overtime and take maintenance field trips to repair aircraft.  Historically, American has never had an issue staffing overtime or field trips given the premium pay associated with them.  Since the Union initiated its campaign, however, there have been periods with no overtime shifts worked at American's hub in Phoenix, and there have regularly been weeks with a 100% field trip refusal rate at American's hubs in Charlotte, Phoenix, and Philadelphia.

5.      These concerted changes in behavior are causing significant flight cancellations and lengthy delays, and that number is rising as the Union's campaign intensifies.  Just a few weeks ago, before the parties' last negotiation session on April 25, the Union's campaign was causing on average eight additional cancellations per day.  That number has since skyrocketed to 14 per day through May 13.

6.      This Union-directed slowdown violates Section 2, First of the RLA, which requires the Union and its members to "avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees."  45 U.S.C. § 152, First.

7.      It is well established that even if the parties' collective bargaining agreements do not require employees to do certain things on an *individual* basis (such as work overtime),

changed conduct on a *concerted* basis (such as refusing to accept overtime en masse) to disrupt operations and exert economic leverage against a carrier during negotiations is prohibited.  In these circumstances, the Union has an obligation under Section 2, First of the RLA to make all reasonable and effective efforts to stop concerted activity when it occurs.

8.      Here, the Union has not only failed to take all (or any) steps to stop the illegal behavior, it has expressly encouraged its members to engage in the illegal concerted behavior.  Indeed, the Union has gone so far as to blatantly direct its members to "**stop all voluntary actions**" that they were previously taking that allowed American to operate in the normal course—and directly tied its call for action to its demand for a "CONTRACT NOW!"  The Union has also threatened and intimidated employees who have accepted overtime and field trips stating they expect "100% participation" and that those who do not comply are "going on the list."

9.      The requirements for a preliminary injunction are readily satisfied.  American is likely to succeed on the merits of its claims because the evidence, including expert statistical data and anecdotal evidence, leaves no doubt that the Union and its members are engaged in an illegal slowdown.

10.      Although an irreparable injury showing does not apply to RLA injunctions, American and the traveling public have suffered, and will continue to suffer, incalculable irreparable harm if the slowdown is not stopped.

11.      A preliminary injunction is particularly critical here because the summer flying season (which starts in a few days on May 23) is one of the busiest travel times.  Accordingly, if the Union's slowdown activity continues into the summer at its current pace—and the Union's

communications suggest that it will actually increase—then the impact on the operation and public will increase exponentially.

12.     The Union knows this, which is why it has repeatedly warned American that, "***this may be shaping up to be a very long, hot summer and not just because of the weather***." Thus, it is critically important to American and the public that American obtain a preliminary injunction on an expedited basis.

13.     At the same time, as the courts have repeatedly recognized in these types of cases, there can be no claim of harm to the Union or its members in issuing an injunction because it would simply prohibit them from engaging in illegal activity.

14.     An injunction should therefore be issued prohibiting the Union and its members from instigating or engaging in, and to require them to make every reasonable effort to discourage and terminate, ongoing, unlawful concerted actions in order to return American to normal operations.

## JURISDICTION

15.     This action arises under the Railway Labor Act, 45 U.S.C. § 151 *et seq.*  The Court has jurisdiction over this action under 28 U.S.C. § 1331.

## VENUE

16.     Venue is proper within the Northern District of Texas, Fort Worth division pursuant to 28 U.S.C. § 1391(b)(2).

## THE PARTIES

### Plaintiff

17.     American is a commercial air carrier, headquartered in Fort Worth, Texas. American is a "common carrier by air" as defined in the Federal Aviation Act of 1958 and a "carrier" as defined by the RLA.

18.     The current American is the product of a merger between American and US Airways, Inc. ("US Airways") and their parent corporations.

19.     American employs various classifications of employees, including mechanics and related.  The mechanics and related classification includes several job titles, including mechanics (also known as aircraft maintenance technicians or AMTs) who perform mechanical repairs and inspections on aircraft and other employees who support them.

### The Union

20.     TWU and IAM are unincorporated associations headquartered in Washington, D.C. and Upper Marlboro, Maryland, respectively.  Prior to the merger, the TWU represented the legacy American mechanics and related employees, and the IAM represented the legacy US Airways mechanics and related employees.  In May 2013, TWU and IAM formed the Airline Mechanic and Related Employee Association TWU/IAM (the "Association") for the sole purpose of seeking to represent the mechanics and related employees at American.  The Association is located in Washington, D.C.

21.     On August 6, 2014, TWU and IAM jointly filed a single carrier application with the National Mediation Board ("NMB") seeking certification of the Association as the representative for the combined crafts and class of the mechanics and related employees at post-merger American.  On May 19, 2015, the NMB certified the Association as the representative of

the mechanic and related work group.  Depending on the work location, the Union has

designated either TWU or IAM to handle day-to-day contract administration and grievances.

22.     The officers of the Association are the Association Director, who acts as chief

executive officer, and the Vice Director, who performs the Association Director's duties in his

absence.  These positions alternate between the international presidents of the TWU and IAM or

their designees.

23.     John Samuelsen is the International President of the TWU and currently serves as

the Association Director for the Association.

24.     Sito Pantoja is the General Vice President of the IAM and currently serves as the

Vice Director for the Association.

<strong><u>BACKGROUND OF THE DISPUTE</u></strong>

**<u>The Parties' Collective Bargaining Negotiations</u>**

25.     The collective bargaining agreements ("CBAs") between the legacy carriers and

the TWU and IAM, respectively, currently govern the rates of pay, rules, and working conditions

for mechanics and related employees represented by the Union except for Flight Simulator

Engineers.[1]

26.     Under the RLA, a CBA does not expire, but remains in effect until amended by

agreement of the parties.  Thus, the existing CBAs will continue to govern the other work groups

until the Union and American reach agreement on joint CBAs for those groups.

27.     American and the Union have been engaged in negotiations for joint CBAs to

cover each combined workgroup since December 2015.  Given that the parties had still not

---

[1] On November 7, 2016, American and the Union reached agreement on a new joint CBA
covering Flight Simulator Engineers.  Although Flight Simulator Engineers are included within
the mechanic and related classification, the parties agreed that a separate CBA was appropriate
for these employees.

reached an agreement despite American's continued and extensive efforts to do so, American ultimately requested the mediation services of the NMB.  In October 2018, the parties conducted their first mediated session.  On April 25, 2019, American and the Union conducted their 17th session with the NMB.  That was the last scheduled NMB session.

28.     Throughout negotiations, American has engaged in good faith negotiations in an effort to reach agreement and has proposals on the table that would provide its employees with an industry-leading contract, when taken as a whole, including the highest wage rates in the industry and system-wide station and job protections.

29.     American was hopeful that the parties would have a breakthrough and reach an agreement before the summer, but that did not occur.

**The Union Has Orchestrated And Encouraged The Slowdown.**

30.     The evidence that the Union is encouraging its members to engage in an illegal slowdown in order to put pressure on American in negotiations is significant and compelling. The Union has an extensive system of communications that it maintains among its members, including electronic messages and flyers.  The Union also possesses a large number of confidential communication mechanisms to which American does not have access, including password-protected internet sites.

31.     Courts have repeatedly recognized that "work to rule," "work to book," and "work safe" campaigns are code words for inciting illegal slowdowns.  *See, e.g.*, *United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257 at 272 ("Phrases such as 'work safe,' 'work by the book,' 'adhere to strict contractual requirements,' 'not to neglect even the most minor write ups,' 'check every item on the checklists,' [are] all recognized as coded signals to engage in a slowdown."); *United Air Lines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO*, 243 F.3d at 366-67 (same).

February 2019 Communications

32.     On February 4, 2019, Local 591—one of the Union's most prominent locals representing over 4,000 mechanics and related employees at some of American's largest hubs—issued a "call to arms" letter.[2]  This letter states, "I believe, like you, that our jobs are careers worth fighting for, and we need to start fighting as one for our careers now. . . .  Local 591's membership has proven in the past that we are a force to be reckoned with when we stand as one, and now is that time to stand as one."  The letter continued, "[i]t is time for us to lead the way, and for others to wish they had our contract!  *American needs to hear loud and clearly from this membership that the time to deliver the best contract is NOW*!"

33.     The Union then told its members to target American when it is most vulnerable—during the summer travel season.  On February 15, 2019, the Union released a bulletin that stated, "*this may be shaping up to be a very long, hot summer and not just because of the weather*."  The Union tied the summer to "the fight of our careers," telling members that "[b]y standing together as one, *in solidarity to preserve our jobs and our livelihood, we will prevail*."

March 2019 Communications

34.     On March 6, 2019, American learned of a joint CBA "fact sheet" distributed by the Union.  In the same breath as "**CONTRACT NOW!**," the Union demanded, "**We need to get the company's attention**" and told its members "**Do Your Job!**," and "**It will be a long hot summer!**"

35.     Then, on March 8, the Union made an even more blatant call to arms in a bulletin.  The bulletin contained a header that said "GRIEVANCE COMMITTEE," which appears on

---

[2] A "local" is a local branch of a national union that represents a subset of the union's members (e.g., members who work in a particular geographic area).  Local unions have their own governing bodies, which represent the interests of the national union, while at the same time responding to the needs of their constituents.

faxes made by the Union's Charlotte grievance committee, and was distributed by senior Union leadership to Union shop stewards and posted on Union bulletin boards and local union websites.

36.     The bulletin expressly tied a change in behavior to leverage in contract negotiations.  The Union first wrote that: "Negotiations have dragged on for over three years," while "American's Leadership has reaped the rewards in massive stock options, incentive payouts to themselves and future stock values that will be inflated from billions in cash used in stock buy-backs."  The Union then provided express and direct slowdown instructions:

> American's Leadership stands to make a windfall off the membership's backs if we don't all stand as one and **FIGHT** to stop them. . . . [W]e have to tell them no, or hell no, [but] they [management] like to point out how the membership continually gives them excellent performance – with much of that performance coming from a minority of members going above and beyond, ***voluntarily helping the company*** . . .

> While we cannot demand members stop, we are asking that we all stop going above and beyond and eating the corporate welfare meals.  American needs to know that we are all on the same page and on the side of our negotiation committee.  We are asking TWU/IAM Association members; including all AMT's, Facilities Maintenance, GSE, MLS/Stores, MCT's, MTS/Instructors, QA and Planners, to **stop all voluntary actions.**

> Voluntary actions include, but are not limited to:

> * Field Trips,
> * Using your personal cell phone for work,
> * Paid Lunches,
> * Job Continuances, etc. . . .

> Voluntary actions also include no deviation from:

> * In Accordance With (IAW) requirements, FAR's
> * Safety Requirements,
> * Company policy and procedures,
> * Contractual provisions.

> The above lists are not intended to be all-encompassing and should instead be seen as ***a guide to actions to cease voluntarily helping the company while they try to steal from you***! We ask that ***you stop doing those extra little things*** and cutting corners like many have done ***in the past to help the company out***. For clarity, we are not asking anyone to do anything that could be construed as illegal, we are ***just focused simply on not volunteering and not voluntarily going beyond what's required***.

37.     The Union concluded its message by encouraging its members to tell other employees to slow down, asking them to:  "Feel free to use this opportunity to share any issues (compliance, safety-of-flight, vehicle safety, etc.) that you may discover with fellow members, ensuring everyone is as well informed as possible."

38.     The Union also encouraged its members to slow down by baselessly warning that American would conduct a lockout.  In a March 22, 2019 bulletin, the Union complained about contract negotiations while again warning, "we are headed for a very long and hot summer." The bulletin also claimed without any justification "**The Time to Prepare for a Potential Lockout by American is Now!**"  Given that American has never threatened to lock out its employees (nor could it under Section 2, First of the RLA), the only potential reason for the Union to make such a statement is to draw it membership's attention to economic weapons, like its own job action.

39.     The Union released a bulletin on March 26, 2019 that encouraged its members to fight American with their illegal slowdown.  The Union wrote, "We will not sell out, we will not concede more.  *It is time for every Association represented member to make American Airlines understand that they must get serious at the table to finish these negotiations*.  The Company must hear from you that their miscommunication garbage will not work."  And the Union again warned "[i]t appears that *we are headed for a very long and hot summer*, remaining behind our peers in the industry."

40.     On March 29, 2019, Local 513 released a communication stating: "[t]he ones who can change all of this is all of you *in doing what is right by following and complying with your current Contract, Company Policies and Procedures, Safety Procedures, as well as DFW Airport Policies for all of its intended purposes*."  Then, after claiming American had not

sufficiently responded to the Union's joint CBA proposals, the local wrote that "[a]gain as I mentioned, *give this Company your 100% full compliance of all the rules, and your Contract*."

41.     Then, on March 30, 2019, American found flyers at the airport in Charlotte, stating, "[i]f 2500 members at one airline can send a unified message to their company and conclude their negotiation.  WHAT CAN 30,000 DO!!"  This is a reference to Southwest Airlines, Inc., at which mechanics also engaged in a purported job action, and the company then reached an agreement on a CBA.  The bulletin warned that Union members should "Let Doug [Parker, American's CEO] and his cronies know *we are prepared for a long hot summer*."

April 2019 Communications

42.     On April 5, 2019, one of the Union's locals, TWU Local 591, released a podcast that directly instructed Union members to "as always, work safe and stay safe."  Then, on April 8, 2019, TWU Local 591 released a new podcast that again asked employees to work to rule.  He stated *"[a]s always, work safe, work in accordance with all the rules, regulations and FARs and most of all, please stay safe*."

43.     On April 23, 2019, a TWU Vice President encouraged mechanics to work safe by tweeting out that "[p]rofits over passenger safety and quality workmanship should never be legal!"

44.     The last scheduled NMB's mediation sessions occurred on April 23-25, 2019.

45.     Then on April 27, 2019, a TWU Vice President tweeted out "Parker [American's CEO] also kicked off a war with the airlines ground workers yesterday by failing to renegotiate their contract," and "expect *a very hot summer at American*."

<u>May 2019 Communications</u>

46.     The Union's locals also carried out the illegal campaign by blatantly tying safe work to demands for a new joint CBA.  For example, at least as of May 16, 2019, Local 567's website has a button on its homepage demanding a "CONTRACT NOW!," alongside a demand for the Union's members to "***Always Work SAFE and I.A.W. [In Accordance With]***."  As explained in the Union's March 8 letter, the Union had demanded mechanics cease "all voluntary actions," which "***include no deviation from 'In Accordance With (IAW)' requirements***."

47.     Moreover, on May 6, 2019, a "President's News Article," entitled "Staying Strong During Contract Talks," was posted on the website of Local 1976, calling out members who continued to accept overtime for not showing solidarity.  The posting questioned how the Union could be sure that mechanics who "***suck up all the overtime you can work***" could be trusted to "stand with" the Union and "walk a picket line."

48.     On May 10, 2019, the Union issued a bulletin, telling members "[w]e make this airline run, not [management]," and instructed members "***to work In Accordance With all rules, regulations, and manuals***," and "***work safe and stay safe***."  The bulletin closed by saying, "Do not go above and beyond for this company and risk injury, as they have made it clear through their [bargaining] proposal that they will not go above and beyond for you."

49.     On May 13, 2019, the TWU Local 591 podcast told mechanics that American's contractual proposals are insufficient and "[a]s a reminder on this type of subject; if we don't fight, we can't win . . . [s]o it's time for our members to start fighting.  As always, ***work safe, work in accordance with all the rules, regulations and FARs and most of all, stay safe***."

**Additional Anecdotal Evidence Establishing The Union Has Encouraged And Orchestrated The Slowdown**

50.     While the Union's communications on their face confirm that it is engaged in an illegal slowdown, on certain occasions, union leaders have even told management that an illicit job action is underway.  For example, on March 15 and 22, 2019, mechanics in San Juan accepted field trip opportunities.  After they accepted, the station chairman for the TWU told the San Juan station manager that the mechanics could not take the field trips because a Union leader conveyed to him that the Union was not permitting its members to take field trips.  As to the March 15 field trip, the two mechanics indicated that they did not feel safe taking the field trip and were worried Union members would be waiting for them when they took a connecting flight through Miami.

51.     At the same time, online postings by members of the Union have repeated the Union's slowdown themes, demonstrating the effectiveness of the campaign.  For example:

- On February 16, 2019, one poster wrote, "Time for EVERYONE to work safe."  He later wrote, "Yes people work safe.  Everyone including the ramp needs to follow the policy and procedures exactly how they are written."  And he directly tied this to the desire for a new joint CBA, later noting, "[w]ith whom you are negotiating against their track record shows that's the only way you will obtain a fair contract."

- Another became angry at those who refused to participate in the Union's illegal campaign on March 19, 2019.  Responding to another post that asked why road trips were still occurring, the poster wrote the Union could only do so much and "if you want to slut yourself out for money that's on you."

- Another poster agreed, writing on March 20, 2019, that "[t]he company will only respond to real pressure.  Canceled and delayed flights are the only thing they understand," and he was "really disappointed in some of the guys I work with. after all that has gone on. . . .  I still see guys going above and beyond to move metal and suck up to company crew chiefs and management.  Really disappointed."

- Yet another demanded that Union members slow down to achieve a new contract, writing "[t]he current negotiations are worthless. . . .  Enough brother and sisters!  Park the aircraft and slow down at work.  No road trips or OT."

- Posters also pointed out that an illegal slowdown would give the Union "leverage" to achieve a new joint CBA.  One poster wrote "they absolutely wont [sic] let us strike we have no leverage," to which another responded "they will not let you all strike. BUT, I disagree about leverage.  Think about it.  Stay put at work and do your job."

- When the posters learned that mechanics from Tulsa International Airport had accepted a field trip to John F. Kennedy International Airport, they became especially enraged.  On April 18, 2019, one wrote he "[w]ant[ed] to thank the Tulsa scabs for coming to JFK on a field trip for the OTS A321," and tied it to a new contract, angrily warning "[h]ow many overhaul jobs are getting cut with the new contract."  Another warned, "[o]nce again Tulsa doing their own thing and screw everyone else," while another claimed "those field trip whores from DFW will do the same thing!"

52.     In addition, a number of Union members have reported threats of intimidation and harassment of those who refuse to acquiesce in the illegal activity.

53.     For example, on March 24, 2019, American received an email from an employee, in which he stated that, "field trip personnel [are] being called and harassed by other employees and being intimidated into turning down field trips."  He further stated that, "[t]hey are also being threatened when they accept field trips" and that because mechanics are being threatened, "we are no longer posting field trip information," publicly.

54.     Similarly, on April 22, 2019, an employee claimed Union members were retaliating against him for taking overtime.  In his statement to American, he wrote that "the union [was] telling [me] not to come to do 'overtime'" but "I do not wanna to be bullied by anybody."  He said that Union members had come up to him asking, "what are you doing here" and telling him "you should not be here today!"

55.     On April 24, 2019, an employee reported to American that the Union was asking its members to turn down overtime.  He said he responded that he "would work any and all O.T. that made it to me," and in response, his shop steward stated that "the union was looking for '100% participation' in turning down O.T."  A few days later, when he worked overtime again,

his shop steward warned, "so, you're not going to be a team player . . . OK, your name's going on the list."

**The Union And Its Members Have Engaged In Unlawful Concerted Activity To Pressure American In Collective Bargaining.**

56. Since February 2019, American's mechanics have engaged in an unlawful slowdown designed to disrupt operations and commerce in order to put pressure on American in CBA negotiations. Following the Union's March 8 call to arms, the slowdown has escalated, and since the parties' last negotiation session on April 25, the slowdown has escalated even further.

57. This illegal conduct includes a concerted change of behavior by failing to close out maintenance items and complete maintenance checks, refusing to accept overtime, refusing to accept field trips, and generally slowing down and refusing to do anything more than the bare minimum required by the CBA or federal regulations.

58. The Union's directives to its membership have been effective. Economists and statisticians routinely rely upon a variety of tests to determine the likelihood that an observed outcome lies within its expected range after controlling for other factors and its historic variability. Based on these recognized tests, each of the tactics adopted by the Union's members on a concerted basis represents a "statistically significant" change in behavior (i.e., such changes are all well in excess of what conventional statistical analysis would deem is potentially a "random" occurrence). For many of these changes, there is more than a 99% confidence level (i.e., it is 99% certain that the changes are the result of concerted activity) and all of them are at least at the 95% confidence level.

Mechanics Are Taking Longer To Repair And Clear Write-Ups.

59.   American has a comprehensive maintenance program to ensure a safe operation.  Aircraft in American's fleet each have an Aircraft Maintenance Logbook that may contain maintenance items known as "MELs"—which stands for Minimum Equipment List.  MELs are an important part of American's maintenance program.  An MEL is a maintenance discrepancy that does not need to be fixed immediately but may be deferred for a specific but limited time allowing the aircraft to be repaired at a more convenient time.  For example, when the aircraft is on the ground overnight, when the aircraft reaches a station with full maintenance capabilities, or when American can obtain a necessary part.  MELs do not affect an aircraft's airworthiness but could impose certain operational limitations or passenger or crewmember limitations.  This allows American to operate safely, while also ensuring that American is not continuously pulling aircraft out of service.

60.   Pursuant to FAA regulations, however, if the MEL is not repaired within the required timeframe, it expires (called a "dead MEL"), and the aircraft cannot be flown until it is repaired.  Accordingly, a large number of open "MELs" at any given time makes it more likely that one or more MELs will expire, which in turn means that American will have to remove those aircraft with the dead MELs from service.  Thus, prompt resolution of MELs plays a crucial role in ensuring that the aircraft operate with as few limitations or restrictions as possible and ensuring that aircraft remain in service.  American's mechanics historically have worked diligently to clear MEL items to ensure aircraft remain in service with as few limitations as possible.

61.     Since the slowdown began, however, the daily number of open MELs has skyrocketed.  The number of daily open MELs from February 4 to May 13, 2019 was approximately 28% higher than during the same period in 2017, and 27% higher than the same period in 2018.  This number is rising as the slowdown intensifies with 54 additional open MELs per day from February 4 to March 7; 92 additional open MELs per day from March 8 (when the Union told members to "stop all voluntary actions") to April 25; and 126 additional open MELs per day between April 26 (following the parties' last negotiation session) and May 13.  This spike indicates that mechanics are taking longer to clear MELs.  Indeed, the number of MELs taking over eight days to clear has increased by more than 35% since last year.  Over this same period, there were 69 "outlier" days.  The "outliers" are those days with residuals at or above the 99th percentile—or, in other words, residuals that one would only expect to see on 1% of days.  The chance that there would randomly be 69 outliers in 99 days is *far less than one-in-one-billion*.

62.     Notably, mechanic productivity should be much higher than normal now.  On March 13, 2019, the FAA issued an order grounding all Boeing 737 MAX planes.  Not knowing exactly when the grounding would be lifted, American removed its fleet of 24 737 MAX aircraft from its flight schedule until August 19, 2019.  Before the FAA issued its order, American planned to add 16 additional 737 MAX aircraft to its fleet by the end of the year.  Because the 737 MAX aircraft are not flying, they do not require the routine service that they would otherwise require.  Based on the amount of maintenance that American's 737 MAX fleet would require on a daily basis, the grounding of these aircraft has freed up an estimated 180 manhours on average of mechanics' time per night to work on other aircraft.  As detailed in this Complaint, however, mechanic productivity has significantly decreased.

The Slowdown Has Caused A Spike In Aircraft Out Of Service.

63.     American has a fleet of approximately 950 aircraft.  American schedules its aircraft on a daily basis.  On any given day, American may schedule an aircraft for multiple flights to domestic and international airports.  American typically schedules routine maintenance on its aircraft during the night when most aircraft are not flying (i.e., a RON).  If mechanics do not complete the required maintenance by the morning, American may have to pull the aircraft out of service ("AOS") on an unscheduled basis.  Because American generally schedules its aircraft to fly multiple flights per day, an unscheduled AOS in the morning will often have a cascading effect of delays and cancellations throughout the day.  American's maintenance program is built around at most 35 unscheduled aircraft being out of service at 7 a.m.

64.     Since early February, the number of unscheduled AOS at 7 a.m. has spiked, indicating that mechanics are slowing down in their overnight maintenance checks and not completing them by the morning.  In contrast to American's target of 35 unscheduled AOS per day—and the actual average of 36 unscheduled AOS per day from October 1, 2016 through February 4, 2019—American has averaged 44 unscheduled AOS per day from February 4 through May 13, 2019.

65.     The daily number of unscheduled AOS at 7 a.m. is even higher than what American experiences during its peak summer season.  During the period from February 4 through May 13, 2019, American has averaged 44 AOS at 7 a.m. per day (compared to 43 per day during summer 2018 and 41 per day during summer 2017).

66.     This increase in system-wide unscheduled AOS is driven in large part by "expiring MELs," which have been pending for so long they can no longer be deferred.  AOS at 7 a.m. resulting from expiring MELs across the system is double the average for this time of year.  Moreover, in Charlotte, the number of AOS at 7 a.m., resulting from expired MELs since

February 4, 2019, is significantly higher than the number American experienced for the entirety

of 2018, and more than triple the number that American experienced during all of 2017.

67.     From February 4 to March 7, 2019, mechanics' slower working pace, on average,

led to four additional unscheduled AOS per day; from March 8 through April 25 to almost nine

additional unscheduled AOS per day; and from April 26 through May 13 to over 13 additional

unscheduled AOS per day—all statistically significant at the 95% or 99% confidence level.

Moreover, there have been 23 "outlier" days for unscheduled AOS at 7 a.m. in the 99-day period

between February 4 and May 13, 2019, the odds of occurring randomly is *less than one-in-one*

*billion*.  And 22 of the outlier days have occurred during the 67-day period between March 8 and

May 13—the odds that this is random rather than concerted action is *less than one-in-several*

*billion*.

Mechanics Are Refusing To Work Overtime And Take Field Trips.

68.     The TWU/American CBA governs the rates of pay, rules, and working conditions

for legacy American mechanics, and the IAM/US Airways CBA governs the rates of pay, rules,

and working conditions for legacy US Airways mechanics.

69.     Under the TWU/American CBA, legacy American mechanics can make

themselves available for overtime, and management will offer the overtime to qualified

employees, with the employee who has the fewest overtime hours receiving the offer first.

Under the IAM/US Airways CBA, legacy US Airways mechanics are presumed to be available

for overtime.  When an overtime opportunity becomes available, management removes

unqualified employees (i.e., those without the required training or qualifications) from the

overtime list and refers the list to the union, which makes the offer to the employee with the

fewest overtime hours first.

70.     Field trips are trips by mechanics to another location when a plane suffers a mechanical issue at a location where American does not have its own readily available mechanics and/or parts.  When a plane suffers a mechanical issue at an airport where American does not have readily available mechanics, American management informs Maintenance Operations Control ("MOC").  MOC then determines which American maintenance station is best positioned and suited to assist with the maintenance issue and informs that location of the field trip opportunity.  American offers field trips to legacy American or legacy US Airways employees depending on whether the aircraft that requires repairs is a legacy American or legacy US Airways aircraft.  If local management at the station cannot find the mechanics to take the field trip, they will inform MOC, which will call a new station to offer the field trip opportunity. Field trips are very important to American's operations because they allow it to address maintenance problems that arise in locations with no American mechanics on duty.

71.     The specific protocol for offering field trips to mechanics depends on whether the TWU/American CBA or the IAM/US Airways CBA governs the mechanic who American is offering the field trip.  Legacy American mechanics can log onto American's intranet and make themselves available to receive field trip offers.  When a field trip for legacy American mechanics becomes available, American station leaders will offer the field trip to those who have made themselves available, with those with the fewest field trip hours receiving the offer first. Legacy US Airways mechanics are presumptively available to take field trips and do not need to make themselves available.  When a field trip offer comes in, management will check the list of available legacy US Airways mechanics for the field trip and remove those unqualified to take the field trip (i.e., those who have not completed the required training).  A representative of the IAM will then offer the field trips to mechanics in order of field trip hours.

72.     Overtime and field trips are a normal and expected part of American's maintenance process and recognized as such in the parties' CBAs.  The CBAs do not require individual employees to accept overtime or field trips, but prior to this slowdown, American rarely (if ever) had difficulty finding an employee willing to work overtime or take a field trip.  Field trips allow mechanics to earn additional wages in a short period, because of the premium pay associated with field trips.  Overtime and field trips are essential to American's operations.  And employees working overtime or taking field trips perform a significant amount of maintenance work.  Such flexible measures allow American to operate efficiently and safely and allow its aircraft to remain in service for longer than they otherwise would be able to.

73.     Legacy American mechanics earn straight time wages for the first eight hours of the field trip work and time and a half wages for field trip time worked after the first eight hours.  Overtime pay for these employees is time and a half their regular rate.  Legacy US Airways employees earn similar amounts, but earn two times their regular wages if they are required to work on their second scheduled day off.

74.     Occasionally, managers may also ask individual employees to defer or work through their lunches in order to meet a pressing emergency.  Employees are entitled to a lunch break in the third to fifth hour of their work, and if they do not receive one, American pays them for their time (and also provides a lunch break later).  Employees who miss their designated lunch break are paid straight time or time and a half depending on if they worked more than eight hours a day.

75.     The Union's express directive to its members not to accept overtime or field trips has been effective.  IAM overtime shifts worked dropped precipitously since the Union released its March 8 letter instructing mechanics not to engage in any voluntary actions, and again on the

eve of the parties' last negotiation sessions on April 23-25, 2019.  For example, the number of overtime shifts worked at Phoenix dropped almost to zero immediately following the March 8 letter.  And after March 8, 2019, field trips with "no takers" began occurring significantly more frequently, most conspicuously in Charlotte, Phoenix, and Philadelphia, which regularly reached *a 100% refusal rate*.

76.     Like overtime and field trips, paid lunches taken by TWU-represented employees also have dropped since February 4, 2019, and further since March 8, 2019.

The Cumulative Effect Of Changes In Behavior Has Created A Statistically Significant Increase In Cancellations And Delays.

77.     The concerted changes in mechanic behavior have caused a dramatic increase in maintenance-related cancellations and delays.  From February 4 to May 13, 2019, American experienced 450 more maintenance-related cancellations than during the same period in 2018 and 646 more maintenance cancellations than during the same period in 2017.  Since the March 8, 2019 directive to "**stop all voluntary actions**," the campaign caused approximately eight additional maintenance-related cancellations each day.  And since the parties' last negotiation session on April 25, this number has increased to 14 cancellations per day.  Both figures are significant at the 99% level of confidence.

78.     This translates to nearly *650* additional cancellations and three quarters of all maintenance-related cancellations since the Union issued its March 8 directive affecting approximately 88,000 passengers, through May 13, 2019.

79.     Similarly, for the period from February 4 through May 13, 2019, the average number of maintenance-related delay minutes per flight has increased nearly 29% relative to 2018.

80.     The changes in mechanic behavior are responsible for more than 1,550 additional flight delays that would have not otherwise occurred but for the slowdown.  Of these, more than a thousand are delays of more than 15 minutes.  Moreover, between March 8 and May 13, 2019, the concerted changes in behavior have caused 279 maintenance delays of two hours or longer, impacting over 37,500 passengers.  Notably, this figure *understates* the full impact of these delays because it only considers the *initial* flight delay, and not the "downline" impacts that propagate through the system.

81.     Equally important, these changes will only worsen as the busy summer travel season commences, when American experiences a significant increase in passengers and aircraft utilization leading to increased maintenance demands with less time to perform maintenance.

82.     American defines the 2019 summer season as the 90-day period commencing on May 23, 2019.  During a typical summer, American experiences a significant increase in passengers and aircraft utilization, in turn causing a significant increase in the wear and tear of aircraft.  By way of example, American increased the number of scheduled flights by 5.3% during the summer as compared to the spring of 2018, which in turn increases aircraft utilization but decreases the amount of time that each aircraft spends on the ground for maintenance.  Similarly, in summer 2018, the percent of seats occupied by revenue passengers increased by 4.0 percent spring over summer 2018.  The increased number of passengers over the summer increases wear and tear of aircraft.  In summer 2019 (as compared to spring 2019), American expects comparable increases in passengers and aircraft utilization to those that occurred between spring and summer 2018.

83.     American's routine scheduled maintenance checks are typically scheduled on intervals based on either aircraft flight hours, aircraft flight cycles (take off and landings), or in

some cases calendar days.  Because there are numerous checks that American must perform on its aircraft, and because American flies the aircraft more in the summer peak period, American is required to perform more checks on its aircraft during the summer in the normal course.  And because aircraft are flown more often in the summer, they tend to develop more mechanical discrepancies at a quicker rate.  For these reasons, even during normal operations, the number of AOS typically increases during the summer, as compared to less busy travel periods, and if the Union's activity continues, it will lead to an even greater increase in AOS, and in turn, a greater increase in maintenance-related delays and cancellations.

84.     Indeed, if the slowdown persists at the current level, American estimates that over the 90-day summer season, the Union's campaign will result in more than 2,200 maintenance-related cancellations or prolonged delays (of two hours or longer) that would not occur absent the slowdown.  These cancellations and delays will affect an estimated ***300,000 additional passengers*** over the summer (approximately 3,400 per day), and ***will cause an estimated 1.3 million additional hours of disruption for passengers***.

85.     Given the FAA's order grounding all Boeing 737 MAX planes (and American's subsequent removal of those flights from its summer schedule), American's remaining flights will likely be even fuller this summer, and both American and its passengers will be more vulnerable in response to disruptions because there is less room to rebook passengers on other flights.

**The Slowdown Has Irreparably Harmed The Public And American.**

86.     A showing of irreparable injury is not required for issuance of an injunction to stop a violation of Section 2, First of the RLA.  *See Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 303 (1989); *see also S. Ry. Co. v. Bhd. of Locomotive Firemen & Enginemen*, 337 F.2d 127, 133 (D.C. Cir. 1964) (same); *United Transp. Ass'n v. Ill. Cent. R.R.*

*Co.*, 1997 WL 560924, at *3 (N.D. Miss. Aug. 4, 1997) (same); *United Air Lines, Inc. v. Int'l Ass'n of Machinist & Aerospace Workers, AFL-CIO*, 243 F.3d at 362-64; *US Airways, Inc.*, 813 F. Supp. 2d at 736 (same); *United Air Lines, Inc. v. Air Line Pilots Ass'n., Int'l*, 2008 WL 4936847, at *45 (N.D. Ill. Nov. 17, 2008) (same).

87.     There can be no doubt, however, that the actions of the Union and its members are causing irreparable harm to the public, which will increase dramatically if this job action continues into the summer.  Since it began, the Union's campaign has affected over 125,000 customers in the form of cancelled or delayed flights—and an estimated additional 3,400 passengers will be harmed each day over the summer.  Each flight that is late or cancelled results in disruption to the customers' daily lives, including missing family events, vacation plans, and business obligations, each of which can negatively affect the lives of others as well.

88.     Delayed and cancelled flights also tarnish American's reputation in the marketplace by making customers unhappy and creating lost customer goodwill that cannot be replaced.  Many of the 125,000 customers impacted will undoubtedly question whether to fly American in the future.  If other things are equal, a passenger is more likely to choose an airline that he believes will arrive on time, and it is likely that certain of these passengers will never return.  Moreover, unhappy customers share their experience with friends and family, including more broadly through social media, thus eroding goodwill of other potential customers.

89.     The illegal slowdown has also caused harm to American because it has not been able to complete its scheduled maintenance plan before the busy summer months.  Because certain maintenance checks have longer frequencies between required checks, American can perform those checks before the summer peak starts to free up mechanics to work on other mechanical issues that arise in the summer in the normal course.  In December 2018 and January

2019, American identified over 2,700 maintenance tasks, which, if accomplished before the 2019

summer travel season, would have freed up over 15,000 mechanic hours to address other

unscheduled mechanical issues that arise in the normal course in the summer, thereby improving

operational dependability during the summer.  American estimated it could complete 95% of

these tasks (saving over 14,750 hours) before the summer began and started work on this project

on January 23, 2019.  As of approximately mid-February 2019, American was on pace to do so.

90.     The Union's illegal campaign, however, has forced American to devote more

resources to dealing with the additional aircraft out of service in the short-term.  Beginning in

mid-February, additional aircraft out of service in the short-term forced American to devote more

resources to dealing with those immediate problems rather than "pre-paying" maintenance in

advance of summer.  Shortly thereafter, American's pace on this project began to decline

dramatically.  Currently, American only expects to complete approximately 55-65% of its

targeted repairs, which will require it to work nearly 4,400 more hours than planned during the

summer.

91.     Similarly, the slowdown has forced American to expend significant time and

resources on efforts to mitigate the slowdown's impact that it could have dedicated elsewhere.

Notably, if American had not undertaken these actions, the impact of the slowdown on

American's operations would have been much worse.

**American Attempted To Resolve This Dispute Without Judicial Intervention.**

92.     On March 21, 2019, American informed the Union that its actions are a violation

of the RLA and requested that it take action to stop the slowdown.  American wrote that "[t]he

[Union's] March 8, 2019 communication instructing its members to '**stop all voluntary**

**actions**,' specifically including field trips, and to work to rule because we have not yet reached a

JCBA constitutes a violation of the [Union's] status quo obligations under the Railway Labor

Act."  American "specifically request[ed] that the [Union] rescind its March 8, 2019 directive,

and instruct its members to return to normal practices in terms of voluntary actions and to not

otherwise disturb the status quo in any way."

93.    In response, on March 26, 2019, the Union responded by denying the existence of

the slowdown, and referencing "the extreme frustration that our membership has expressed to us

with the slow pace of these negotiations."

94.    While the Union claimed that the March 8 letter was "unauthorized," the

indisputable evidence is to the contrary.  The March 8 letter was faxed with the Union's

Charlotte "GRIEVANCE COMMITTEE" header, was emailed by senior Union officials to other

union representatives, and was posted on Union bulletin boards and local Union websites.  And

while the Union asserted that "once the unauthorized posting was discovered, it was promptly

taken down from all locations and Union representatives were made aware that such

unauthorized communications are unacceptable," as of April 26, 2019, the Union's March 8

letter remained posted on at least one locked and glass encased union bulletin board.  And there

is no evidence that the Union issued a written rescission of the communication to its members as

requested by American.

95.    Subsequently, on April 25, 2019, following the most recent negotiation session,

American's lead negotiator informed a Union leader that American knew Union members were

engaged in a slowdown and that American expected the slowdown to stop as the parties

continued their negotiations.  Not only has the illegal slowdown continued unabated, it has

further intensified.

## CAUSE OF ACTION - VIOLATION OF RAILWAY LABOR ACT

96.     American realleges and incorporates by reference the allegations set forth in Paragraphs 1-95, inclusive.

97.     The Union's attempt to unlawfully create leverage in current negotiations for a new collective bargaining agreement by disrupting operations through a concerted and statistically significant change in the Union's members' normal behavior is a blatant violation of their obligations during collective bargaining under Section 2, First, of the RLA, as established by the applicable legal precedent. *See, e.g.*, *United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257 (7th Cir. 2009); *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300 (11th Cir. 2001); *United Air Lines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO*, 243 F.3d 349 (7th Cir. 2001); *Spirit Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 2017 WL 2271500 (S.D. Fla. May 9, 2017); *US Airways, Inc. v. US Airline Pilots Ass'n*, 813 F. Supp. 2d 710 (W.D.N.C. 2011); *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59 (D.D.C. 2017); *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 1999 WL 88778 (N.D. Tex. Feb. 10, 1999). These cases all arise in the identical context as here—a union attempting to put pressure on an airline in order to gain leverage in contract negotiations by disrupting operations—and all expressly confirm that in this situation, an injunction must issue.

98.     Section 2, First, of the RLA, 45 U.S.C. § 152, First, imposes an affirmative legal duty on employers, unions, and employees "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions . . . in order to avoid any interruption to commerce."  During negotiation of a CBA (which is ongoing between American and the Union), Section 2, First, imposes two obligations at issue here.  First, a union and its officers and members cannot instigate or encourage a slowdown (or any other concerted

change in normal behavior in order to disrupt operations and obtain leverage in contract

negotiations).  Second, a union must make all reasonable efforts to prevent or stop a slowdown.

Federal courts have repeatedly confirmed this.  *See, e.g.*, *United Air Lines, Inc. v. Air Line Pilots*

*Ass'n, Int'l*, 563 F.3d at 257; *Delta Air Lines, Inc.*, 238 F.3d at 1300; *United Air Lines, Inc. v.*

*Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO*, 243 F.3d at 349.  The Union is

violating both of these obligations.

99.     The obligation under Section 2, First, to refrain from engaging in slowdown

activities is "a substantive legal duty 'enforceable by whatever appropriate means might be

developed on a case-by-case basis.'  An injunction is an appropriate remedy to compel the

performance of this legal duty."  *Delta Air Lines*, 238 F.3d at 1308-09 (quoting *Chi. & N.W. Ry.*

*Co. v. United Transp. Union*, 402 U.S. 570, 577 (1971)).  Accordingly, federal courts are

authorized under Section 2, First, "to enjoin not only strikes but also 'union conduct . . . which

has the consequences of a strike,' such as refusal of overtime, slowdowns, and sit-ins."  *See*

*United Air Lines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO*, 243 F.3d at

362 (citing *Air Line Pilots Ass'n Int'l v. United Air Lines, Inc.*, 802 F.2d 886, 906 (7th Cir.

1986)).  In addition to enjoining such RLA violations, courts may enjoin imminent threats of

such violations.  *See*, *e.g.*, *Norfolk & W. Ry. Co. v. Bhd. of R.R. Signalmen*, 164 F.3d 847, 856

(4th Cir. 1998).

100.     American and the Union are currently engaged in negotiations for a CBA.

Accordingly, the concerted campaign by American's employees, at the direction of the Union, to

slow down in their duties violates Section 2, First, of the RLA.

## PROPRIETY OF INJUNCTIVE RELIEF

101.    A showing of irreparable injury is not required for issuance of a Section 2, First violation injunction.  *Consol. Rail Corp.*, 491 U.S. at 303; *see also United Air Lines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO*, 243 F.3d at 362-64.  Thus, upon a showing that a union or its members have altered their behavior on a concerted basis to gain leverage in negotiations, a preliminary injunction should issue as a matter of course.  The statistical evidence—paired with the Union's express directives to its members to alter their behavior—justify such relief without further analysis.

102.    Even if a showing of irreparable injury to American were required, American has suffered and will continue to suffer irreparable injury because of the Union's unlawful job actions.  As a direct result of the Union's illegal slowdown, American has suffered irreparable harm in the form of lost customer goodwill and a loss of reputation.

103.    American has no adequate remedy other than injunctive relief because of the irreparable harm it is suffering because of the illegal actions of the Union, and it will continue to suffer irreparable harm without injunctive relief.

104.    American's customers and the public are also suffering irreparable harm because of the illegal actions of the Union, and they will continue to suffer irreparable harm without injunctive relief.  The public interest alone warrants an injunction.

105.    The Union is engaged in an ongoing concerted effort to delay and interfere with American's operations.  A preliminary injunction is necessary in order to prevent this disruption to American's operations and the resultant damage to American's goodwill, brand, reputation, and relationship with its customers.  Absent a preliminary injunction, the Union's members will be free to continue to disrupt American's operations.

106.    As to each item of relief sought, greater injury will be inflicted on the public, American's customers, and American if such relief is denied than will be inflicted upon the Union by the granting of the relief sought.

WHEREFORE, American prays for relief as follows:

1.    That this Court issue a Preliminary Injunction and a Permanent Injunction, restraining and enjoining the Union, and its members, agents, and employees, and all persons and organizations acting by, in concert with, through or under it, or by and through its or their orders, including, but not limited to, affiliated entities, associated entities, and local unions, from calling, permitting, instigating, authorizing, encouraging, participating in, approving, or continuing any form of interference with American's airline operations, including, but not limited to, any strike, work stoppage, sick-out, slowdown, work to rule campaign, or any other concerted refusal to perform normal operations in violation of Section 2, First of the RLA.  By way of further example, this includes, but is not limited to, refusing to accept overtime, refusing to accept field trips, failing to complete maintenance repairs timely, slowing down in the performance of their job duties, and any other action intended to cause aircraft to be out of service (and specifically to cause aircraft out of service at 7 a.m.) or otherwise to cause flight delays or cancellations or interfere with American's operations, or threatening or intimidating any employee for accepting overtime or field trips or otherwise performing his or her job duties as he or she would in the normal course.

2.    That this Court further order that the Union shall take all reasonable steps within its power to prevent the aforesaid actions, and to refrain from continuing the aforesaid actions if commenced, including, but not limited to, the following:

a.   Instructing all employees represented by the Union and employed by American to resume their normal working schedules and practices, and providing American a copy of all such instructions;

b.   Notifying all employees represented by the Union and employed by American, by the most expeditious means possible, of the issuance, contents, and meaning of the injunctive relief ordered, and producing a copy of all such notices to American;

c.   Including in such notice a directive from the Union to its members employed by American not to engage in any concerted refusal to perform normal operations, including, but not limited to, any strike, work stoppage, sick-out, slowdown, work to rule campaign, or any other concerted refusal to perform normal operations, including, but not limited to, refusing to accept overtime, refusing to accept field trips, failing to complete maintenance repairs, slowing down in the performance of their job duties, and any other action intended to cause aircraft to be out of service (and specifically to cause aircraft out of service at 7 a.m.) or otherwise to result in delays or cancellations or interfere with American's operations, or in any way threatening or intimidating any employee for accepting overtime or field trips or otherwise performing his or her job duties as he or she would in the normal course, to cease and desist all such activity, and to cease and desist all exhortations or communications encouraging same upon pain of fine, suspension, or other sanction by the Union;

d.   Posting the notice described above on the Union's internet websites and social media accounts and providing American a copy of the notices;

     e.     Distributing the contents of such notice through all non-public communication systems maintained by the Union, including any text message distribution lists, or similar systems, and providing a copy of the notice to American.

     3.     That this Court further order that the Union is prohibited from including in such notices (or distributing contemporaneously with such notices) any statements that are intended, or could reasonably be interpreted to mean, that their members should continue to engage in the previously-described conduct notwithstanding the injunctive relief, including:

     a.     Any assertion that the injunctive relief does not prohibit individual employees from making voluntary decisions to engage in such actions; and

     b.     Any explanation of circumstances in which it would be appropriate or necessary for employees to engage in such actions prohibited by the injunctive relief.

     4.     That this Court further order that the Union report to the Court by 5 p.m. on the day following issuance of any injunctive relief, by sworn affidavit, the methods used by the Union to effect the notice described above to all its members and furnish to the Court copies of all notices required to be furnished to American by the Union under the injunctive relief ordered; and

     5.     Such other and further relief as the Court deems proper.

Respectfully submitted,
Dated:  May 20, 2019

*s/ Dee J. Kelly, Jr.*
Dee J. Kelly, Jr. (S.B. # 11217250)
Lars L. Berg (S.B. # 00787072)
Elizabeth A. Cuneo (S.B. # 24100166)
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Tel.: (817) 332-2500
Fax: (817) 878-9280
dee.kelly.2@kellyhart.com
lars.berg@kellyhart.com
elizabeth.cuneo@kellyhart.com

Robert A. Siegel (*pro hac vice* forthcoming)
Mark W. Robertson (*pro hac vice* forthcoming)
Sloane Ackerman (*pro hac vice* forthcoming)
O'Melveny & Myers LLP
7 Times Square
New York, New York 10036
Tel.: (212) 326-2000
Fax: (212) 326-2061
rsiegel@omm.com
mrobertson@omm.com
sackerman@omm.com

*Attorneys for Plaintiff American Airlines, Inc*