# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

AMERICAN AIRLINES, INC.,

                Plaintiff,

      v.

TRANSPORT WORKERS UNION OF
AMERICA, AFL-CIO, INTERNATIONAL
ASSOCIATION OF MACHINISTS AND
AEROSPACE WORKERS, and AIRLINE
MECHANIC AND RELATED EMPLOYEE
ASSOCIATION TWU/IAM,

                Defendants.

Civil Action No. 4:19-cv-00414-A

## PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION FOR TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ......................................................................................................................... 4

     I.     American Has a Substantial Likelihood of Success on the Merits ........................ 4

     II.    Irreparable Harm is Occurring on a Daily Basis .................................................... 11

     III.   There is no Threatened Harm to Defendants ......................................................... 13

     IV.   The Public Interest Strongly Supports Issuance of an Injunction ........................ 13

CONCLUSION .................................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Air Line Pilots Ass'n Int'l v. United Air Lines, Inc.*,
  802 F.2d 886 (7th Cir. 1986) ............................................................................................. 5

*Allied Pilots Ass'n v. Am. Airlines, Inc.*,
  643 F. Supp. 2d 123 (D.D.C. 2009) ................................................................................. 5, 7

*Am. Airlines, Inc. v. Allied Pilots Ass'n*,
  228 F.3d 574 (5th Cir. 2000) ............................................................................................. 8

*Am. Airlines, Inc. v. Allied Pilots Ass'n*,
  53 F. Supp. 2d 909 (N.D. Tex. 1999) ................................................................................. 6

*Am. Airlines, Inc. v. Allied Pilots Ass'n.*,
  1999 WL 88778 (N.D. Tex. Feb. 10, 1999) ...................................................................... 13

*Am. Train Dispatchers Dept. v. Fort Smith R.R. Co.*,
  121 F.3d 267 (7th Cir. 1997) ........................................................................................... 14

*Atlas Air, Inc. v. International Brotherhood of Teamsters*,
  280 F.Supp.3d 59 (D.D.C. 2017) ....................................................................................... 5

*BNSF Railway Co. v. BLET*,
  595 F. Supp. 2d 722 (N.D. Tex. 2008) ............................................................................. 11

*Byrum v. Landreth*,
  566 F.3d 442 (5th Cir. 2009) ........................................................................................... 14

*Celotex Corp. v. Oil, Chem. & Atomic Workers Int'l Union*,
  516 F.2d 242 (3d Cir. 1975) ............................................................................................. 14

*Chi. River & Indian R.R. Co. v. Bhd. of R.R. Trainmen*,
  229 F.2d 926 (7th Cir. 1956), *aff'd*, 353 U.S. 30 (1957) ................................................. 14

*Clark v. Prichard*,
  812 F.2d 991 (5th Cir. 1987) ............................................................................... 4, 11, 13, 14

*Conceal City, LLC v. Looper Law Enforcement*, LLC,
  2011 WL 5557421 (N.D. Tex. 2011) ................................................................................ 14

*Concerned Women for America Inc. v. Lafayette County*,
  883 F.2d 32 (5th Cir. 1989) ............................................................................................. 14

*Consolidated Rail Corp. v. Railway Labor Executives' Ass'n,*
  491 U.S. 299 (1989) ................................................................................ 11

*Cottonwood Financial Ltd. v. Cash Store Financial Services, Inc.*
  778 F. Supp. 2d 726 (N.D. Tex. 2011) .................................................. 14

*Delta Air Lines v. Air Line Pilots Ass'n, Int'l,*
  238 F.3d 1300 (11th Cir. 2001) ...................................................... 5, 6, 7, 14

*Janvey v. Alguire,*
  647 F.3d 585 (5th Cir. 2011) ......................................................... 4, 10, 11

*Local Lodge No. 1266, Int'l Ass'n of Machinists v. Panoramic Corp.,*
  668 F.2d 276 (7th Cir. 1981) ................................................................. 14

*Long Island R.R. Co. v. Sys. Fed'n No. 156,*
  368 F.2d 50 (2d Cir. 1966) ..................................................................... 6

*Speaks v. Krause,*
  445 F.3d 396 (5th Cir. 2006) ................................................................. 14

*Spirit Airlines, Inc. v. Air Line Pilots Ass'n, Int'l,*
  No. 0:17-cv-60917, 2017 WL 2271500 (S.D. Fla. May 9, 2017) ............ 6

*Tex. Int'l Airlines, Inc. v. Air Line Pilots Ass'n Int'l,*
  518 F. Supp. 203 (S.D. Tex. 1981) ......................................................... 6

*U.S. Airways v. U.S. Airline Pilots Ass'n,*
  813 F. Supp. 2d 710 (W.D.N.C. 2011) ............................................ 5, 6, 13

*United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l,*
  563 F.3d 257 (7th Cir. 2009) ............................................................ 6, 10

*United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l,*
  No. 08 CV 4317, 2008 WL 4936847 (N.D. Ill. Nov. 17, 2008) ....... 6, 7, 14

*United Air Lines, Inc. v. Int'l Ass'n of Machinist & Aerospace Workers,*
  243 F.3d 349 (7th Cir. 2001) ........................................................... 5, 6, 15

*Winter v. NRDC, Inc.,*
  555 U.S. 7 (2008) ..................................................................................... 4

**Statutes**

29 U.S.C. § 107(e) ....................................................................................... 4

45 U.S.C. § 152 ........................................................................................... 4

45 U.S.C. §151. ........................................................................................... 1

## PRELIMINARY STATEMENT

American Airlines, Inc. ("American") greatly appreciates this Court's expeditious scheduling of the trial on its request for a permanent injunction in this matter. Notwithstanding American's specific requests to Defendants that they stop the disruption (including with the commencement of this action), however, Defendants' illegal conduct has dramatically escalated and become devastating to the airline's operations, customers and employees. In the three weeks since the filing of the complaint and preliminary injunction motion, Defendants and their members have responded by intensifying their rallying cries, and have created an operational crisis that is disrupting the lives of approximately *11,000 passengers a day*. As a result, American now seeks immediate emergency relief in the form of a temporary restraining order ("TRO"). The TRO that American is seeking would only be in place pending a trial on the merits, require Defendants to do nothing more than comply with their statutory legal obligations, and would (if complied with) eliminate the operational crisis and protect American's operations and the traveling public pending completion of the trial scheduled for July 1.

On May 20, 2019, American filed its complaint in this matter, and on May 21, 2019, American filed its motion for a preliminary injunction and supporting declarations. American did not seek a TRO originally. Rather, it sought a preliminary injunction on an expedited basis. It did so in order to afford Defendants an opportunity to review and respond. It also did so with the expectation that—faced with judicial scrutiny of its behavior and the threat of injunctive relief—Defendants would immediately take steps to stop the slowdown as the Railway Labor Act, 45 U.S.C. §151 *et seq.* ("RLA") requires.

This Court did indeed schedule a prompt trial date (of July 1), but in the three weeks since American filed its lawsuit, Defendants have utterly failed to take any steps to stop the

1

slowdown—refusing to issue a single communication asking their members to return to normal operations. Rather, Defendants have only sought to intensify the slowdown by making public statements that if American does not accede to Defendants' demands in negotiations, American will continue to get a "bloodying of [its] brand" and "if this erupts into the bloodiest, ugliest battle that the United States labor movement ever saw, that's what's gonna happen." At the same time, Defendants have issued repeated communications to their members stating that American's lawsuit is "frivolous." Defendants have also taken out a full-page advertisement in the Wall Street Journal, purporting to warn investors of American's labor relations problems, referencing "**safety first**," and stating "**WE WILL NOT SURRENDER**." Because of Defendants' utter failure to take any steps to stop the slowdown, the situation is demonstrably worse than when American filed its complaint and the degradation has intensified to the point that emergency relief is required.

By way of example, in the 23 days since American filed its lawsuit, American has experienced *722 flight cancellations due to the maintenance slowdown*. This number of maintenance cancellations over only 23 days is almost 70% of the already significantly elevated number of maintenance cancellations it endured during *the entire 14-week period* leading up to the filing. And since June 7, American has averaged almost 80 maintenance-related flight cancellations or prolonged delays a day. APP0015-16 (¶ 15). Consequently, the number of passengers—in excess of what one would otherwise expect to see—who have had their lives disrupted due to the job action because of flight cancellations or substantial delays (i.e., two hours or longer) has *increased to approximately 11,000 passengers per day between June 7 and June 12*.

The additional evidence of the significant worsening of the situation that has forced

2

American to return to this Court seeking an immediate TRO pending the July 1 trial includes that:

- During the 23-day period from May 21 to June 12, 2019, there have been 16 outlier days for maintenance cancellations after controlling for factors systematically related to maintenance cancellations.  The probability that this is random as opposed to the result of concerted behavior *is far less than one in several billion.*

- During the ten-day period from June 4 to June 13, the already high number of aircraft out of service ("AOS") at 7 a.m. has intensified, averaging 61—the highest ten-day average American has experienced over the period of available AOS data. Over these ten days, there were four days in which AOS spiked above 60.  Prior to the start of the slowdown, there was not a single day *in all of 2017 or 2018 in which American experienced more than 60 AOS at 7 a.m.*

- For each of the past 10 days (i.e., between June 4 and June 13, 2019), the number of AOS at 7 a.m. has been a statistical outlier (i.e., it exceeds what one would predict would occur on 1% of days, after controlling for factors that are systematically related to aircraft out of service).  The probability that this is random as opposed to the result of concerted behavior *is far less than one in several trillion.*

- The number of open MELs has continued to rise, and has averaged 522 per day since American filed its complaint, up from an average of 457 between April 26 and May 13, 2019—i.e., an additional 65 open MELs on average that are attributable to the slowdown.

These catastrophic effects on American's operations are the direct result of the escalation in illegal activities of Defendants and their members, not the result of other factors—as confirmed by the regression analysis performed by Dr. Lee and submitted in support of this motion.

The irreparable harm Defendants and their members are inflicting on approximately 11,000 members of the public each day that they continue to refuse to take all reasonable and effective steps to stop the slowdown as required by the RLA warrants a TRO—which would only require them to comply with their existing legal obligations expressly imposed by statute. Nor should American—in the words of Defendants' leader—have to continue experiencing irreparable harm in the form of a "bloodying" of its brand.

As explained in the Declaration of American's President, Robert Isom, American does

not take the decision to seek emergency relief from this Court lightly, but has concluded that it must do so given the recent significant intensification in the slowdown activity and the resulting dramatic increase in harm to its customers, employees, and brand.  Accordingly, American now seeks an emergency TRO requiring Defendants to comply with their statutory obligations, and based on the facts set forth in its opening papers and below, American plainly satisfies each of the elements for issuance of a TRO.[1]

## **ARGUMENT**

A TRO is warranted if:  "(1) there is a substantial likelihood that the movant will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendant; and (4) the granting of the [] injunction will not disserve the public interest."  *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987); *see also Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011); *Winter v. NRDC, Inc.*, 555 U.S. 7 (2008).

In support of its motion for a preliminary injunction, American filed a Brief in Support of Plaintiff's Motion for Preliminary Injunction, the supporting Declarations of Jerrold A. Glass, Maria Oramas, Kerry F. Philipovitch, David Seymour, and Jim Weel, and the Expert Report of Dr. Darin N. Lee, Ph.D., alongside its Complaint (Docket Nos. 19 to 25 (collectively, the "Opening Papers")).  For the reasons set forth in American's Opening Papers, as well as in this brief and supporting documents, American has satisfied this standard and a TRO should issue.

---

[1] American does not seek to change the July 1 trial date, and will, of course, continue to meet all of the deadlines contained in the Court's scheduling order.  Under the Norris LaGuardia Act, however, a TRO such as the one requested here can only last five days before a preliminary injunction hearing must occur.  29 U.S.C. § 107(e).  Defendants, however, can waive the 5-day requirement so that any TRO issued could remain in place until this Court issues a decision following the trial, which would be appropriate here given the trial schedule already in place.  If Defendants refused, a preliminary injunction hearing or trial would need to occur within five days.

## I.     American Has a Substantial Likelihood of Success on the Merits[2]

Section 2, First, of the RLA, 45 U.S.C. § 152, First, imposes an affirmative legal duty on

employers, unions, and employees "to exert every reasonable effort to make and maintain

agreements concerning rates of pay, rules, and working conditions … in order to avoid any

interruption to commerce." Accordingly under Section 2, First, courts are authorized to enjoin

"'union conduct … which has the consequences of a strike,' such as refusal of overtime, [and]

slowdowns." *United Air Lines, Inc. v. Int'l Ass'n of Machinist & Aerospace Workers*, 243 F.3d

349, 362 (7th Cir. 2001) ("*UAL v. IAM*") (quoting *Air Line Pilots Ass'n Int'l v. United Air Lines,*

*Inc.*, 802 F.2d 886, 906 (7th Cir. 1986)).

Federal courts routinely invoke this principle to enjoin slowdowns. *See, e.g., Allied*

*Pilots Ass'n v. Am. Airlines, Inc.*, 643 F. Supp. 2d 123, 127-28 (D.D.C. 2009); *UAL v. IAM*, 243

F.3d at 361; *Atlas Air, Inc. v. International Brotherhood of Teamsters*, 280 F. Supp. 3d 59

(D.D.C. 2017); *Spirit Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, No. 0:17-cv-60917, 2017 WL

---

[2] In opposition to American's preliminary injunction motion, Defendants argue that the
slowdown raises a "minor dispute" under the RLA, over which this Court lacks jurisdiction.
(Docket No. 52 at 18.) A minor dispute turns on "the proper meaning or application of an
existing collective bargaining agreement," whereas a major dispute as here, "arises out of efforts
to form or change a collective bargaining agreement." *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*,
280 F. Supp. 3d 59, 78 (D.D.C. 2017) (citations omitted). Defendants fail to identify a single
case finding a minor dispute in circumstances as here. The "cases that have considered the
question … are uniform in holding that … slowdowns, and similar conduct targeted at an
ongoing, major dispute violates the status quo obligation contained in the RLA." *Id.* at 81. If
American were required first to challenge the slowdown in arbitration, it would undermine
completely Section 2, First. *Atlas Air, Inc.*, 280 F. Supp. 3d at 82. In any event, even if this
were a minor dispute (and it plainly is not), the Court would still have jurisdiction. Courts have
repeatedly held "even when a dispute has been found to be minor, a trial court may exercise
equitable power to impose conditions requiring the [party] to maintain the status quo, pending
resolution of the dispute." *See, e.g., Air Line Pilots Ass'n, Int'l v. Eastern Air Lines, Inc.*, 869
F.2d 1518, 1520, n.2 (D.C. Cir. 1989). The remainder of the arguments made by Defendants in
their June 11, 2019 opposition brief do nothing to diminish American's likelihood of success.
Indeed, they are all arguments that unions routinely make in similar litigation and that courts
routinely reject. *See, e.g., Delta Air Lines, Inc.*, 238 F.3d 1300; *UAL v. IAM*, 243 F.3d 349; *U.S.*
*Airways, Inc.*, 813 F. Supp. 2d 710; *Atlas Air, Inc.*, 280 F. Supp. 3d 59.

2271500, at *1-2 (S.D. Fla. May 9, 2017); *U.S. Airways v. U.S. Airline Pilots Ass'n*, 813 F. Supp. 2d 710, 735-37 (W.D.N.C. 2011); *United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, No. 08 CV 4317, 2008 WL 4936847, at *44-46 (N.D. Ill. Nov. 17, 2008) ("*UAL v. ALPA I*"); *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 53 F. Supp. 2d 909 (N.D. Tex. 1999); *Long Island R.R. Co. v. Sys. Fed'n No. 156*, 368 F.2d 50, 52-53 (2d Cir. 1966); *Tex. Int'l Airlines, Inc. v. Air Line Pilots Ass'n Int'l*, 518 F. Supp. 203, 218 (S.D. Tex. 1981).

During negotiation of a collective bargaining agreement (which is ongoing between American and Defendants), Section 2, First, imposes two obligations at issue here. First, a union and its officers and members cannot instigate or encourage a slowdown (or any other concerted change in normal behavior in order to disrupt operations and obtain leverage in contract negotiations). *UAL v. IAM*, 243 F.3d at 362; *United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 273-74 (7th Cir. 2009) ("*UAL v. ALPA II*"). Second, a union must make all reasonable efforts to prevent or stop a slowdown, *even if it did not instigate or encourage it. See, e.g.*, *UAL v. ALPA II*, 563 F.3d at 257; *Delta Air Lines, Inc.*, 238 F.3d 1300, 1309-10 (11th Cir. 2001); *UAL v. IAM*, 243 F.3d at 362. Thus, to satisfy the likelihood of success on the merits requirement, American need only show that it has a substantial likelihood that Defendants' members are engaging in concerted action that is disrupting American's operations, and that Defendants have failed to take all reasonable and effective efforts to stop it.

As set forth in American's Opening Papers, there is overwhelming evidence that mechanics are en masse taking an inordinately long time to repair aircraft, resulting in a dramatic increase in outstanding maintenance write-ups and contributing to a spike in AOS. (Memorandum of Law in Support of Plaintiff's Motion for a Preliminary Injunction ("PI Mtn.") at 11-14.) There is also overwhelming evidence that mechanics are en masse refusing

to work overtime and take maintenance field trips to repair aircraft. (PI Mtn. at 14.)[3]

Moreover, as detailed in Report of Darin N. Lee, Ph.D. In Support of Plaintiff's Motion for Temporary Restraining Order, filed concurrently with this Motion, since American filed this lawsuit, the level of concerted activity and resulting disruption has significantly worsened. For example, there has been a dramatic increase in maintenance-related flight cancellations since American filed its complaint. In just the 23 days since American filed this lawsuit, American has been forced to cancel *722 flights* due to maintenance—*almost 70% of* the number of cancellations American experienced during the ***entire 14-week period*** leading up to American's filing of this lawsuit. APP0007 (¶ 6). The maintenance cancellations during the last 23 days represent a 126% increase over an average of 319 flights cancelled due to maintenance during the same period from last year, and a 259% increase over the 201 maintenance cancellations from the same period from two years ago. (*Id.*) Moreover, while maintenance cancellations were already extremely elevated leading up to American's filing compared to the same periods in prior years, the degree that maintenance cancellations have increased compared to the same period during 2017 and 2018 has become significantly more pronounced since American filed this lawsuit. APP0007-09 (¶¶ 6 & 7); *see Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574,

---

[3] Even if the parties' collective bargaining agreements do not require employees to do certain things on an *individual* basis (such as work overtime), changed conduct on a *concerted* basis (such as refusing to accept overtime en masse) to disrupt operations and exert economic leverage against a carrier during negotiations is prohibited. *See, e.g., Allied Pilots Ass'n. v. Am. Airlines, Inc.*, 643 F. Supp. 2d 123, 127-32 (D.D.C. 2009) (relying on the conclusion of "numerous other courts[,] that . . . voluntary open time avoidance campaigns . . . violate the RLA."); *Delta Air Lines,* 238 F.3d at 1307-09 ("We reject ALPA's contention that the CBA 'arguably' allows *all* pilots to refuse to work overtime when *it is clear industry practice to structure flight schedules with 'open time' built in . . . . [A]n expectation that not all of the pilots will choose to refrain from working overtime at the same time . . . is implicit in the CBA.* ") (second emphasis added); *UAL v. ALPA I,* 2008 WL 4936847 at *40 ("Section 2, First prohibits employees from engaging in concerted action to put economic pressure on the carrier *even where the employees have a right under the existing collective bargaining agreement to take the action in question.*") (emphasis added).

577, 583 (5th Cir. 2000) (finding that the number of flight cancellations on a single day as compared to the cancellations during a previous three-day period indicated that the union had ramped up its unlawful concerted action).

Moreover, during the 23-day period from May 21 to June 13, 2019, there have been 16 outlier days for maintenance cancellations (i.e., the number of MX cancellations exceeds what one would predict would occur on 1% of days, after controlling for factors that are systematically related to maintenance cancellations). APP0009-10 (¶ 8). The probability of observing 16 outlier days over a 23-day period is far less than *one in several billion*. APP0010 (¶ 8).

The same is true with aircraft out of service ("AOS"). During the ten-day period from June 4 to June 13, there were four days in which AOS spiked above 60. APP0011-12 (¶ 10). By comparison, during the entirety of 2017 and the entirety of 2018, American did not experience more than 60 AOS at 7 a.m. on a single day. APP0012 (¶ 10). Further, on each day between June 4 and June 13, 2019, AOS at 7 a.m. has been a statistical outlier (i.e., it has exceeded what one would predict would occur on 1% of days, after controlling for factors that are systematically related to aircraft out of service). APP0013 (¶ 11). The probability of observing 10 consecutive outlier days is *far less than one in several trillion*. (*Id.*) And this comes at a time when American has acquired newer aircraft that require less maintenance and have more mechanics to perform needed maintenance work. APP0139 (¶ 4). As explained in American's Opening Papers, American has structured its maintenance program around at most 35 unscheduled AOS at 7 a.m. (PI Mtn. at 13); APP0139 (¶ 4). Thus, if American has more than 35 unscheduled AOS at 7 a.m., it is likely to result in a flight delay and/or cancellation.

Similarly, the number of open MELs has continued to rise, and has averaged 522 since American filed its complaint (and 546 for the week ending June 12), up from an average of 457 between April 26 and May 13, 2019.  APP0013-14 (¶¶ 12 & 13).[4]

There is also a substantial likelihood of American showing that Defendants have failed to take all reasonable steps to stop this concerted change in behavior.  Indeed, on this point, American is substantially likely to demonstrate that Defendants *have utterly failed to take any action to stop it*, and instead have repeatedly made statements to encourage it under the guise of fighting back against the lawsuit.

American is unaware of a single publication or other communication that Defendants have issued telling their members to resume normal operations.  Defendants, however, have made several statements that on their face appear designed to incite anger and continued concerted behavior.  For example, on May 21, 2019—the day after American filed its complaint and the same day it filed its preliminary injunction motion—TWU's International President John Samuelsen attended a town hall meeting at LaGuardia Airport in New York led by American's President Robert Isom before a room of union-represented American employees.  APP0027-28 (¶ 3).  During that meeting, Mr. Samuelsen stated that unless American goes Defendants' way in

---

[4] As detailed in American's PI Mtn. and the Declaration of David Seymour, MEL stands for Minimum Equipment List, which is a maintenance discrepancy that does not need to be fixed immediately.  (PI Mtn. at 10-11; Appendix to Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for a Preliminary Injunction ("Opening Appendix") at APP0121 (¶ 8).)  Rather, a MEL may be deferred for a specific but limited time allowing the aircraft to be repaired at a more convenient time.  (Opening Appendix at APP0121-0122 (¶ 8).)  MELs do not affect an aircraft's airworthiness but could impose certain limitations.  (Opening Appendix at APP0122 (¶ 8).)  This allows American to operate safely, while also ensuring that American is not continuously pulling aircraft out of service.  (*Id.*)  If a MEL is not repaired within the required timeframe, however, it expires and the aircraft cannot be flown until it is repaired.  (*Id.*)  Accordingly, a large number of open MELs at any given time makes it more likely that one or more MELs will expire, which in turn means that American will have to remove those aircraft from service.  (*Id.*)  Thus, prompt resolution of MELs plays a crucial role in ensuring that aircraft remain in service.  (PI Mtn. at 11-12; Opening Appendix at APP0121-0122 (¶ 8.).)

terms of certain aspects of the parties' negotiations regarding scope of work, "*all [American's] going to get is a bloodying of [its] brand*" and that "*if this erupts into the bloodiest, ugliest battle that the United States labor movement ever saw, that's what's gonna happen.*" APP0038 (Ex. 1 at 6:17-18); APP0035 (Ex. 1 at 3:7:10). The TWU has since posted this video on the TWU International's public Vimeo website page, where it has been viewed over 38,100 times. APP0028 (¶ 5).

And on May 24, TWU Local 591 released a podcast that encouraged mechanics to work safe. APP0093 (Ex. 2). After discussing why he believed American's contract proposals were inadequate, TWU Local 591 President Gary Schaible stated that, "as always remember to work in accordance with all rules, regulations, and manuals that American Airlines has. . . . As always, please work safe and most of all stay safe." APP0093 (Ex. 2 at 44:16-22); *see, e.g., UAL v. ALPA II*, 563 F.3d 257, 272 (7th Cir. 2009) ("Phrases such as 'work safe,' 'work by the book,' 'adhere to strict contractual requirements,' 'not to neglect even the most minor write ups,' 'check every item on the checklists,' [are] all recognized as coded signals to engage in a slowdown.").

And on June 6, 2019, the Association published a bulletin to its members, claiming that "American Airlines is pushing forward with its frivolous lawsuit in a Fort Worth, TX Federal Court." APP0108 (Ex. 4). At the same time, the Association posted an open letter to American's President, Robert Isom that also attacked American's "frivolous lawsuit." APP0106 (Ex. 3). And on June 10, 2019, Defendants took out a full page advertisement in the Wall Street Journal purporting to warn American's investors that American's labor relation problems would hurt its performance, while stating, "**We will always put safety first,**" and concluding with, "**WE WILL NOT SURRENDER!**" APP0110 (Ex. 5).

Defendants' members are following suit. On May 21, 2019, handwritten notes on a

copy of an American publication referencing the lawsuit was found in an American

mechanics-only area of Los Angeles International Airport (LAX) that states, *inter alia*:

"THIS PROVES IF WE SHUT THEM DOWN THEY <u>WILL</u> CAVE!!" and "SHUT THIS

BITCH DOWN!!" APP0117 (Ex. 1).  Further, on May 23, 2019, a flyer was found in a

mechanics-only area of Charlotte International Airport:  "JUST SAY NO TO OVERTIME

IT'S NOT A CONTRACTUAL ISSUE." APP0136 (Ex. 1).  And on May 27, 2019, an

employee provided a manager at LAX with a handwritten note on a list of employees who had

accepted overtime stating: "Always a sucker willing to suck, NO OT 5/24-5/26." APP0121

(Ex. 3).  The employee also confirmed that there was a union-directed ban on overtime during

the May 24-26 period.  APP0114 (¶ 6).

## II.    Irreparable Harm Is Occurring on a Daily Basis.

The second requirement for obtaining a TRO in an action outside the RLA is a showing

that "there is a substantial threat that irreparable harm will result if the injunction is not granted."

*Clark,* 812 F.2d at 993; *see also Janvey,* 647 F.3d at 595.  Under the RLA, however, a federal

court can "enjoin a violation of the status quo . . . without the customary showing of irreparable

injury." *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 303 (1989);

*BNSF Railway Co. v. BLET*, 595 F. Supp. 2d 722, 729-730 (N.D. Tex. 2008) ("This may be done

without the showing of irreparable injury normally required to obtain injunctive relief.").

Indeed, Defendants concede that a showing of irreparable harm is not required for American to

obtain an injunction in this case.  (Defs.' Response in Opp. to Pl.'s Mot. for a Prelim. Injunction

& Supporting Br. at 18 n.3.)

In any event, American has demonstrated much more than a substantial threat of

irreparable harm; it has demonstrated actual irreparable harm to both the traveling public and its

11

business that is occurring each day the slowdown continues.  As detailed in Dr. Lee's supplemental report in support of this TRO motion, between May 20 and June 6, 2019, an average of more than *6,300 additional passengers per day* on American have had their travel plans disrupted due to both the direct and indirect impacts of changes in behavior by the Company's mechanics.  APP0005-06 (¶ 4); APP0015-16 (¶ 15).  And since June 7, it has increased to approximately *11,000 per day*.  APP0006 (¶ 4).  This means that, since American filed its lawsuit on May 21, more than *175,000 members* of the traveling public have had their travel plans and daily lives disrupted (which for many of these passengers undoubtedly means missing weddings, funerals, graduations, and numerous other family, life and business events and once-in-a-lifetime trips they can never replicate, meaning the passenger may choose never to fly American again) due to the slowdown.  APP0140 (¶ 7).  In the last four days alone (June 9-12, 2019), American's maintenance-related cancellations have caused a direct, and significantly negative impact to more than 40,000 customers, and approximately 2,000 American pilots and flight attendants, and directly and indirectly affected many more of American's employees.  APP0140 (¶ 5).

Cancelled flights, of course, translate directly into irreparable harm to American, including damage to its business reputation and customer goodwill, none of which may be recoverable from Defendants and much of which can never be recovered.  (Opening Appendix at APP0116-APP0117 (¶¶ 7-9).  In the last three weeks, customer complaints have skyrocketed to an unprecedented level.  The number of complaints has risen to the point that American simply does not have the capacity to respond to, or remedy, all of its customers' concerns, and the harm to American's goodwill that is occurring each day is likely not completely repairable.  APP0140 (¶ 7); *see also Am. Airlines, Inc. v. Allied Pilots Ass'n.,* 1999 WL 88778, at *1 (N.D. Tex. Feb.

10, 1999) (enjoining union sick-out when "American will lose traffic which it may never regain in its airline system, and may be compelled to curtail substantially or eliminate transportation services which will deprive large numbers of the public of essential service, all of which will cause irreparable damage and injury to American for which it has no adequate remedy at law, as well as serious and substantial damage to the public interest").  The next three weeks will be the busiest of the summer and among the busiest of the year for American.  Thus, this is the time of year in which the disruption to its schedule and operation from the illegal work action being undertaken by the Defendants and their members would have the most extreme impact on American's customers, team and brand.  APP0141 (¶ 9).

## III.    There Is No Threatened Harm To Defendants

The third requirement for a TRO is that the "threatened injury outweighs the threatened harm to the defendant."  *Clark,* 812 F.2d at 9 993; *see also Janvey,* 647 F.3d at 595.  While American and the travelling public are suffering significant harm each day, the issuance of a TRO would not cause Defendants any harm.  Rather, the TRO would simply prohibit Defendants from engaging in activity that is illegal under the RLA, and would only be in effect pending a hearing on American's Motion for Preliminary Injunction or trial on its request for permanent injunctive relief. *See U.S. Airways,* 813 F. Supp. 2d at 736-37 ("On one side, rests the enormous disruption and harm to US Airways and the traveling public, while on the other side, rests no legally cognizable harm to USAPA because an injunction would only require it to satisfy its

existing legal duty under the RLA."); *UAL v. ALPA I*, 2008 WL 4936847 at \*45 (injunction "merely requires them to satisfy their existing legal obligations under the RLA").[5]

## IV.   <u>The Public Interest Strongly Supports Issuance of an Injunction.</u>

The final requirement for issuance of a TRO is that "the granting of [it] will not disserve the public interest. *Clark*, 812 F.2d at 993; *see also Cottonwood Financial Ltd. v. Cash Store Financial Services, Inc.* 778 F. Supp. 2d 726, 760 (N.D. Tex. 2011); *Speaks v. Krause*, 445 F.3d 396, 400 (5th Cir. 2006); *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009); *Concerned Women for America Inc. v. Lafayette County*, 883 F.2d 32, 34 (5th Cir. 1989). "The focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Conceal City, LLC v. Looper Law Enforcement*, LLC, 2011 WL 5557421 at \*8 (N.D. Tex. 2011).

No critical public interest would be harmed by the grant of a temporary restraining order. Rather, the public interest strongly supports issuance of a TRO where, as here, the lives of the traveling public are disrupted (often irreparably) by each additional cancellation or delay caused by Defendants' illegal activity. *See, e.g., Am. Train Dispatchers Dept. v. Fort Smith R.R. Co.*, 121 F.3d 267, 268 (7th Cir. 1997) (strike in violation of RLA enjoined because of disruption to commerce and inconvenience to passengers); *Chi. River & Indian R.R. Co. v. Bhd. of R.R. Trainmen*, 229 F.2d 926, 932 (7th Cir. 1956), *aff'd*, 353 U.S. 30 (1957) (interruption to

---

[5] Unlike typical TRO situations where the defendant has little or no notice, Defendants have had American's Opening Papers for more than three weeks—and filed an opposition brief on June 11, 2019. Thus, Defendants have no basis to seek delay of a TRO hearing if the Court deems a hearing necessary, although a hearing is not required for issuance of a TRO. *See, e.g., Delta Air Lines v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300, 1305-06 (11th Cir. 2001); *Local Lodge No. 1266, Int'l Ass'n of Machinists v. Panoramic Corp.*, 668 F.2d 276, 291 n.17 (7th Cir. 1981); *Celotex Corp. v. Oil, Chem. & Atomic Workers Int'l Union*, 516 F.2d 242, 247 (3d Cir. 1975); *Spirit Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 2017 WL 2271500 (S.D. Fla. May 9, 2017).

transportation system is, in and of itself, sufficient irreparable injury to justify injunction).[6]

## CONCLUSION

Under these facts, a TRO is warranted in order to stop the significantly worse disruption to American's operations and the increasing irreparable harm to it and the traveling public and American's employees each day that Defendants refuse to comply with their obligations under the RLA.  Of course, Defendants would only have to comply with its existing and express statutory obligations until a decision is issued on the trial on the merits.  Thus, American respectfully requests that, if this Court concludes that a hearing is necessary, it schedule a TRO hearing as soon as feasible and issue a TRO barring Defendants from engaging in an illegal slowdown pending completion of the trial in this matter.

Respectfully submitted,

Dated:  June 14, 2019

Dee J. Kelly, Jr. (S.B. # 11217250)
Lars L. Berg (S.B. # 00787072)
Elizabeth A. Cuneo (S.B. # 24100166)
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Tel.: (817) 332-2500
Fax: (817) 878-9280
dee.kelly.2@kellyhart.com
lars.berg@kellyhart.com
elizabeth.cuneo@kellyhart.com

Robert A. Siegel (*pro hac vice*)
Mark W. Robertson (*pro hac vice*)
Sloane Ackerman (*pro hac vice*)
Rachel S. Janger (*pro hac vice*)
O'Melveny & Myers LLP
7 Times Square
New York, New York 10036
Tel.: (212) 326-2000
Fax: (212) 326-2061
rsiegel@omm.com
mrobertson@omm.com

---

[6] Faced with this unfavorable balance, unions frequently argue that issuance of an injunction would raise safety concerns —for example, that an injunction would somehow prohibit mechanics from writing up maintenance issues.  This argument fails.  The relief sought by American will merely prohibit Defendants from engaging in this illegal slowdown and require it to take reasonable steps to stop it, but in no way removes or limits individual mechanics' discretion.  The law does not permit fabrications regarding safety in order to inflict economic harm on American to obtain what Defendants believe would be a more favorable contract. *See, e.g.*, *United Air Lines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers AFL-CIO*, 243 F.3d 349, 368 n.14 (7th Cir. 2001).

sackerman@omm.com
rjanger@omm.com

*Attorneys for Plaintiff American Airlines, Inc.*

## CERTIFICATE OF SERVICE

I certify that on June 14, 2019, a true and correct copy of the foregoing document was served

upon all persons who have requested notice and service of pleadings in this case via the Court's

ECF system.

Lars L. Berg