

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

Civil Action No. 4:19-cv -00414-A

AMERICAN AIRLINES, INC.,

     Plaintiff,

  v.

TRANSPORT WORKERS UNION OF
AMERICA, AFL-CIO, INTERNATIONAL
ASSOCIATION OF MACHINISTS AND
AEROSPACE WORKERS, and AIRLINE
MECHANIC AND RELATED EMPLOYEE
ASSOCIATION TWU/IAM,

     Defendants.

## APPENDIX TO AMERICAN AIRLINES, INC.'S MOTION FOR IMMEDIATE MODIFICATION OF TEMPORARY RESTRAINING ORDER

   In accordance with the United States District Court Northern District of Texas Local Rule

7.1(i), Plaintiff American Airlines, Inc. ("American") submits the following appendix to its Motion

for Immediate Modification of Temporary Restraining Order.

| Tab | DESCRIPTION | APP. PAGES |
|---|---|---|
| Tab A. | Declaration of James "Pat" Flynn in Support of Plaintiff's Motion for Immediate Modification of Temporary Restraining Order | APP0001 – APP0005 |
| Tab B. | Declaration of Scott Ramsay in Support of Plaintiff's Motion for Immediate Modification of Temporary Restraining Order | APP0006 – APP0009 |
| Tab C. | Declaration of Christy Baker in Support of Plaintiff's Motion for Immediate Modification of Temporary Restraining Order | APP0010 – APP0012 |
| Tab D. | Declaration of Darin N. Lee, Ph.D., in Support of Plaintiff's Motion for Immediate Modification of Temporary Restraining Order | APP0013 – APP0037 |
| Tab E. | Proposed Modifications to June 14, 2019 Temporary Restraining Order | APP0038 – APP0043 |

Respectfully submitted,

Dated: July 10, 2019

Dee J. Kelly, Jr. (S.B. # 11217250)
Lars L. Berg (S.B. # 00787872)
Elizabeth A. Cuneo (S.B. # 24100166)
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Tel.: (817) 332-2500
Fax: (817) 878-9280
dee.kelly.2@kellyhart.com
lars.berg@kellyhart.com
elizabeth.cuneo@kellyhart.com

Robert A. Siegel (*pro hac vice*)
Mark W. Robertson (*pro hac vice*)
Sloane Ackerman (*pro hac vice*)
Rachel S. Janger (*pro hac vice*)
O'Melveny & Myers LLP
7 Times Square
New York, New York 10036
Tel.: (212) 326-2000
Fax: (212) 326-2061
rsiegel@omm.com
mrobertson@omm.com
sackerman@omm.com
rjanger@omm.com

*Attorneys for Plaintiff American Airlines, Inc.*

## CERTIFICATE OF SERVICE

I certify that on July 10, 2019, a true and correct copy of the foregoing document was served upon all persons who have requested notice and service of pleadings in this case via the Court's ECF system.

Elizabeth A. Cuneo

# TAB A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| AMERICAN AIRLINES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, and AIRLINE MECHANIC AND RELATED EMPLOYEE ASSOCIATION TWU/IAM,<br><br>Defendants. | Civil Action No. 4:190-cv-00414-A |

### DECLARATION OF JAMES "PAT" FLYNN

I, JAMES "PAT" FLYNN, declare and state as follows:

1.     I work at American Airlines, Inc. ("American") as a Senior Manager Line Maintenance, at the Philadelphia International Airport in Philadelphia, Pennsylvania. I have held this position for three years. I have personal knowledge of the facts set forth below and if called as a witness in this matter, I could and would competently testify to the below facts.

2.     In Philadelphia, when line maintenance management determines that it needs mechanics to work overtime, a member of the Philadelphia administrative staff with responsibility for line maintenance first reviews a list of mechanics provided by the International Association of Machinists and Aerospace Workers ("IAM") at the beginning of every shift. The administrative staff member then "qualifies" the list of mechanics, i.e., determines who can be called for overtime based on criteria agreed-upon between American and the IAM. The administrative staff member then contacts the IAM shop steward on site and provides him/her

1

with the qualified list and the number of mechanics American is requesting for overtime. Generally, the request is for eight hours of overtime per mechanic, although we occasionally request only four hours, but never under four hours. The shop steward is then supposed to call mechanics in the order presented on the list to determine if they are willing to work the needed overtime.

3.     Once the shop steward completes this task, he/she provides the line maintenance supervisor with the names of mechanics who have accepted the overtime proffer.

4.     Between July 1 and July 7, 2019, no airline maintenance technician ("AMT") accepted overtime work proffered in Philadelphia. The following lists the number of AMTs we needed to work each shift during the period July 1 – July 7, the number of overtime hours requested, the number of AMTs who were qualified to work those shifts, and the number of AMTs who accepted (which was zero for all such requests).

| Date | Shift | Number of AMTs Requested | Total OT Hours Requested | Qualified AMTs | Number of AMTs Who Accepted |
|---|---|---|---|---|---|
| July 1 | 3 | 10 | 80 | 133 | 0 |
| July 1 | 1 | 5 | 40 | 162 | 0 |
| July 1 | 2 | 8 | 64 | 136 | 0 |
| July 2 | 3 | 10 | 80 | 127 | 0 |
| July 2 | 1 | 10 | 80 | 152 | 0 |
| July 2 | 2 | 10 | 80 | 141 | 0 |
| July 3 | 2 | 4 | 32 | List not generated[1] | 0 |

---

[1] On July 3, 2019, the IAM informed American that it was unable to print the list of AMTs to determine who qualified for an overtime proffer. American could not print it either due to an IT issue that was resolved during a subsequent shift. Because I did not expect that we would

APP0003

| July 4 | 3 | 6 | 48 | 66 | 0 |
|--------|---|---|----|----|---|
| July 4 | 1 | 4 | 32 | 149 | 0 |
| July 4 | 2 | 8 | 64 | 133 | 0 |
| July 5 | 3 | 6 | 48 | 92 | 0 |
| July 5 | 1 | 5 | 48 | 150 | 0 |
| July 5 | 2 | 10 | 96 | 144 | 0 |
| July 6 | 3 | 10 | 88 | 84 | 0 |
| July 6 | 1 | 10 | 88 | 112 | 0 |
| July 6 | 2 | 12 | 112 | 181 | 0 |
| July 7 | 3 | 10 | 88 | 86 | 0 |
| July 7 | 1 | 10 | 96 | 185 | 0 |
| July 7 | 2 | 12 | 112 | 188 | 0 |
| TOTAL | n/a | 160 | 1376 | 2421 | 0 |

5.      I reviewed our database to confirm no individuals worked proffered overtime hours between July 1 and July 7, 2019. While no individuals accepted proffered overtime as set forth in the chart above, certain individual did work overtime in what is known as a "job continuation." Job continuation occurs when a mechanic is working on a maintenance project and stays beyond the end of his/her shift. A job continuation rarely, if ever, extends beyond three hours.

6.      Of those individuals who our database indicates worked more than four hours of overtime on any day between July 1 and July 7, 2019, none of those worked proffered overtime.

---

receive any overtime takers given that we had no overtime takers the prior two days, I did not hand write the list and no overtime was proffered.

APP0004

One individual who is listed in our database as having worked overtime hours on July 2, 2019, had a time code of "CB," which means "Company Business." That was coded in error. That individual was on "Union Business" and performed no maintenance duties on July 2, 2019. Another individual who was listed as working overtime hours was not working proffered overtime, but instead was working on a special project for American outside of the proffered overtime process. This was the first and only time a mechanic in Philadelphia was asked to perform this special project. Finally, one other individual who was listed as having worked overtime hours was listed with the time code of "training coverage," which indicates that he did not perform proffered overtime.

7.     On July 1, 2019, American requested that a mechanic in Philadelphia from the first shift take a field trip to Nashville. And on July 7, American requested that two mechanics in Philadelphia from the second shift take a field trip to Minneapolis-St. Paul. American was unable to staff either field trip with a mechanic from Philadelphia.

I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct.

Executed this 10th day of July, 2019 at Philadelphia, Pennsylvania.

James "Pat" Flynn

4

# TAB B

APP0006

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

|  |  |
|---|---|
| AMERICAN AIRLINES, INC.,<br><br>                    Plaintiff,<br><br>        v.<br><br>TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, and AIRLINE MECHANIC AND RELATED EMPLOYEE ASSOCIATION TWU/IAM,<br><br>                    Defendants. | Civil Action No. 4:19-cv-00414-A |

## DECLARATION OF SCOTT RAMSAY

I, SCOTT RAMSAY, declare and state as follows:

1.    I work at American Airlines, Inc. ("American") in Fort Worth, Texas as Managing Director, Integrated Operations Center. In this position, I have oversight of American's system operations group that determines which scheduled flights will operate and which flights will be cancelled or delayed. I have personal knowledge of the facts set forth below and if called as a witness in this matter, I could and would competently testify to the below facts.

2.    Starting in February 2019, American has experienced a dramatic increase in unscheduled aircraft out of service ("AOS"). American has a target of 35 unscheduled AOS at 7:00 a.m. and has historically come close to meeting that target. Specifically, for calendar year 2017, American averaged 36 unscheduled AOS at 7:00 a.m., and for calendar year 2018, it

1

averaged 38 unscheduled AOS at 7:00 a.m. Recently, however, American has routinely experienced unscheduled AOS at 7:00 a.m. in the high-50s and low-60s.

3.      A large number of unscheduled AOS inevitably causes long delays and cancellations as aircraft linger out of service and American lacks spare or alternative aircraft to complete scheduled flights.

4.      Starting on June 15, 2019, American decided to implement a program of "pre-cancelling" flights, designed to proactively address the disruption high levels of unscheduled AOS (and the subsequent delays and cancellations) were causing American's passengers. This pre-emptive cancel program remained in place until July 1. While this program was in place, we would examine the number of unscheduled AOS by city and by sub-fleet, and determine which cities that we believed lacked the available aircraft to complete their scheduled flights because of the elevated unscheduled AOS. We would then select flights to pre-cancel in an attempt to mitigate passenger inconvenience, seek advance re-accommodation of those passengers, and maximize operational performance. American created this program in an attempt to help preserve customer goodwill by cancelling flights well in advance of their scheduled departure time, so that customers had more time to make alternative arrangements and/or to rebook.

5.      American implemented the pre-cancel program in direct response to the consistently high levels of unscheduled AOS that it has experienced since February and would not have implemented the program but for the consistently high levels of unscheduled AOS it has experienced since February. Because American is able to give customers more options, the pre-cancel program has worked to reduce modestly the impact to our customers from the high levels of unscheduled AOS and resulting maintenance-related cancellations and delays.

6.      American suspended the pre-cancel program on July 1.

2

I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct.

Executed this 9th day of July, 2019 at Fort Worth, Texas.

Scott Ramsay

3

APP0009

# TAB C

APP0010

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| AMERICAN AIRLINES, INC.,<br><br>            Plaintiff,<br><br>      v.<br><br>TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, and AIRLINE MECHANIC AND RELATED EMPLOYEE ASSOCIATION TWU/IAM,<br><br>            Defendants. | Civil Action No. 4:190-cv-00414-A |

### DECLARATION OF CHRISTY BAKER

I, CHRISTY BAKER, declare and state as follows:

1.      I work at American Airlines, Inc. ("American") as a Supervisor, Stores at the Philadelphia International Airport in Philadelphia, Pennsylvania. I have held this position since March 2015. I have personal knowledge of the facts set forth below and if called as a witness in this matter, I could and would competently testify to the below facts.

2.      In Philadelphia, the International Association of Machinists and Aerospace Workers ("IAM") Stores shop stewards are responsible for contacting Stores clerks to determine if they are available to work overtime when overtime is needed.

3.      On June 29, 2019, I worked second and third shift at the Company's Philadelphia station. During a conversation with Sara Thomson, who is a Stores shop steward, I asked her if Stores clerks would be taking overtime, after I heard some Stores clerks discussing not taking overtime the day before. Ms. Thomson responded, no they're not taking overtime from Monday

1

to Monday, and then it would be other stations.  Ms. Thomson also told me that she was going to

call overtime as she normally would and that she didn't want to get into trouble because of the

lawsuit.

4.     From Monday, July 1, 2019 to July 7, 2019, despite proffering overtime every day

on every shift except two, no Stores clerk has accepted overtime in Philadelphia.

I declare under penalty of perjury under the laws of the United States that the foregoing

statements are true and correct.

Executed this _____9ᵗʰ_____ day of July, 2019 at Philadelphia, Pennsylvania.

Christy Baker

# TAB D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| AMERICAN AIRLINES, INC.,<br><br>    Plaintiff,<br><br>  v.<br><br>TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, and AIRLINE MECHANIC AND RELATED EMPLOYEE ASSOCIATION TWU/IAM,<br><br><br>        Defendants. | Civil Action No. 4:19-CV-00414-A |

**DECLARATION OF DARIN N. LEE, PH.D., IN SUPPORT OF PLAINTIFF'S MOTION FOR IMMEDIATE MODIFICATION OF TEMPORARY RESTRAINING ORDER**

## I. QUALIFICATIONS & ASSIGNMENT

1. I am an economist and Executive Vice President in the Boston, Massachusetts office of Compass Lexecon. My qualifications are set forth in my initial May 20, 2019 report filed with this Court on May 21, 2019.[1] I submit this declaration in support of Plaintiff's Motion for Immediate Modification of the Temporary Restraining Order. This declaration contains a statement of my opinions as well as the bases for those opinions, and is supported by the work that I have performed or supervised to date. My investigation and consideration of the issues in this matter are ongoing. Accordingly, my opinions are subject to revision based on the work I may complete in the future and further documents, data, testimony, and other materials I may review. My professional fees for this matter are $825 per hour and my compensation is not contingent on the outcome of this litigation.

2. In my Initial Report, I described a variety of statistical analyses demonstrating how several measures of behavior by American's AMTs and related key maintenance metrics heavily influenced by AMT behavior began to exhibit statistically significant changes relative to their historical norms beginning on or around February 4, 2019, and coinciding with various union communications.[2] These

---

[1] *See* Expert Report of Darin N. Lee, Ph.D. in Support of Plaintiff's Motion for a Preliminary Injunction, May 20, 2019 ("Initial Report").

[2] As stated in my Initial Report, AMTs are represented by a joint bargaining association between the Transport Workers' Union of America, AFL-CIO (the "TWU") and the International Association of Machinists and Aerospace Workers (the "IAM") called the Airline Mechanic and Related Employee Association TWU/IAM (collectively, the

APP0015

changes in behavior and related metrics included significant and unseasonable increases in (i) minimum equipment list issues ("MELs"), i.e., temporarily deferable maintenance discrepancies that, if not timely resolved, will result in pulling an aircraft out of service;[3] and (ii) unscheduled out-of-service aircraft at 7:00 a.m. ("AOS at 0700")—both of which suggest that AMTs are working at a slower pace than usual, which I confirmed through statistical analysis.[4] Further changes in AMT behavior starting on or around February 4, 2019, and incrementally worsening after March 8, 2019, include a reduced frequency of volunteering for overtime work by AMTs, including (i) overtime shifts (including paid lunches) and (ii) field trips for out-of-station maintenance demands—each of which is critical in running an efficient and effective maintenance operation.[5] My Initial Report also described how the confluence of American's AMTs' behavioral changes since early February (i.e., the slowed pace of work) and further incremental changes since early March (i.e., reduction in willingness to volunteer for overtime) had contributed to a statistically significant increase in maintenance-related delays and cancellations.

---

"Union") in their joint collective bargaining agreement ("JCBA") negotiations with American.

[3] *See* Initial Report, ¶¶ 7(a), 11.

[4] *See* Initial Report, Section IV(A).

[5] *See* Initial Report, Section IV(B).

2

3. In my June 13, 2019 Report in Support of American's Motion for a Temporary Restraining Order ("TRO"),[6] I demonstrated that the level of maintenance-related cancellations, unscheduled AOS at 0700, and open MELs had not improved following American's initial Complaint, and in fact, had considerably worsened since early June. In my June 26, 2019 Declaration in Support of American's Notice Regarding TRO Compliance and Proposed Permanent Injunction Order,[7] I demonstrated that certain changes in AMT behavior continued to remain above (or below) historical norms consistent with a continuing slowdown, including above-normal levels of open MELs and unscheduled AOS at 0700 and below-normal overnight work productivity.

4. As I testified at the hearing on July 1, the analysis I conducted for my June 24, 2019 Rebuttal Report to the report submitted by Mr. Christian Tregillis on behalf of Defendants[8] further reinforced the conclusions in my Initial Report.[9] For example, in response to Mr. Tregillis's hypothesis that AMTs were individually choosing to

---

[6] Report of Darin N. Lee, Ph.D., in Support of Plaintiff's Motion for a Temporary Restraining Order, June 13, 2019 ("TRO Report").

[7] Report of Darin N. Lee, Ph.D., in Support of Plaintiff's Motion for American's Notice Regarding TRO Compliance and Proposed Permanent Injunction Order June 26, 2019 ("TRO Compliance Report").

[8] Rebuttal Report of in Further Support of Plaintiff's Motion for a Preliminary Injunction, June 24, 2019 ("Rebuttal Report").

[9] Trial Transcript of Permanent Injunction Hearing, American Airlines, Inc. v. Transport Workers Union of American, AFL-CIO, et al., Case No. 4:19-cv-414-A (N.D. Tex.) July 1, 2019, ("Trial Transcript") 70:22-71:2.

APP0017

work less overtime and that that alone was causing a decrease in productivity, I analyzed the Company's AMT overnight work productivity data—which demonstrated that the proportion of assigned work that was completed by AMTs began to decrease in the aggregate in February 2019.[10] Further, in response to Mr. Tregillis's additional hypothesis that AMTs were reacting to a February 4, 2019 CBS News report by working more slowly as a safety precaution, I conducted an additional standard statistical test to confirm that each event subsequent to the news story—i.e., the subsequent impact of March 8, 2019 Union communication, the final JCBA negotiation session, and the filing of American's preliminary injunction—had a larger and statistically different impact than any purported impact following the CBS story.[11] I also demonstrated (and testified), for example, that Mr. Tregillis's hypothesis that the grounding of the Boeing 737-MAX8s caused American to fly the remainder of its fleet harder (therefore contributing to the operational disruption I observed) was an impossibility because American simply cancelled those flights and made no attempt to make up for that capacity by adding more flights on its other aircraft.[12]

---

[10] Trial Transcript, 71:15-22; Rebuttal Report, Section II.A(i).

[11] I also noted that this additional statistical test assumed—*arguendo*—that the entire change in each measure from February 4 to March 7 was attributable to the CBS news story, even though there was another Union communication on February 15 calling for a "long hot summer..." Trial Transcript, 74:25-75:19; Rebuttal Report, Section II.A(ii).

[12] Trial Transcript, 75:20-76:4; Rebuttal Report, Section II.C(iii).

4

5.  In this declaration, I demonstrate that (i) there continues to be little to no evidence to suggest that AMTs systemwide are complying with the Court's Order by returning to a historically normal pace of work; (ii) there is compelling recent evidence in Philadelphia that AMTs are *explicitly ignoring* the Court's June 14, 2019 TRO Order by instituting an overtime boycott; and (iii) the cumulative effect of AMTs' slowdown behavior continues to plague American's operation.

## II.   AMTs HAVE NOT CURBED MOST OF THE BEHAVIORAL CHANGES IDENTIFIED IN MY INITIAL AND REBUTTAL REPORTS

6.  In my Initial Report and again in my Rebuttal Report, I identified certain AMT behaviors and maintenance-related metrics heavily influenced by AMT behavior that began to change in February and March of this year.  To date, little of the changed behavior has recovered to pre-slowdown levels (i.e., levels considered to be historically normal for this time of year).  In particular, overnight work productivity remains stagnant at an approximately 70% accomplishment rate—*seven percentage points lower than last summer*.  Moreover, the post-TRO summer average for open MELs is actually *worse* than the pre-TRO summer average.  And unscheduled AOS at 0700 has continued to linger far above historical summer norms, with recent data demonstrating another climb above 60 unscheduled AOS at 0700, which, as noted in my TRO Report, did not occur on any single day during 2018 or 2017.

APP0019

**A. Data Indicates That AMTs' Overnight Work Productivity Has Not Recovered to Historical Norms**

7. In my Rebuttal Report, I demonstrated that since February 2019 there had been a systemic decrease in overnight work productivity.[13] Specifically, whereas AMTs were accomplishing approximately 80% of their assigned work in January 2019, that percentage had dropped below 70% by June 2019—a trend that is indicative of a persistent slower pace of work by AMTs.[14] Exhibit 3 below is an extended near-replication of the accomplishment yield from my Rebuttal and TRO Compliance Reports, with the only changes being that I have extended the data through July 6 and have excluded the "in progress" code from the denominator of my rate calculation.[15] As demonstrated in Exhibit 1 below, the average productivity during this year's summer period *after* the TRO Order (70.0%) is virtually identical to the average productivity this summer *before* the TRO Order (70.6%)—demonstrating no systemwide improvement in AMT's overnight productivity since the June 14, 2019 TRO Order.

---

[13] *See* Rebuttal Report, ¶ 10 and Exhibit 1.

[14] Rebuttal Report, ¶ 10 and Exhibit 1; TRO Compliance Report, ¶ 8 and Exhibit 3.

[15] As I testified at trial, certain dates in 2018 had a significant amount of assigned work coded as "in progress" due to a coding error, which indicates that that certain tasks assigned in the past were mistakenly never appropriately coded as accomplished or deferred. Trial Transcript, 74:10-20. Moreover, by excluding the "in progress" code from the denominator, the average accomplishment yield increases last summer's figure from 75.7% to 77.5%.

APP0020



**EXHIBIT 1: ACCOMPLISHMENT YIELD (EXCLUDING IN PROGRESS CODE) (JANUARY 1, 2018, TO JULY 6, 2019)**

Source: American Airlines data.
Notes: Accomplishment yield defined as RON accomplished hours by RON assigned hours by 2100. Includes ATL, AUS, BOS, CLT, DCA, DEN, DFW, EWR, FLL, JFK, LAS, LAX, LGA, MCO, MIA, ORD, PHL, PHX, PIT, RDU, SAN, SAT, SEA, SFO, SJU, STL, and TPA. Excludes April 11, 2018. Does not include "In Progress" hours. Data through July 6, 2019.

## B. Data Indicates That Open MELs Have Continued to Linger at Unprecedented Levels after the TRO Order

8.  I demonstrated in my Initial Report, TRO Report, and TRO Compliance Report that the number of open MELs has continued to rise to unprecedented levels since February 2019. Exhibit 2 below extends the plot of open MELs through July 8. Whereas open MELs averaged 526 during the summer period prior to the TRO Order, they averaged 561 after the TRO Order—i.e., the average number of open MELs has actually worsened since the TRO was granted.[16]

---

[16] While on July 4, 2019, there was a demonstrated drop in total open MELs to just under 500, the number of open MELs returned to numbers well-above 500 on July 7 (530) and July 8 (560), indicating that the number of daily open MELs are not on a sustained downward trend.

APP0021

EXHIBIT 2: DAILY OPEN MELs (JANUARY 1, 2016, TO JULY 8, 2019)



Source: American Airlines data.
Notes:  Daily open fleetwide MELs for mainline fleet.  Data through July 8, 2019.  Shaded regions represent summer periods for previous two
years.  Summer period for 2017 and 2018 defined as the 90-day period beginning on the Thursday before Memorial Day.

9.  Furthermore, in order to eliminate any potential confusion, *the number of open MELs is not exogenous to AMT behavior and cannot be explained by higher write-up rates by pilots.*  To be clear, once an aircraft discrepancy is identified—via a maintenance "writeup" either by an AMT or a pilot—AMTs can clear the discrepancy right away or, alternatively, the necessary maintenance to resolve the discrepancy can be temporarily deferred via the MEL vehicle (assuming it is a discrepancy that can be temporarily deferred under FAA guidance).  As demonstrated in Exhibit 3 below, the number of writeups from both pilots and AMTs are flat; in other words, because neither AMTs nor pilots are identifying more discrepancies for AMTs to fix, it follows that AMTs are not being forced to resolve

8

more discrepancies as the Union has claimed.[17]  Rather, because AMTs are working more slowly to resolve roughly the same number of writeup discrepancies (either overnight or on an aircraft turnaround during the day), American is being forced to defer more discrepancies via the MEL vehicle to keep aircraft in service.  Simply put, AMTs' slower pace of work—and not higher write-up rates by pilots—is the underlying source of the unprecedented number of open MELS.

### EXHIBIT 3: DAILY OPEN MELS, MX WRITEUPS, AND PILOT WRITEUPS (JANUARY 1, 2018, TO JULY 7, 2019)



Source:  American Airlines data.
Notes: Data through July 7, 2019. Mechanic writeups are identified in the data as "Non-Pilot". MELs data through July 8, 2019.

---

[17] Trial Transcript 138:12-18.

9

APP0023

### C. Data Indicates That Unscheduled AOS at 0700 Continue to Linger at Numbers Far Above Historical Averages

10. I also demonstrated in my Initial Report, TRO Report, and TRO Compliance Report that since February 2019 the number of unscheduled AOS at 0700 has lingered above historical averages. Exhibit 4 below shows that this trend has continued into July.

**EXHIBIT 4: DAILY NUMBER OF UNSCHEDULED AOS AT 0700**
**(JANUARY 1, 2017, TO JULY 8, 2019)**



Source: American Airlines data.
Notes: Shaded regions represent summer periods for previous two years. Summer period for 2017 and 2018 defined as the 90-day period beginning on the Thursday before Memorial Day. Excludes scheduled maintenance (i.e., only includes codes D, M, U, P). Data for January 1, 2017 through July 8, 2019. Statistical significance based on methodology described in Exhibit 12 of Expert Report of Dr. Darin Lee, May 20, 2019.

11. Moreover, as Exhibit 5 below demonstrates, this summer's pre-TRO average (54.5) is virtually the same as the post-TRO average (53.8), demonstrating no meaningful

10

improvement since the TRO was granted.[18]  Moreover, while my TRO Compliance Report noted that there were some early indications that AOS at 0700 had begun to trend downwards after reaching 66 on June 18—one of the highest unscheduled AOS at 0700 days ever at American—I also noted that it was far from certain that this trend would continue.[19]  Based on the 12 days of additional data since I filed my TRO Compliance report, however, any putative downward trend appears to have reversed.  Indeed, since I filed my TRO Compliance Report on June 26, there have been far more days where unscheduled AOS at 0700 has been 50 or higher (including 62 aircraft on July 8) than days where unscheduled AOS at 0700 has been below 50.  And on no single day since the TRO has unscheduled AOS at 0700 reached even the *average* level recorded the past two summers (42).[20]

---

[18] To be sure, the unique number of narrowbody aircraft that have been pulled out of service, on an unscheduled, basis at 7:00 a.m. during the post-TRO period is 473 (out of 772 total narrowbody aircraft that flew over this period) and is therefore not the result of a small number of certain problematic aircraft experiencing recurring maintenance issues.

[19] *See* TRO Compliance Report, ¶ 6.

[20] *See* TRO Report, ¶ 10.

11

APP0025

EXHIBIT 5: DAILY UNSCHEDULED AOS FEB 4 THROUGH JULY 8, 2019



Source: American Airlines data.
Notes: Summer period for 2018 and 2019 defined as the 90-day period beginning on the Thursday before Memorial Day. AOS at 0700 excludes scheduled maintenance (i.e., only includes codes D, M, U, P).

## III.   PHILADELPHIA AMTs ARE BLATANTLY DISREGARDING THE COURT'S TRO ORDER

12. Not only is there little indication that AMTs are curbing their behavioral changes at the system level, but there are blatant examples of a sustained slowdown effort at specific stations. For example, data demonstrates that AMTs in Philadelphia have recently continued the targeted pressure tactic of refusing proffered overtime shifts *notwithstanding the Court's TRO Order specifically prohibiting such behavior.* As shown on Exhibit 6 below, starting Monday July 1 and continuing through July 7—

12

one of American's busiest travel weeks of the year covering the July 4 holiday where

overtime need is high—AMTs in Philadelphia all but refused to work any overtime.

**EXHIBIT 6: YEAR-OVER-YEAR PHL OVERTIME HOURS WORKED
MAY 21 THROUGH AUGUST 22 (2018 VS. 2019)**



Source: American Airlines data.
Notes: Overtime hours worked for IAM line mechanics. Excludes reason code "Administrative Other." Hours on Memorial Day 2019 (May 27) only reflect those with an overtime reason code due to a policy that all those who worked on the holiday would be paid an overtime rate. Data through July 7, 2019.

13. Moreover, the *de minimis* amount of overtime hours that AMTs did work between

July 1 and July 7 of this year were not proffered overtime shifts[21] accepted by AMTs,

but rather, continuation of existing shifts or other special overtime-eligible work

---

[21] Per the Company's collective bargaining agreement with the IAM (the pre-merger bargaining unit representing legacy US Airways AMTs in Philadelphia), overtime shifts are proffered generally in increments of eight hours and sometimes in increments of four hours—but never less than four hours. *See* Declaration of James P. Flynn ("Flynn Declaration") July 10, 2019, ¶ 2.

13

APP0027

organized well in advance (e.g., training coverage).[22] Indeed, between July 1 and July 7, AMTs in Philadelphia *volunteered for no proffered overtime shifts*.[23] The number of proffered overtime shifts worked during this week in Philadelphia (zero) stands in stark contrast to the number of proffered overtime shifts worked during the same period (excluding July 3) in Philadelphia last year (80).[24] And on these 80 separate overtime shifts last year, Philadelphia AMTs worked a total of 658 overtime hours.

14. In fact, as shown in Exhibit 7, the distribution of the number of AMTs working overtime shifts in Philadelphia each day last summer shows that *only once* were there no AMTs working proffered overtime shifts on any day during the entire 90 day period (i.e., only 1.11% of summer days in 2018). In contrast, for six of the seven days between July 1 and July 7 of this summer, there were no AMTs who worked proffered overtime shifts, despite the fact that the Company affirmatively proffered multiple overtime shifts on each of these days except July 3 (due to a

---

[22] One individual spent eight hours on July 5 and July 6 on a special project for the Company that was eligible for overtime, but this project was outside of the daily proffered overtime process. *See* Flynn Declaration ¶ 6. This project was also a one-off, unique project that no other AMT in Philadelphia has ever been asked to do. *See id.* ¶ 6. I therefore did not include this individual in my analysis.

[23] On July 3, 2019, American did not proffer any overtime to Philadelphia AMTs on account of a technical problem preventing both the IAM and American from printing a list of AMTs to qualify for overtime. *See* Flynn Declaration ¶ 4 and FN1.

[24] A single AMT proffered multiple overtime shifts on the same day is counted once in this calculation.

14

technical issue).[25]   The probability of observing no AMTs working proffered overtime on six out of seven days, each with a probability of only 1.11% is exceedingly remote, i.e., *less than one-in-75 billion.*[26] This further indicates (in addition to Company testimony) that the lack of proffered overtime shifts accepted by AMT's in Philadelphia during the week of the recent July 4 holiday is unlikely to be the result of random chance, but instead, reflects a concerted and targeted attempt by AMTs to refuse overtime.[27]

---

[25] Flynn Declaration, ¶¶ 4-6.

[26] The probability of observing six out of seven days with an event that should occur randomly 1.11 percent of the time (i.e., in one out of 90 days) is computed as:

$$\sum_{k=6}^{7} \binom{7}{k} 0.0111^k 0.9889^{7-k}.$$

[27] On July 1, 2019, and July 7, 2019, Philadelphia AMTs also refused field trip proffered by American.  Flynn Declaration, ¶ 7.

15

**EXHIBIT 7: DISTRIBUTION OF SUMMER 2018 DAYS BY NUMBER OF AMTS WORKING A PROFFERED OVERTIME SHIFT VS. JULY 1 THROUGH JULY 7, 2019 (EXCLUDING JULY 3)**



Source: American Airlines data.
Notes: Number of days with AMTs working overtime shifts of four hours or longer (to exclude job continuances) for IAM line mechanics in PHL for summer of 2018 and July 1-7, 2019. Excludes reason codes "Administrative Other," "Vacation Coverage," "Training Coverage," "Holiday Coverage," "Sick/Medical Coverage," and "Attended Training."

## IV.   AMTS' UNCHECKED BEHAVIORAL CHANGES CONTINUE TO PLAGUE AMERICAN'S OPERATION

15. The cumulative effect of the sustained changes in AMT behavior described above—where in some cases the slowdown effort has been reinvigorated (i.e., PHL overtime boycott)—has continued to adversely affect the Company's operational performance and the traveling public. This is most evident (and most harmful to the traveling public) with respect to maintenance-related cancellations.

16. For two weeks, starting on June 15, 2019, in direct response to the unprecedented levels of maintenance cancellations the Company had been experiencing in the

16

weeks leading up to the TRO,[28] American began a program that involved analyzing unscheduled AOS systemwide and *pre-cancelling* targeted flights to mitigate the adverse impact of thousands of customers coming to the airport each day and learning that their flights had been cancelled due to maintenance.[29]  By pre-cancelling a limited number of flights over this period and, where possible, re-booking passengers in advance of them arriving at the airport, the Company was able to reduce—albeit modestly—the harm to its customer goodwill that had been accumulating since the slowdown began in February.[30]

17. Although American initiated the pre-cancellation program in direct response to the climbing (and unprecedented) number of maintenance-related ("MX") cancellations, by inserting an American-led decision-making process into the equation on the first day after the TRO was granted, it complicates extending the period of data used in the MX cancellation regression from my Initial Report to statistically isolate the average number of MX cancellations attributable to changes in AMT behavior since the TRO.[31]  That said, during the two week period of pre-cancellations (June 15 to July 1), and as described in detail above, neither the overnight accomplishment rates nor any of the key maintenance metrics heavily

---

[28] Declaration of Scott Ramsey ("Ramsey Declaration"), July 10, 2019, ¶ 5.

[29] *See* Ramsey Declaration, ¶¶ 4-5.

[30] Ramsey Declaration, ¶ 5.

[31] Put differently, since the dependent variable in the maintenance-related cancellation regression following the TRO would consist of both maintenance-related cancellations and pre-cancellations, it would not be consistently measured over time.

APP0031

influenced by AMT behavior (i.e., MELs or AOS at 0700) meaningfully improved. Thus, with no meaningful and consistent improvement in any of these metrics, it is therefore reasonable not to expect a meaningful improvement in maintenance-related cancellations in the post-TRO summer period.

18. Therefore, in order to estimate the average number of MX cancellations attributable to AMTs from June 15 through July 1, I applied two different methodologies. The first methodology uses the estimated coefficient from the regression shown in column 1 of Exhibit 8 below analyzing the period from May 21 through July 7 but *excludes the days of the pre-cancel program (i.e., June 15-July 1)* and applies the results to the number of scheduled flights during the pre-cancellation period. The estimated coefficient over these days was 0.807%, which when applied to the average number of scheduled flights over this period (3,201/day) implies that from May 21 through June 14 and from July 2 through July 7, changes in AMT behavior resulted in an average of 26 additional MX cancellations per day above and beyond what one would otherwise expect to see. Under the hypothesis that there would be no improvement in MX-cancellations without a meaningful improvement in the AOS at 0700, MELs and accomplishment yield, it is reasonable to conclude that absent the pre-cancellation program, the average number of excess MX-cancellations over the pre-cancelation period (June 15-July 1) would have been approximately the same as the average for this summer on the days preceding and directly after the program. As a second methodology, column 2 of Exhibit 8 modifies my original regression method by including the pre-cancellations (plus MX

18

cancellations) in the dependent variable.  Under this alternative methodology, the elevated MX cancellation rate this summer attributable to AMTs is higher post-TRO (1.31)% than pre-TRO (0.815%) and translates to an average of 42 additional MX cancellations per day attributable to AMT behavior during the post-TRO period from June 15 to July 6.

### EXHIBIT 8: UPDATED REGRESSION TABLE FOR MX CANCELLATIONS

| VARIABLES | (1) MX Cancellation Rate | (2) MX and Pre-cancellation Rate |
|---|---|---|
| D(Feb 4 - Mar 7, 2019) | 0.000482 (0.000385) | 0.000487 (0.000389) |
| D(Mar 8 - Apr 25, 2019) | 0.00230** (0.000467) | 0.00229** (0.000477) |
| D(Apr 26 - May 20, 2019) | 0.00504** (0.000836) | 0.00497** (0.000842) |
| D(May 21 - Present) - Excluding the Pre-cancel Period | 0.00807** (0.00102) | |
| D(May 21 - June 14, 2019) | | 0.00815** (0.00112) |
| D(June 15 - Present) | | 0.0131** (0.00129) |
| Seat Factor (7 day Moving Average) | -0.00700** (0.00255) | -0.00692** (0.00266) |
| Scheduled Departures | -2.15e-06 (1.26e-06) | -1.88e-06 (1.32e-06) |
| AA/US Regional Carriers Cancelled Rate | -0.00527 (0.00310) | -0.00625 (0.00324) |
| % of Departures on Aircraft Younger Than 1 Year | 0.00740 (0.00693) | 0.00664 (0.00703) |
| % of Departures on Aircraft Older Than 25 Years | 0.0202 (0.0183) | 0.0140 (0.0187) |
| % Turns Under 45 Minutes | 0.0236** (0.00330) | 0.0236** (0.00339) |
| Mechanic Headcount | -1.87e-05** (4.34e-06) | -1.85e-05** (4.37e-06) |
| Pilot Writeups per Departure | 0.00652 (0.00353) | 0.00635 (0.00358) |
| Average Scheduled Narrowbody Cycles per Shell | 0.00369** (0.00105) | 0.00387** (0.00107) |
| Min Temp Under 10 Degrees | 0.000823 (0.00136) | 0.00100 (0.00138) |
| Max Temp Over 100 Degrees | 5.26e-05 (0.00371) | 0.000270 (0.00366) |
| Snow (Squared) | -0.0374** (0.0140) | -0.0350* (0.0142) |
| Rain (Squared) | 0.00112 (0.00121) | 0.00214 (0.00145) |
| Constant | 0.0745** (0.0180) | 0.0719** (0.0184) |
| Observations | 1,267 | 1,284 |
| Adjusted R-squared | 0.542 | 0.655 |

Robust standard errors in parentheses
** Significant at 99%, * Significant at 95%

Source: American Airlines data.
Notes: Regression uses a period of January 1, 2016, through July 7, 2019, controlling for scheduled AA departures, seat factor (7 day moving average), AA regional cancel rates, percent departures on aircraft under 1 year , percent departures on aircraft over 25 years, daily scheduled cycles per shell (narrowbody), mechanic head count, percent turns under 45 minutes, pilot writeups per departure, weather, fleet fixed effects, holiday dummies, day of week and weekly fixed effects.

19

20. Exhibit 9 below plots the number of MX cancellations as well as pre-cancellations versus unscheduled AOS at 0700 each day between January 1 and July 7 of 2019, showing that in the days directly after the TRO was granted, the number of unscheduled AOS at 0700 remained at or near their historically high levels, exceeding 60 on four separate days (61 on June 15, 66 on June 18, 63 on June 20, and 62 on July 8).[32] Thus, from a simple visual inspection, applying an average of 26 MX-cancellations from the first methodology does not, in fact, statistically attribute all or even the majority of pre-cancellations to slowdown behavior, and thus, is likely to be a conservative estimate.

---

[32] I did not overlay open MELs or work productivity due to differences in the scale of these metrics. Nevertheless, as discussed above, both of these metrics have remained essentially unchanged this summer pre- and post-TRO.

20

**EXHIBIT 9: DAILY NUMBER OF MX CANCELLATIONS AND PRE-CANCELLATIONS VS. UNSCHEDULED AOS AT 0700 (JANUARY 1, 2019, TO JULY 7, 2019)**



Source: American Airlines data.
Notes: Unscheduled AOS at 0720. Pre-cancels identified by codes XZP and YZP. Data through July 7, 2019.

21. Using the conservative approach described above (i.e., attributing an additional 26 MX cancellations a day to AMTs), changes in AMT behavior in the roughly *three-week period* since the June 14, 2019 TRO have led to 592 additional maintenance cancellations above and beyond what one would otherwise expect to see for this time of year, affecting almost 85,000 passengers. A nearly equivalent number of passengers were harmed by incremental MX cancellations attributable to AMT behavioral changes during the roughly *three-month period* between March 8 and May 13 (i.e., 644 cancellations impacting 88,000 passengers).[33] And under the alternative methodology (i.e., assuming that pre-cancellations would have been

---

[33] *See* Initial Report, ¶¶ 7(h), 61.

21

APP0035

cancelled due to maintenance but for the program), changes in AMT behavior have resulted in 961 incremental maintenance-related cancellations, impacting over 136,000 passengers since the TRO was granted (i.e., June 15–July 7), far more than number impacted by MX cancellations in the three months of the slowdown period leading up to the TRO.

Executed this 10th day of July, 2019, at Boston, Massachusetts

Darin N. Lee

22

APP0036

## APPENDIX A:  LIST OF ADDITIONAL DOCUMENTS AND INFORMATION SOURCES RELIED UPON AND CONSIDERED

### CASE DOCUMENTS

1. Trial Transcript of Permanent Injunction Hearing, American Airlines, Inc. v. Transport Workers Union of American, AFL-CIO, et al., Case No. 4:19-cv-414-A (N.D. Tex.) July 1, 2019

2. Expert Report of Darin N. Lee, Ph.D. in Support of Plaintiff's Motion for a Preliminary Injunction, May 20, 2019

3. Report of Darin N. Lee, Ph.D., in Support of Plaintiff's Motion for a Temporary Restraining Order, June 13, 2019

4. Report of Darin N. Lee, Ph.D., in Support of Plaintiff's Motion for American's Notice Regarding TRO Compliance and Proposed Permanent Injunction Order June 26, 2019

5. Rebuttal Report of in Further Support of Plaintiff's Motion for a Preliminary Injunction, June 24, 2019

6. Declaration of James P. Flynn, July 10 2019

7. Declaration of Scott Ramsey, July 10, 2019

### AMERICAN AIRLINES DOCUMENTS AND DATA

1. American Airlines flight-level operations data.

2. American Airlines AOS snapshot data.

3. American Airlines write-ups data.

4. American Airlines MEL snapshot data.

5. American Airlines field trip data.

6. American Airlines headcount data.

7. American Airlines IAM overtime usage data.

8. American Airlines bill of work data.

A-1

# TAB E

APP0038

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| AMERICAN AIRLINES, INC.,<br><br>                              Plaintiff,<br><br>         v.<br><br>TRANSPORT WORKERS UNION OF<br>AMERICA, AFL-CIO, INTERNATIONAL<br>ASSOCIATION OF MACHINISTS AND<br>AEROSPACE WORKERS, and AIRLINE<br>MECHANIC AND RELATED EMPLOYEE<br>ASSOCIATION TWU/IAM,<br><br>                              Defendants. | Civil Action No. 4:19-cv-00414-A |

## [PROPOSED] MODIFICATIONS TO JUNE 14, 2019 TEMPORARY RESTRAINING ORDER

On June 14, 2019, American Airlines, Inc. ("American") filed a Motion for Temporary Restraining Order, which the Court granted the same day.  On July 10, 2019, American filed a Motion seeking Immediate Modification of the Temporary Restraining Order.  After considering the July 10, 2019 Motion and Appendix in Support of American's Motion for Immediate Modification of Temporary Restraining Order, as well as the other filings in this matter, the Court finds cause to modify the June 14, 2019 Temporary Restraining Order by imposing additional requirements on Defendants Transport Workers Union of America, AFL-CIO, International Association of Machinists and Aerospace Workers, and Airline Mechanic and Related Employee Association TWU/IAM (collectively "Defendants" or the "Union").

THEREFORE, IT IS ORDERED that the June 14, 2019 Temporary Restraining Order remains in full force and effect, and the Union remains adequately indemnified by the bond

APP0039

previously obtained by American, with the following additional requirements imposed on Defendants:

   a.   The most senior Union leaders, including Sito Pantoja, Alex Garcia, and John Samuelsen, shall conduct in person group meetings as soon as possible with mechanics at American's line maintenance stations who are currently scheduled to work the RON (overnight) shift, and communicate a sincere and emphatic respect for the requirements of the Temporary Restraining Order and an imperative that every single mechanic and related employee fully and immediately comply with an unequivocal goal of restoring the mechanics and related employees' behavior and the operation to normal subject to the imposition of fines or discipline by Defendants, and allow representatives of American management to attend those meetings to monitor compliance;

   b.   The most senior Union leaders, including Sito Pantoja, Alex Garcia, and John Samuelsen, shall conduct in person group meetings as soon as possible with all Union officials, including Local leadership, Local e-board members, shop stewards and grievance committee members, at all stations and communicate a sincere and emphatic respect for the requirements of the Temporary Restraining Order and an imperative that every single union official fully and immediately comply with an unequivocal goal of restoring the mechanics and related employees' behavior and the operation to normal subject to the imposition of fines or discipline by Defendants, and allow representatives of American management to attend those meetings to monitor compliance;

APP0040

c.   The most senior Union leaders, including Sito Pantoja, Alex Garcia, and John Samuelsen, shall, to the extent that mechanics or Union officials are not available to attend the above meetings to call those mechanics and Union officials, as soon as possible and communicate a sincere and emphatic respect for the requirements of the Temporary Restraining Order and an imperative that every single mechanic and related employee and union official fully and immediately comply with an unequivocal goal of restoring the mechanics and related employees' behavior and the operation to normal, subject to the imposition of fines or discipline by Defendants;

d.   Defendants shall post the June 14, 2019 Temporary Restraining Order and these modifications to a dedicated webpage and on dedicated bulletin boards, separate from all other union correspondence;

e.   Defendants shall post a video on the same dedicated webpage of the most senior Union leaders, including Sito Pantoja, Alex Garcia, and John Samuelsen, communicating a sincere and emphatic respect for the requirements of the Temporary Restraining Order and an imperative that every single mechanic and related employee and union official fully and immediately comply with an unequivocal goal of restoring the mechanics and related employees' behavior and the operation to normal, subject to the imposition of fines or discipline by Defendants;

f.   Each of Defendants' members shall sign and date an acknowledgment form stating that they have read and understand their obligation to comply with the

APP0041

modified Temporary Restraining Order upon risk of being disciplined or fined by

Defendants and American;

g.    The most senior Union leaders, including Sito Pantoja, Alex Garcia, and John

Samuelsen, shall issue, as soon as possible, the following notice, to all mechanics

and related employees:

"Despite the Temporary Restraining (TRO) issued by the United
States District Court for the Northern District of Texas on June 14,
2019, the disruption from the status quo—as measured by AOS at
0700, high daily open MELs, and low nightly accomplishment
yields—has continued, and even worsened.

We therefore notify you, in no uncertain terms, that:

Any actions by mechanic and related employees that are designed
or intended to harm or slow down American's operations is a
violation of the Court's TRO and the Railway Labor Act.

You MUST resume normal working schedules and practices.

You MUST NOT engage in any concerted refusal to perform
normal operations.

Any individual employee represented by the Association who is
found to have:

- Refused to accept overtime or field trip requests as they
  would in the normal course;

- Failed to complete maintenance repairs as they would in
  the normal course;

- Slowed down in the performance of their job duties; or

- Taken any other action intended to cause aircraft to be out
  of service outside of the normal course (including
  specifically aircraft out of service at 7:00 a.m.) or otherwise
  cause flight delays or cancellations or interfere with
  American's operations;

WILL face discipline and fines from the Association, TWU and/or IAM"; and

4

APP0042

h.   Defendants shall take all reasonable actions, including but not limited to communications to their members, to ensure that their members working at American's line maintenance stations, within seven days of entry of the modified Temporary Restraining Order, achieve approximately, in the aggregate, on a 7-day moving average basis, overnight productivity levels equal to the aggregate status quo overnight productivity levels achieved in the summer of 2018 of 77.5%.

IT IS FURTHER ORDERED that by 10:00 a.m. on the fifth business day following issuance of these modifications, Defendants shall, by sworn declarations, confirm the steps taken toward compliance with each of the above requirements.  The declarations shall include full details regarding the timing/location of the meetings and names of attendees at such meetings, and a detailed summary of what Defendants' leaders said at such meetings—with the recognition that Defendants may not be able to accomplish all of the above actions within five business days. If that is the case, Defendants shall update the Court every third business day until completed.

SO ORDERED at _____ o'clock, this _____ day of July, 2019.


_____
**HON. JOHN McBRYDE**
**United States District Judge**

APP0043