U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

AUG 1 2 2019

CLERK, U.S. DISTRICT COURT
By_____
Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

AMERICAN AIRLINES, INC. §
§
Plaintiff, §
§
VS. § NO. 4:19-CV-414-A
§
TRANSPORT WORKERS UNION OF §
AMERICA, AFL-CIO, ET AL., §
§
Defendants. §

## MEMORANDUM OPINION

Came on for consideration the above-captioned action
wherein American Airlines, Inc. is plaintiff and Transport
Workers Union of America, AFL-CIO ("TWU"), International
Association of Machinists & Aerospace Workers ("IAM"), and
Airline Mechanic and Related Employee Association TWU/IAM (the
"Association") are defendants. In its complaint, plaintiff
prayed for a permanent injunction against defendants. The court,
having considered the pleadings, evidence, post-trial briefs,
and record, finds that such relief should be granted and a
permanent injunction basically in the form of plaintiff's
proposed permanent injunction should be entered against
defendants.

I.

Background

On May 20, 2019, plaintiff initiated this action by filing its complaint. Doc.[1] 1. Plaintiff alleged: To gain leverage in contract negotiations, defendants' members changed their behavior in a concerted fashion by, for example, taking an unusual amount of time to repair aircraft and refusing to work overtime and take maintenance field trips[2] to repair aircraft. Id. at 2, ¶ 2 & 3, ¶ 4. The concerted slowdown is causing flight delays and cancellations. Id. at 3, ¶ 5. Defendants failed to take any steps to stop the concerted behavior; in fact, they have encouraged it. Id. at 4, ¶ 8.

Plaintiff brought a single cause of action against defendants for violation of Section 2, First of the Railway Labor Act ("RLA"), 45 U.S.C. § 152, First, and requested a preliminary and permanent injunction enforcing defendants' duties under that statute. Id. at 29-34. On May 21, 2019, plaintiff filed a motion for preliminary injunction, and, by order signed the same day, the court advised the parties that it intended to combine the hearing on the motion with the trial on

---

[1] The "Doc. ___" references are to the numbers assigned to the referenced items on the docket in this Case No. 4:19-CV-414-A.

[2] A field trip is a trip by mechanics to another location where plaintiff does not have its own readily-available mechanics or parts in response to a mechanical issue at that location. Doc. 75 at 15, ¶ 30.

intended to combine the hearing on the motion with the trial on the merits. Docs. 17, 24. Plaintiff then moved on June 14, 2019, for entry of a temporary restraining order, which the court entered the same day (the "TRO"). Docs. 58, 65. The court ultimately held the combined trial on July 1, 2019. On July 10, 2019, plaintiff requested that the court enter a modified TRO based on its allegation that defendants failed to comply with the original TRO, and the court entered a modified TRO the same day (the "modified TRO"). Docs. 108, 111.

## II.

## Findings of Fact[3]

Based on the evidence and the record, the court makes the following findings of fact:

A.   History and Nature of the Parties' Dispute

1. Plaintiff is a "common carrier by air" as defined in the Federal Aviation Act of 1958 and a "carrier" as defined by the RLA. Doc. 75 at 9, ¶ 1.

2. Plaintiff, in its current form, is the product of a merger between plaintiff and US Airways, Inc. ("US Airways"). Id. at ¶ 2.

---

[3] To the extent that anything in this opinion under the heading "Background" or "Conclusions of Law" is a finding of fact, the court hereby adopts it as such; conversely, to the extent that anything under the "Findings of Fact" section is a conclusion of law, the court adopts it as such.

3.  Plaintiff employs mechanics and related employees who support them. Id. at 9-10, ¶ 3.

4.  Before the merger, TWU represented plaintiff's mechanics and related employees, and IAM represented

5.  those of US Airways. Id. at 10, ¶ 4. After the merger, TWU and IAM formed the Association to represent the combined set of employees. Id.

6.  The collective bargaining agreements ("CBAs") between the pre-merger companies and TWU and IAM currently govern the pay rates, rules, and working conditions for plaintiff's mechanics and related employees. Id. at 11, ¶ 7.

7.  In 2015, plaintiff and the Association began negotiating new CBAs to cover the mechanics and related employees represented by the Association. Id. at ¶ 9. The parties held their last CBA negotiating session on April 23-25, 2019. Id. at 13, ¶ 20.

8.  On February 4, 2019, CBS News aired a news segment (the "CBS News report") in which a reporter interviewed airline mechanics who claimed to feel pressured not to report safety concerns. Ex. 170.

9.  TWU Local 591 represents about 3,600 of plaintiff's mechanics and related employees. Doc. 75 at 18, ¶ 47. On February 4, 2019, it released a letter to its

membership stating, "[plaintiff] needs to hear loud and clearly from this membership that the time to deliver the best contract is NOW!" (the "February 4 letter"). Id. at 12, ¶ 13; ex. 4.

10. IAM District Lodge 142 is an intermediate-level IAM affiliate that represents legacy mechanics and related employees of US Airways. Doc. 75 at 17, ¶ 38. Its president and general chairman, David Supplee, distributed on March 8, 2019, a letter on Association letterhead calling for members to "stop all voluntary actions" (the "March 8 letter"). Ex. 7; ex. 62 at 11-12, ¶¶ 29-30.

11. On March 21, 2019, plaintiff sent to certain TWU and IAM officials a letter requesting that the Association rescind the March 8 letter and instruct its members to return to normal practices and otherwise maintain the status quo. Doc. 75 at 16, ¶ 35; ex. 9.

12. The Association responded on March 26, 2019, by sending plaintiff a letter denying that the March 8 letter was an Association communication or directive and explaining that it took down the letter. Doc. 75 at 16, ¶ 36; ex. 11.

B.    Discussion and Further Fact Findings

The parties stipulated to a list of factual issues in their
June 18, 2019 joint pretrial order under the heading "Agreed
List of the Ultimate Issues of Fact . . . ." Doc. 75 at 19. On
June 28, 2019, the court issued a memorandum opinion setting
forth conclusions of law as to certain of the legal issues
stipulated in the same pretrial order.[4] Doc. 100. Considering
those conclusions, it is unnecessary to resolve issues of fact
numbers 1.a, 2, and 3. The pertinent portions of the rest of the
issues read as follows:

> 1.    Whether the Defendants' members have changed
> their normal working behavior on a concerted basis in
> a manner that violates Section 2, First of the RLA
> resulting in a disruption to Plaintiff's operations
> and/or interstate commerce? . . .
> 1.b   . . . [I]f Defendants have a legal
> obligation under Section 2, First of the RLA to take
> all reasonable measures to stop concerted activity by
> their members even if Defendants have not participated
> in, authorized or ratified it, have they done so?
> . . .
> 4.    If Plaintiff is required to demonstrate that
> injunctive relief is the only practical and effective
> means of enforcing the Defendants' obligations under
> Section 2, First of the RLA, has it done so?
> 5.    Whether the requested injunction would
> disserve the public interest?

Doc. 75 at 19.

---

[4] The court adopts and incorporates such memorandum opinion by reference into this opinion.

The court makes the following findings as to the proper answers to those factual issues:

Factual Issue No. 1 ("Whether the Defendants' members have changed their normal working behavior on a concerted basis in a manner that violates Section 2, First of the RLA resulting in a disruption to Plaintiff's operations and/or interstate commerce?"):

### 1.   Concerted Activity

Defendants' members have reduced their normal working behavior in a concerted manner. Plaintiff's data indicate that they volunteered for less work in recent months. Specifically, the percentage of field trips with no volunteers increased dramatically at certain airports after the dissemination of the March 8 letter. Ex. 45 at 56-57, ¶ 55. Mechanics at certain airports accomplished, on average, less routine overnight maintenance work per day, and deferred more such work, beginning in January 2019. Ex. 53 at 12.[5] And, the following key measurements increased above historical norms starting February 4, 2019, the date of the February 4 letter: (1) the daily number of outstanding minimum equipment list issues ("MELs")— maintenance issues temporarily deferred by mechanics that, if left unfixed, may result in the pulling of an aircraft out of

---

[5] Plaintiff alleged that the overnight work at the above-mentioned airports is performed exclusively by defendants' members. Doc. 128 at 3 n.1. The fact that plaintiff only showed trends at certain airports does not negate the implication of plaintiff's evidence that defendants' members conducted a concerted slowdown.

service—and (2) the daily number of unscheduled aircraft out of service ("AOS") at 7:00 a.m. Ex. 45 at 26-30, ¶¶ 25-28 & 44-47, ¶¶ 42-44; see also tr. 32:23-25 & 33:1-6. In addition, the proportion of MELs being resolved after eight days increased above historical norms starting in February 2019. Ex. 53 at 14. In short, plaintiff's mechanics, whom defendants represent, are deferring more work than they used to.

Those trends are not the result of coincidence or anything else that could reasonably explain the slowdown in productivity. To eliminate that possibility, plaintiff's expert, Darin Lee ("Lee"), conducted a regression analysis[6] that measured the degree to which the alleged slowdown can be explained, all else being equal, by whether those measurements—the daily number of outstanding MELs and unscheduled AOS at 7:00 a.m.—were observed after the occurrence of certain of the above-mentioned communications or events in the parties' dispute.[7] Lee also

---

[6] A regression analysis measures the impact of a change in one variable (the independent variable) on the change in another (the dependent variable) holding constant other things that could also explain that change. See ex. 45 at 21-23, ¶ 18. The goal is to allow statisticians to conclude whether a change in the independent variable causes a change in the dependent variable. The degree of an independent variable's impact on a dependent variable is measured by a "coefficient." If the coefficient is positive, for example, it means that an increase in the value of the independent variable causes an increase in the value of the dependent variable. The regression analysis also allows statisticians to calculate the probability that the coefficient is not the result of random chance and is, therefore, "statistically significant," as measured by a "confidence level." For example, when someone says that a coefficient is statistically significant at the 99% confidence level, he means that there is a 99% probability that the measured impact of the independent variable on the dependent variable is not the result of random chance. See id. at 23, ¶ 19.

[7] He did that by including in his regression three independent dummy variables (which take the value of 1 if a condition is met and 0 if it is not) that each took the value of 1 for the daily number of MELs and unscheduled AOS at 7:00 a.m. observed during the following date ranges, coinciding with certain of the

controlled for other factors that are known to impact those
measurements, including the number of maintenance-related issues
found by pilots ("pilot write-ups") and the daily number of
scheduled mainline departures. Ex. 45 at 32-33, ¶¶ 31-32 & 48, ¶
46; ex. 46 at 17.[8] The regressions, in a nutshell, show a
statistically significant (i.e., not random) increase in the
daily number of outstanding MELs and unscheduled AOS at 7:00
a.m. after each of those communications and events, even when
everything else that could reasonably explain those trends is
held constant. Ex. 45 at 36-37, ¶ 35 & 49-50, ¶ 48; ex. 46 at
17.[9] It is reasonable to conclude that plaintiff's mechanics are
the culprit. Mechanics can decrease plaintiff's productivity by
reducing the amount of work they accomplish. Tr. 29:22-23. They
can, for example, take longer to troubleshoot an aircraft or

---

above-mentioned union communications and events: (1) February 4 to March 7, 2019, (2) March 8 to
April 25, 2019, and (3) April 26 (the day after the parties' last negotiating session ended) to May 13,
2019. Id. at 31, ¶ 30. In his report supporting plaintiff's motion for temporary restraining order, Lee added
additional dummy variables for the following date ranges: (1) April 26 to May 20, 2019 (the date plaintiff
filed its complaint), (2) May 21 to June 6, 2019 (the date of an Association letter directing members to
"[r]emain unified and [] not back down from telling your management that [plaintiff's] negotiators need
to get back to the table and get the deal done," ex. 38), and (3) June 7 to June 12, 2019. Ex. 46 at 17. Of
course, what matters is not whether those communications and events caused the slowdown, but whether
defendants' members conducted a concerted slowdown to begin with.

[8] Lee's regression also included variables designed to control for the following factors: aircraft age,
aircraft operating intensity, passenger count (but only for the MEL regression), aircraft size, holidays,
system-wide disruptive events (e.g., hail or lightning), time to complete jobs, mechanic headcount, the
weather, fleet composition, week, and day of the week. Ex. 45 at 31-35, ¶¶ 31-33 & 48, ¶ 46; ex. 46 at 17.

[9] To put it in jargon, the coefficients for each of the above-mentioned dummy variables is positive and
statistically significant at the 99% confidence level. Ex. 45 at 36-37, ¶ 35 & 49-50, ¶ 48; ex. 46 at 17.

research the parts necessary to complete a project. Tr. 30:1-7. It follows that the only reasonable explanation for the slowdown is concerted action on the part of plaintiff's mechanics and related employees.

Defendants could have refuted those facts by arguing that Lee failed to consider some other factor that could also explain the slowdown, but they failed to do anything of the sort. Their criticisms instead reflect a misunderstanding of statistics and Lee's analysis. They argued that the increase in the daily number of outstanding MELs was due primarily to an increase in pilot write-ups. Doc. 125 at 3. Lee controlled for that, however; his analysis shows an increase in the daily number of outstanding MELs even holding pilot write-ups constant. Defendants also contended that plaintiff has more flights in the summertime, which can cause an increase in mechanical problems, thereby suggesting that season or departure volume might have caused the increase. See id. at 2 n.2. Lee controlled for that, too.[10] Defendants also observed that the time it takes to complete an assigned task varies based on aircraft and equipment conditions. Id. Lee controlled for those factors as well.[11] They

---

[10] Specifically, he controlled for the daily number of scheduled mainline departures and week of the year. Ex. 45 at 32, ¶ 31 & 35, ¶ 33; ex. 46 at 17.

[11] In particular, he controlled for aircraft size and age. See ex. 45 at 32-33, ¶¶ 31-32; ex. 46 at 17.

vaguely hinted that the random differences from job to job (specifically, the tools available and the time at which the task was assigned) might have caused the slowdown. See id. But, the regression results essentially rule out random chance as a cause of the slowdown. Defendants also suggested that the CBS News report may have caused the slowdown. Id. at 12; see also ex. 88 at 21-23, ¶¶ 61-62. Defendants did not allege where that story was published or aired or how many people saw it. In any case, the notion that a seven-minute news story caused the entire slowdown is implausible. It is substantially more likely that it was caused by heated, years-long contract negotiations that eventually reached a boiling point.[12]

Nor does anything else in the record suggest that something else could have caused the slowdown. As stated, Lee controlled for everything that could reasonably explain the slowdown. And, there were no changes in plaintiff's maintenance program or operations that could explain the decline in productivity. Tr. 29:8-19, 38:9-12 & 44:15-21. Plaintiff has made no change in recent months in how much overtime it offers or how it pays overtime. Id. at 41:5-8. Nor has it changed its policies or

---

[12] Defendants also pointed to publications allegedly distributed by plaintiff promoting June 2019 as "National Safety Month." Doc. 125 at 12. Those publications would not explain the decline in productivity that occurred before that month.

practices regarding field trips or field trip compensation since February 2019. Id. at 39:21-24.

In a last-ditch effort to raise issues with plaintiff's evidence, defendants argued that the court cannot rely on statistics, citing Air Line Pilots Association v. United Airlines, 802 F.2d 886 (7th Cir. 1986). That case does nothing to support their argument. In that case, the Seventh Circuit suggested, in the context of a "sick-out" by pilots, that statistical evidence showing an increased use of sick leave did not rise to the level of "clear and convincing evidence" required by Section 6 of the Norris-LaGuardia Act to show the union's involvement in the sick-out. Id. at 905-06. Plaintiffs can show that defendants' members engaged in a concerted slowdown without showing that defendants were involved in it. In any event, plaintiff's evidence does more than show an increase in the daily number of outstanding MELs and unscheduled AOS at 7:00 a.m.: it also rules out every other reasonable explanation for the slowdown.

For those reasons, the court finds that defendants' members have changed their normal working behavior in a concerted fashion.

2.  **Disruption to Plaintiff's Operations and Interstate Commerce**

The rate of scheduled flights cancelled[13] and delayed[14] for maintenance-related reasons increased above historical norms after February 4, 2019. Ex. 45 at 58-59, ¶ 58 & 63-65, ¶ 62; ex. 46 at 5-9, ¶¶ 6-9. Those delays and cancellations undoubtedly disrupted commerce and plaintiff's operations. With respect to each of those measurements, Lee conducted largely the same regressions as above to determine whether those increases were the result of concerted activity or something else, generally controlling for the same factors. See ex. 45 at 60-61, ¶ 60 & 66, ¶ 65.[15] The results show that the cancellation rate increased to a statistically significant degree after the March 8 letter and subsequent events. Id. at 61-62, ¶ 61; ex. 46 at 18.[16] The delay rate, along with other measurements of

---

[13] Specifically, the seven-day moving average of the proportion of plaintiff's scheduled mainline flights cancelled for maintenance-related reasons, excluding cancellations related to the grounding of the 737 Max plane, as well as those due to collision with ground equipment, damage during aircraft relocation, and accidental slide deployment (the "cancellation rate"). Ex. 45 at 59.

[14] Specifically, the seven-day moving average of the proportion of mainline flights delayed for more than two hours beyond scheduled departure for maintenance-related reasons (the "delay rate"). Id. at 65.

[15] The independent dummy variables for whether an observation occurred during one of the above-mentioned time periods were the same, but there were some minor differences in the control variables used. See id. at 59-61, ¶¶ 59-60 & 65-66, ¶¶ 64-65; ex. 46 at 18. The court need not explain those differences in detail. The bottom line is that Lee controlled for all of the factors one would reasonably expect to disrupt plaintiff's operations.

[16] In other words, the coefficients for the dummy variables for periods following March 8 were positive and statistically significant at the 99% confidence level. Ex. 45 at 61-62, ¶ 61; ex. 46 at 18.

delay[17], also increased to a statistically significant degree after certain of the events tested. Id. at 66-68, ¶ 66; ex. 46 at 18.[18] In short, more flights were cancelled or delayed due to maintenance issues after key events in the parties' dispute, even after controlling for every other reasonable explanation. Critically, the rise was not due to random chance. The only reasonable explanation that can be drawn from the data is that the delays and cancellations were caused by concerted activity on the part of defendants' members.

The parties do not dispute that plaintiff engages in interstate commerce. See doc. 75 at 9, ¶ 1 (stipulating that plaintiff is a "common carrier by air" as defined in the FAA and a "carrier" as defined by the RLA); 45 U.S.C. § 181 (extending RLA to "every common carrier by air engaged in interstate or foreign commerce"). For that reason, the delays and cancellations caused by that concerted activity likely disrupted interstate commerce.[19]

---

[17] Specifically, the delay rates for any length of time and for 15 minutes, as well as maintenance-related departure delay minutes per flight. Ex. 45 at 66, ¶ 64.

[18] The results and their statistical significance varied depending on the dependent variable (i.e., the measure of delay) tested. The court will not discuss those differences at length, but they are displayed in the tables on page 68 of Exhibit 45 and page 18 of Exhibit 46.

[19] The court is not conceding as a matter of law that plaintiff must show some connection to interstate commerce, as opposed to commerce generally, but the parties have stipulated to that as an issue of fact for the court to resolve.

For those reasons, the court finds that the concerted behavior of defendants' members disrupted plaintiff's operations and interstate commerce.

Factual Issue No. 1.b ("[I]f Defendants have a legal obligation under Section 2, First of the RLA to take all reasonable measures to stop concerted activity by their members even if Defendants have not participated in, authorized or ratified it, have they done so?"):

Defendants failed to exert every reasonable effort to prevent or stop their members' concerted activity. They suggested that they had no duty, or perhaps a lesser duty, to prevent the slowdown because they did not know it was happening until plaintiff filed suit. See doc. 145 at 14-15. The March 8 letter commanding defendants' members to "stop all voluntary actions" gave defendants all the notice they needed to "exert every reasonable effort" to prevent the slowdown. Timothy Klima, who oversees certain of IAM's collective bargaining activities, understood that the letter called for a job action. Doc. 75 at 17, ¶ 38; ex. 47; ex. 54 at 9, ¶ 21. Defendants should have known that at least some of their members might follow the letter's instructions. Nonetheless, the evidence does not show that they did anything more in response to that letter than to communicate that it was unauthorized and take it down. See ex. 11; ex. 62 at 12, ¶ 31; tr. 162:6-13. Defendants never alleged, nor does the record suggest, that they did anything in response to that letter to prevent a concerted slowdown, including

15

directing their members to disregard the letter's command and maintain normal operations. As a result, the court finds that defendants failed to exert every reasonable effort to prevent or stop their members' concerted behavior.

Factual Issue No. 4 ("If Plaintiff is required to demonstrate that injunctive relief is the only practical and effective means of enforcing the Defendants' obligations under Section 2, First of the RLA, has it done so?"):

Plaintiff has shown that an injunction is the only practical and effective means of enforcing defendants' duty under Section 2, First of the RLA to "exert every reasonable effort" to restore the status quo. As explained, defendants' members have engaged in a concerted slowdown, disrupting commerce and plaintiff's operations. Those activities undermine plaintiff's bargaining position, and any CBA arising out of the parties' negotiations in the absence of an injunction would likely be the result of that weakened position, rather than good faith bargaining. See United Air Lines, Inc. v. Int'l Ass'n of Machinist & Aerospace Workers ("IAM"), 243 F.3d 349, 365 (7th Cir. 2001); Int'l Ass'n of Machinists & Aerospace Workers v. Transportes Aereos Mercantiles Pan Americandos, S.A. ("TAMPA"), 924 F.2d 1005, 1011 (11th Cir. 1991). Nor would plaintiff's discipline of defendants' members for engaging in a slowdown be

a practical or effective means of enforcing defendants' duty. As the Seventh Circuit explained:

> [R]equiring [plaintiff] to take efforts to end the slowdown would not be an "effective means" of enforcing [defendant's] duty to "exert every reasonable effort to make and maintain agreements"; rather, it would be requiring [plaintiff] to assume [defendant's] duty altogether. Indeed, if we were to accept the premise that a carrier's ability to fire or discipline individual employees is an "effective" remedy for a union's status quo violations, a status quo injunction could never issue against a union, since in virtually every case an employer presumably could take some such measures. Such an interpretation would eviscerate the status quo provisions of the RLA.

IAM, 243 F.3d at 363-64. Thus, an injunction against defendants would be the only practical and effective means of enforcing their duty to "exert every reasonable effort" to stop their members' concerted behavior and restore the status quo. See id.; TAMPA, 924 F.2d at 1011.

Factual Issue No. 5 ("Whether the requested injunction would disserve the public interest?"):

The entry of a permanent injunction would not disserve the public interest. As explained, the concerted job action of defendants' members has caused flight delays and cancellations, inconveniencing the public and disrupting commerce. And, as stated, defendants have failed to "exert every reasonable effort" to maintain the status quo, necessitating the entry of such an injunction to enforce that duty and avert any future disruption to commerce, which would likely continue without one.

Defendants argued that certain provisions of plaintiff's proposed permanent injunction (doc. 120) would harm public safety. First, they dispute the provision of paragraph (o) that they must "take all reasonable actions . . . to ensure that their members . . . achieve approximately, in the aggregate, on a seven-day moving average basis, overnight productivity levels equal to the aggregate status quo overnight productivity level that was achieved during the same seven-day period in . . . 2018." Id. at 19-22. They made essentially the same argument in their motion to reconsider the modified TRO. Doc. 112. The court, in its order denying the motion, adequately addressed that argument when it stated:

> [T]hey have provided nothing in support of that position that would cause the court to believe that the members of defendants do not have good enough judgment to know when they are doing something that would adversely affect the traveling public, as distinguished from taking actions to resume in an appropriate manner their normal work activities.[20]

Doc. 116 at 1-2. Since then, defendants have failed to provide anything supporting their argument that would cause the court to change its mind. Defendants' suggestion that paragraph (o) requires their members to meet a productivity target is false. That paragraph only requires them to "take all reasonable

---

[20] The court adopts and incorporates such order by reference into this opinion.

actions" toward achieving that end, not that they be successful
in doing so.

In addition, defendants take issue with paragraph (j),
which requires them to:

> Direct [] all officials and members of Defendants . . .
> to refrain from taking any action in public or private
> communications, such as using "code words," (e.g.,
> 'work safe,' 'work to rule,' 'work to contract'), or
> cross-messaging (any statements that undermine or
> contradict, directly or indirectly, the mandate to
> restore normal operations) that could be construed as
> a call for a continued slowdown or non-compliance with
> the Permanent Injunction in any manner.

Doc. 120 at App. 006, ¶ (j).

That paragraph does not prohibit defendants or their
officials and members from ever uttering the phrase "work safe";
it only orders defendants to direct their officials and members
to refrain from using such slogans under the narrow
circumstances described in that paragraph. Nor would it disable
defendants' officials and members from talking about safety.
They presumably know the difference between discussing safety
and exclaiming "work safe" as a call to arms.

III.

## Conclusions of Law

In their June 18, 2019 pretrial order, the parties
stipulated to the following list of contested issues of law:

> 1.   Whether the Court lacks subject matter
> jurisdiction of this case on the grounds that
> Plaintiff's claim is a "minor dispute" under the RLA?

>           2.   Whether the requirements of Section[] 6 of
> the Norris LaGuardia Act apply to Plaintiff's claim
> against Defendant?
>           3.   How the requirements of Section 8 of the
> Norris LaGuardia Act apply to Plaintiff's claim
> against Defendants? Specifically, does it require
> Plaintiff to attempt to make reasonable efforts to
> settle the dispute regarding the formulation of a
> joint collective bargaining agreement or the dispute
> regarding the alleged slowdown?
>           4.   Whether Defendants have a legal obligation
> under Section 2, First of the RLA to take all
> reasonable measures to stop concerted activity by
> their members if Defendants have not participated,
> authorized, or ratified it?
>           5.   Whether Plaintiff is required to demonstrate
> that injunctive relief is the only practical and
> effective means of enforcing the Defendants'
> obligations under Section 2, First of the RLA?
>           6.   Whether Defendants have violated Section 2,
> First of the RLA?
>           6.a. If so, whether [plaintiff is] entitled to
> injunctive relief?

Doc. 75 at 19-20. As to issue number 1, it is settled that

plaintiff's claim is a "major dispute" under the RLA and,

therefore, the court does not lack subject matter jurisdiction

over this action on that basis: plaintiff's claim arises out of

the parties' negotiation of a new CBA, not the enforcement of an

existing one. See Conrail v. Ry. Labor Executives' Ass'n, 491

U.S. 299, 302 (1989) (explaining distinction between major and

minor disputes). As to issues 2, 3, 4, and 5, the court issued

on June 28, 2019, a memorandum opinion setting forth its

conclusions of law as to those issues.[21] Doc. 100. That leaves

issues 6 and 6a for the court's resolution.

Legal Issue No. 6 ("Whether Defendants have violated Section 2, First of the RLA?"):

> Section 2, First of the RLA states:

> It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions . . . in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. § 152, First. The Seventh Circuit has explained as

follows what this provision means for a slowdown like the one

alleged here:

> [T]he RLA's status quo provisions . . . impose an affirmative legal duty upon both employers and unions alike--which is enforceable by the courts--to preserve the status quo during the bargaining and mediation process imposed by the RLA. A union has the affirmative duty under the status quo provisions of the RLA to exert every reasonable effort to prevent or discourage a strike or a concerted work action like the slowdown in this case. Once a court determines that such a concerted work action is occurring in violation of the RLA, an injunction can issue ordering the union to observe its statutory duty by trying to stop it.

IAM, 243 F.3d at 363; see also Delta Air Lines, Inc. v. Air Line

Pilots Ass'n, Int'l, 238 F.3d 1300, 1309 (11th Cir. 2001)

(holding that injunction was warranted when evidence showed that

---

[21] The court has adopted and incorporated such memorandum opinion by reference into this opinion. Supra note 4.

there was concerted work action and union failed to exert every reasonable effort to try to stop it). The RLA not only prohibits strikes, but any action that has the consequences of a strike—a disruption to commerce or plaintiff's operations. Allied Pilots Ass'n v. Am. Airlines, Inc., 643 F. Supp. 2d 123, 127-28 (D.D.C. 2009) (citing Nat'l R.R. Passenger Corp. v. Transp. Workers Union of Am., 373 F.3d 121, 124-26 (D.C. Cir. 2004)).

Thus, to show that defendants violated Section 2, First of the RLA, plaintiff must show: (1) defendants' members have changed their normal working behavior on a concerted basis, disrupting commerce or plaintiff's operations, and (2) defendants failed to exert every reasonable effort to prevent or stop such concerted activity. As explained under the heading "Findings of Fact," plaintiff has established each of those facts.

Defendants suggested that they had no duty to "exert every reasonable effort" for a few reasons. First, they argued that the court cannot hold defendants liable under the RLA for actions permitted by the parties' CBA. Doc. 125 at 13 n.18. The court disagrees. "Section 2, First prohibits employees from engaging in concerted action to put economic pressure on the carrier even where the employees have a right under the existing

collective bargaining agreement to take the action in question."
United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l,
No. 08-CV-4317, 2008 WL 4936847, at *40 (N.D. Ill. Nov. 17,
2008), aff'd, 563 F.3d 257 (7th Cir. 2009) (citing Delta, 238
F.3d at 1308-09; IAM, 243 F.3d at 360).

Second, defendants suggested that they should not be held
liable under the RLA because they complied with the court's TRO.
Doc. 125 at 14. It would make no sense to allow defendants to
escape liability on that basis. Doing so would excuse parties on
both sides of labor disputes from complying with their duty to
do everything reasonable to maintain the status quo, so long as
they complied with an order issued after they already destroyed
it. In any case, the concerted activity of defendants' members
may not have stopped and may continue in the absence of a
permanent injunction. See United, 2008 WL 4936847 at *43.
Moreover, the TRO will expire upon the issuance of the final
judgment in this action. Doc. 78. Denying plaintiff a permanent
injunction will leave it with nothing enforcing defendants'
obligations under Section 2, First of the RLA.

For those reasons, the court finds that defendants have
violated Section 2, First of the RLA.

<u>Legal Issue No. 6.a ("If [defendants have violated Section 2,</u>
<u>First of the RLA], whether [plaintiff is] entitled to injunctive</u>
<u>relief?")</u>:

The plaintiff must also show that an injunction "is the

only practical, effective means of enforcing the duty to exert

every reasonable effort to make and maintain agreements."

<u>Chicago & N.W. Ry. Co. v. United Transp. Union</u>, 402 U.S. 570,

583 (1971). And, the plaintiff must show that issuance of an

injunction is equitable under the circumstances. <u>See</u> <u>Winter v.</u>

<u>Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 32 (2008) ("An

injunction is a matter of equitable discretion; it does not

follow from success on the merits as a matter of course."). The

Supreme Court has stated as follows the legal standard generally

applicable to requests for permanent injunctions:

> According to well-established principles of equity, a
> plaintiff seeking a permanent injunction must satisfy
> a four-factor test before a court may grant such
> relief. A plaintiff must demonstrate: (1) that it has
> suffered an irreparable injury; (2) that remedies
> available at law, such as monetary damages, are
> inadequate to compensate for that injury; (3) that,
> considering the balance of hardships between the
> plaintiff and defendant, a remedy in equity is
> warranted; and (4) that the public interest would not
> be disserved by a permanent injunction.

<u>eBay Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388, 391 (2006).

However, "[t]he district courts have subject-matter jurisdiction

to enjoin a violation of the status quo pending completion of

the required procedures, without the customary showing of

irreparable injury." <u>Consol. Rail Corp. v. Ry. Labor Exec.</u>

Ass'n, 491 U.S. 299, 303 (1989). Moreover, there is no monetary remedy for violations of Section 2, First. Burlington N. & Santa Fe. Ry. Co. v. Bhd. of Maint. of Way Emps., 286 F.3d 803, 808 (5th Cir. 2002).

Thus, to show that it is entitled to injunctive relief, plaintiff must show: (1) an injunction is the only practical and effective means of enforcing defendants' duty to exert every reasonable effort to make and maintain agreements, (2) considering the balance of hardships between plaintiff and defendants, an injunction is warranted, and (3) a permanent injunction would not disserve the public interest.

As explained under the heading "Findings of Fact," plaintiff has shown that an injunction is the only practical and effective means of enforcing that duty. Supra at 16-17. Second, the entry of a permanent injunction is warranted considering the balance of hardships. An injunction would only order defendants to do what Section 2, First of the RLA already requires them to do. Plaintiff, on the other hand, would face extraordinary harm in the absence of an injunction. Plaintiff has already shown that the concerted activity of defendants' members has caused flight delays and cancellations, disrupting its operations and likely tarnishing its reputation among affected members of the

flying public.[22] Those effects would likely continue in the absence of a permanent injunction. Thus, whatever harm, if any, the entry of a permanent injunction would cause defendants pales in comparison to the irreparable harm plaintiff would suffer without it. See US Airways, Inc. v. U.S. Airline Pilots Ass'n, 813 F. Supp. 2d 710, 736-37 (W.D.N.C. 2011). Third, as explained, the entry of a permanent injunction would not disserve the public interest. Therefore, the court finds that plaintiff is entitled to a permanent injunction.

As for what form that injunction should take, defendants take issue with certain provisions of plaintiff's proposed permanent injunction (doc. 120). None of those arguments have merit. First, defendants object to the proposed injunction's permanence, arguing that at some point, the mediation process may end and defendants may be allowed to engage in self-help. Doc. 125 at 18-19. If that happens, defendants can file a motion to set aside the injunction, but the court will not limit its injunction based on events that may or may not happen at some indefinite point in time.

Second, defendants dispute the provision of paragraph (o) that they "take all reasonable actions . . . to ensure that their members . . . achieve approximately, in the aggregate, on

---

[22] For that reason, plaintiff has also shown irreparable injury, although such a showing is not required.

a seven-day moving average basis, overnight productivity levels equal to the aggregate status quo overnight productivity level that was achieved during the same seven-day period in . . . 2018." Id. at 19-22. They argued that the paragraph is too vague to satisfy the requirement of Rule 65(d)(1)(B)-(C) of the Federal Rules of Civil Procedure that "[e]very order granting an injunction . . . state its terms specifically; and describe in reasonable detail . . . the act or acts restrained or required." Injunctions cannot be so narrow as to allow for easy evasion. McComb v. Jacksonville Paper Co., 336 U.S. 187, 192-93 (1949). For that reason, injunctions to follow the law are often necessary to restrain repeat violators of the law, who might otherwise find cunning ways to evade narrow orders. See id. As the Fifth Circuit has stated:

> While injunctions should be specific, the command for specificity is not absolute; it merely requires injunctions to be framed so that those enjoined will know what conduct the court has prohibited. The mere fact that interpretation is necessary does not render the injunction so vague and ambiguous that a party cannot know what is expected of him.

Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States Co., 195 F.3d 765, 772 (5th Cir. 1999). The court is satisfied that paragraph (o) is specific enough to comply with Rule 65. It does not require that defendants do anything more than what the RLA already requires of them, which is to "exert

every reasonable effort" to restore the status quo. See 45 U.S.C. § 152, First.

Defendants also argued that paragraph (j) is a prior restraint.[23] Doc. 125 at 23. That paragraph is not a prior restraint, because it restrains no speech; it only orders defendants to direct their officials and members to refrain from using certain speech as a way of enforcing defendants' existing obligations to "exert every reasonable effort" to restore the status quo. If defendants' directives fall on deaf ears, then so be it, but that paragraph censors no one.[24]

Finally, defendants object to paragraphs (d), (e), (f), and (k) as unwarranted and duplicative of similar provisions in the modified TRO. Those provisions are necessary to ensure that defendants' members are apprised of the permanent injunction.

For those reasons, the court finds that plaintiff's proposed permanent injunction would appropriately enforce defendants' duties under Section 2, First of the RLA.

_____

[23] See page 19, supra, for the relevant language of that paragraph.

[24] Defendants did not make a First Amendment objection to any other provision of the proposed injunction, so the court considers it that defendant has no such objections. As to those other provisions, the court notes that the District of Columbia Circuit has recently upheld similar language against a First Amendment challenge, although it did not address the prior restraint issue specifically. See Atlas Air, Inc. v. Int'l Bhd. of Teamsters, 928 F.3d 1102, 1119 (D.C. Cir. 2019).

## IV.

## Conclusion

Plaintiff has shown that defendants' members conducted a concerted slowdown, defendants abdicated their duty to take every reasonable action to prevent or stop it, plaintiff is entitled to a permanent injunction to enforce that duty, and the entry of its proposed permanent injunction is an appropriate means to do so. Accepting defendants' arguments to the contrary would require the court to ignore the evidence and abandon common sense. Accordingly, the court will enter the proposed permanent injunction forthwith.

SIGNED August 12, 2019.

JOHN McBRYDE
United States District Judge