

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

AUG 1 3 2019

CLERK, U.S. DISTRICT COURT
By _____
Deputy

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

|  |  |
|---|---|
| AMERICAN AIRLINES, INC.,<br><br>        Plaintiff,<br><br>v.<br><br>TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, and AIRLINE MECHANIC AND RELATED EMPLOYEE ASSOCIATION TWU/IAM,<br><br>        Defendants. | Civil Action No. 4:19-cv-00414-A |

## AMERICAN AIRLINES, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR CONTEMPT SANCTIONS

**TABLE OF CONTENTS**

<strong>Page</strong>

INTRODUCTION ..................................................................................................1

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF FACTS ...................................................................................4

    I.    Defendants Have Refused To Adopt And Promote The Commitment To Compliance Required By The TRO ........................................................4

        A.    Defendants' Senior Leaders Have Refused To Participate In Ending The Disruption As Required By The TRO ...................................5

        B.    Defendants' Formulaic, Perfunctory Meetings Do Not Comply With The TRO ........................................................................................7

        C.    Defendants Have Expressly Sought To Undermine Compliance With The TRO ........................................................................................9

        D.    The IAM's Robocalling Does Not Comply With The TRO ....................11

        E.    Defendants' Required Videos Do Not Comply With The TRO...............12

        F.    Defendants' Requests For Acknowledgements Do Not Comply With The TRO ......................................................................................12

        G.    Defendants Have Not Complied With The TRO's Requirement To Take All Reasonable Actions To Return Productivity To Status Quo ......................................................................................................14

    II.    American Has Repeatedly Alerted Defendants That They Are Failing To Comply. ...........................................................................................14

    III.    American's Operations Have Not Returned to The Status Quo. ...........................17

ARGUMENT......................................................................................................19

    I.    Defendants Should Be Held In Contempt. ..........................................19

    II.    Both Compensatory And Coercive Civil Contempt Sanctions Are Appropriate. ......................................................................................24

CONCLUSION ..................................................................................................25

<u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*American Airlines, Inc. v. Allied Pilots Ass'n,*
  228 F.3d 574 (5th Cir. 2000) ...................................................................................2

*American Airlines, Inc. v. Allied Pilots Ass'n,*
  53 F. Supp. 2d 909 (N.D. Tex. 1999) .......................................................................4

*Bhd. of R.R. Trainmen v. Jacksonville Term. Co.,*
  394 U.S. 369 (1969) ................................................................................................3

*Black Diamond Coal Co. v. Local Union No. 8460,*
  597 F.2d 494 (5th Cir. 1979) .................................................................................23

*Chi. & N.W. Ry. Co. v. United Transp. Union,*
  402 U.S. 570 (1971) ................................................................................................3

*Consolidation Coal Co. v. Local 1702, United Mineworkers,*
  683 F.2d 827 (4th Cir. 1982) .................................................................................23

*Dow Chem. Co. v. Chem. Cleaning, Inc.,*
  434 F.2d 1212 (5th Cir. 1970) ...............................................................................25

*F.T.C. v. Trudeau,*
  579 F.3d 754 (7th Cir. 2009) .................................................................................20

*Int'l Union, United Mine Workers v. Bagwell,*
  512 U.S. 821 (1994) ..............................................................................................24

*Island Creek Coal Co. v. Local No. 2232, United Mine Workers,*
  732 F. Supp. 666 (W.D. Va. 1990) ........................................................................23

*Maness v. Meyers,*
  419 U.S. 449 (1975) ..............................................................................................20

*Martin v. Trinity Indus., Inc.,*
  959 F.2d 45 (5th Cir. 1992) ...................................................................................20

*McComb v. Jacksonville Paper Co.,*
  336 U.S. 187 (1949) ..............................................................................................25

*N.L.R.B. v. Concordia Elec. Co-Op, Inc.,*
  No. 95-60404, 1999 WL 1411474 (5th Cir. Nov. 9, 1999) .......................................25

*N.L.R.B. v. Trailways, Inc.,*
  729 F.2d 1013 (5th Cir. 1984) ...............................................................................20

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*New York Times Co. v. Newspaper & Mail Deliverers' Union,*
  740 F. Supp. 240 (S.D.N.Y. 1990) ..........................................................................23

*United Air Lines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers,*
  243 F.3d 349 (7th Cir. 2001) ..................................................................................23

*United States Steel Corp. v. United Mine Workers,*
  598 F.2d 363 (5th Cir. 1979) ..................................................................................23

*United States v. United Mine Workers,*
  330 U.S. 258 (1947) ................................................................................................20

*W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber,*
  461 U.S. 757 (1983) ................................................................................................20

*Walker v. Ctr. for Food Safety,*
  667 F. Supp. 2d 133 (D.D.C. 2009) ........................................................................20

## INTRODUCTION

American's sole objective in this litigation has been to stop Defendants' illegal slowdown. The Court's findings in its August 12, 2019 Memorandum Opinion reflect the devastating impact Defendants' concerted job action has exacted upon the airline and the public. Nevertheless, at every step since the Court entered its June 14, 2019 temporary restraining order ("TRO"), and amended it three weeks later, Defendants have refused to comply with the Court's orders and stop the slowdown. While American has been extraordinarily patient—even holding this contempt motion in abeyance until a decision was issued in deference to this Court— Defendants' conduct has continued undeterred. American repeatedly has implored Defendants to comply, but they have been steadfast in their refusal to do so. Defendants claim they should not be held liable because of their supposed "check-the-box" compliance with the TRO, but they have failed, and continue to fail, to "to take all reasonable actions within [their] power" to return American's operations to the status quo that they destroyed. American is thus left with no other option but to file this Motion. For these reasons and those set forth below, American hereby requests this Court find Defendants in contempt of the TRO and impose contempt sanctions against them because of their failure—indeed their blatant refusal—to take all reasonable steps to end the illegal slowdown as required by this Court's orders.

## PRELIMINARY STATEMENT

On June 14, American sought, and the Court issued, a TRO requiring Defendants to take all reasonable steps to stop the illegal slowdown and enjoining any interference with American's operations. The TRO followed an orchestrated, concerted, illegal effort to disrupt American's operations that began in February and steadily escalated, even after American commenced this action. Defendants largely ignored the requirements of the TRO and the disruption continued to escalate. Three weeks later, American sought, and this Court issued, a modified TRO.

The modifications to the TRO proposed by American were carefully designed to advance Defendants' compliance efforts by specifically requiring Defendants' adoption of a commitment to compliance—"a sincere and emphatic respect for the requirements" of the TRO—and by requiring Defendants to take specific actions that would have ended the disruption if adopted and completed as required.  The modifications also require Defendants to make all reasonable efforts to improve a key productivity measure that would quickly restore American's operation to normal.  Despite American's daily advice to Defendants about performance generally, its frequent notice to Defendants about specific compliance failures, and the detailed roadmap included in American's response to Defendants' exaggerated and misleading compliance declarations, Defendants' defiance of the TRO continues.

Far from exerting every reasonable effort to stop the slowdown with sincere, forceful, and unequivocal messaging as required by the TRO, Defendants have orchestrated a thinly-veiled strategy of feigned compliance—messaging to their members that their communications are meant to appease the Court, not to persuade their members to end the slowdown.  Nothing about Defendants' actions evinces a sincere desire to return American's operations to status quo.  Indeed, the Fifth Circuit easily could have been referring to Defendants when it described similar union messages as "so lacking in authoritative forcefulness that [they] either [are] not heard at all … or [are] discounted as being merely stage lines parroted for the benefit of some later judicial review."  *See American Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 582 (5th Cir. 2000).

Defendants' lack in authoritative forcefulness starts at the top.  Their senior leaders—Sito Pantoja, John Samuelsen, and Alex Garcia—who are required under the modified TRO to personally and aggressively act to stop the disruption—have hardly engaged at all.  In their videos and on the very few occasions that they personally stood in front of their members, they

did little more than begrudgingly utter a few scripted words, all while making it abundantly clear

that those words were required by the Court and were not their own. Their actions have sent an

unmistakable signal to their members that the slowdown can continue. These hollow, insincere

messages by the Defendants' senior leadership were mirrored by other Union leaders in virtually

every interaction they undertook with their members under the TRO. And, further subverting

these Court-ordered messages, Defendants have, in post-TRO communications to their members,

openly denied that any slowdown has ever occurred, asserted that American management is to

blame for the disruption to its operations, contended that the TRO is contrary to FAA safety

requirements, and averred that the TRO was granted only because of American's lies.

Defendants' defiance of the TRO has resulted in the operational disruption continuing

largely unabated. In the eight weeks since this Court issued the TRO, Defendants' continued

illegal slowdown has caused over 950 flight cancellations and over 280 two-hour (or longer)

delays, disrupting the lives of over 170,000 members of the public. But for Defendants'

violations of the TRO, these over 1,230 maintenance-related cancellations and delays would not

have occurred. Defendants' illegal activity—now twice ordered stopped by this Court—has

caused (and continues to cause) enormous hardship to American's customers and team members,

enormous financial losses to American, and untold harm in lost customer goodwill.

The mandate set forth in Section 2, First of the RLA requiring carriers and unions and

their members to "make and maintain agreements . . . [without] any interruption to commerce or

to the operation of any carrier" has repeatedly been recognized as the heart and soul of the RLA.

*See, e.g.*, *Bhd. of R.R. Trainmen v. Jacksonville Term. Co.*, 394 U.S. 369, 377 (1969); *Chi. &

N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 574-77 (1971). Defendants' continued

affront to the TRO undermines not only this Court's authority, but the authority of federal courts

to enforce the RLA. If allowed to continue, Defendants' illegal behavior would eviscerate and render meaningless Section 2, First, enabling Defendants to inflict devastating harm to American and the public, and suggest to other unions that they could undertake similar illegal efforts in future collective bargaining, all without penalty.

For these reasons, and as detailed below, American respectfully requests that Defendants be held in contempt and that they be sanctioned in an amount, to be determined at a hearing, sufficient to compensate American for the losses caused by Defendants' violations of the TRO.

## STATEMENT OF FACTS

**I.      Defendants Have Refused To Adopt And Promote The Commitment To Compliance Required By The TRO.**

The Court's TRO requires Defendants to take all reasonable steps to stop the unlawful disruption to American's operations. To support that effort, the modified TRO requires Defendants' leaders to "communicate a sincere and emphatic respect for the requirements of the [TRO] and an imperative that every single mechanic and related employee [and Union official] fully and immediately comply." (Dkt. No. 111 at 2, ¶¶ (a), (b).) American requested that this Court require Defendants to display this attitude of respect for the TRO in an effort to ensure that the mechanics understand that Defendants truly desire the slowdown to stop—in compliance with the TRO—and that, in turn, the mechanics would comply. *See American Airlines, Inc. v. Allied Pilots Ass'n*, 53 F. Supp. 2d 909, 932 (N.D. Tex. 1999) (explaining that it was only when the union issued a "personal plea" from its president, along with clear directives without cross-messaging that the slowdown actually abated). As described in Sections A-G below, however, Defendants blatantly have refused to adopt this commitment to compliance in every action that they have taken in supposed compliance with the TRO. Instead, they have continued the same "check-the-box" approach that led American to seek the TRO modification and that the Fifth

Circuit has found unacceptable. *See American*, 228 F.3d at 579. Defendants' failure to adopt

and promote a commitment to compliance has sent a clear, unmistakable message that the

Unions have no desire to stop the illegal disruption and little, if any, true regard for the TRO—as

confirmed by the ongoing operational disruption described below.

### A. Defendants' Senior Leaders Have Refused To Participate In Ending The Disruption As Required By The TRO.

American specifically named Sito Pantoja, John Samuelsen, and Alex Garcia in the

proposed modified TRO because it believes that any message to stop the illegal job action will be

effective only if it comes directly from Defendants' senior leaders. Despite the modified TRO's

requirement that they each take personal and aggressive action, including conducting in-person

meetings directly with their members, Messrs. Pantoja, Samuelsen, and Garcia have failed to

satisfy that requirement. For instance, five weeks after the issuance of the modified TRO, Mr.

Pantoja has conducted only one meeting, Mr. Samuelsen only two, and Mr. Garcia only three.

At these few meetings, these senior leaders made it abundantly clear that they were there

delivering a message required by the Court and, in some cases, made statements that directly

violated the TRO. At the only meeting Mr. Pantoja attended, after beginning by stating that he

was present under the Court's order and would not answer questions, he violated an express

provision of the TRO when he told mechanics that the TRO provision requiring mechanics to

accept overtime and field trips in the normal course means that "if you want to work overtime

then do it, if you don't want to work overtime then you don't have to." *See* APP0084-85 (¶ 9).[1]

His comment violates the TRO's specific prohibition against Defendants making "[a]ny assertion

---

[1] On July 24, 2019, American filed an Appendix that included 11 declarations. (Dkt. No. 123.) American cites to that Appendix in this brief as "APP." In conjunction with filing this motion, American is filing an additional Appendix that contains 13 declarations. American cites to that Appendix in this brief as "SUPPAPP."

that the TRO does not prohibit individual employees from making voluntary decisions to engage in such actions." (Dkt. No. 65 at 5, ¶ (a).) Similarly, Mr. Samuelsen ended one of his only two meetings, a meeting which he conducted in the same robotic manner as Mr. Pantoja did his, with mechanics at American's Miami station, by remarking to mechanics to "work safe"—a well-recognized code phrase for slowing down the operation. *See* APP0069 (¶ 11). Authenticity similarly has been absent in Mr. Garcia's presentations. At his meeting in Los Angeles, after he told his members that he was present because of a Court order and read the TRO requirements in an emotionless, monotone voice, he refused to answer questions—even as mechanics shouted at him to do so. APP0065-66 (¶¶ 10, 15). His presentation was so ineffective that mechanics walked out, some using expletives as they left. *Id.* (¶¶ 11, 15). His robotic presentation style continued in the only two other meetings Mr. Garcia attended, in San Francisco and San Diego. In both instances, Mr. Garcia read a prepared statement and concluded his remarks in only a few minutes. SUPPAPP0010-11 (¶¶ 3, 11); SUPPAPP0037 (¶¶ 8, 11-12).

The lack of personal, genuine, and emphatic engagement displayed by Defendants' senior leaders signals to their members that their words are meant merely to satisfy the technical requirements of the TRO, not that they sincerely want the illegal slowdown to stop. The contrast between their emotionless TRO presentations and other communications regarding American is stark and telling. When, for example, when TWU President John Samuelsen showed up at a team member town hall and hotly warned American that it would be facing the "bloodiest, ugliest" battle in labor history if American did not agree to Defendants' scope proposal, he certainly did not read a script from a piece of paper in a monotone voice. Instead, in that video which has received over 40,000 views, he displayed the exact type of "authoritative forcefulness" that is absent from not only his, but every Union leader's presentation about the

requirements of the TRO.  *See* SUPPAPP0055 (¶ 6).[2]

### B. Defendants' Formulaic, Perfunctory Meetings Do Not Comply With The TRO.

The modified TRO requires that, in the meetings with the mechanics, Defendants' senior leaders "communicate a sincere and emphatic respect for the requirements of the [TRO] and an imperative that every single mechanic and related employee [and Union official] fully and immediately comply." (Dkt. No. 111 at 2, ¶¶ (a), (b).)  But, just as Messrs. Pantoja, Samuelsen, and Garcia did in their meetings, the various Union representatives sent to deliver the message required by the TRO simply "parroted" stage lines. *American*, 228 F.3d at 582.

After it became apparent that the Union representatives were working from a prepared script and that the meetings uniformly were being conducted in a robotic "check-the-box" approach, American implored Defendants to instead approach the meetings in a manner sincerely calculated to convince their members to abandon their slowdown activities.  Defendants, however, have refused to relent in their flagrant disregard of this Court's orders.  Instead, they have continued to hold perfunctory, robotic meetings that clearly communicate that any action they take or words they speak are required by the Court.  The unmistakable message from these meetings is that the Defendants do not request or expect mechanics to change their behavior or to cease their slowdown activities.  This is confirmed in the declarations submitted by American (SUPPAPP0001-51), certain highlights of which are summarized below:

- Defendants' leaders have begun the meetings required by paragraphs (a) and (b) of the modified TRO by stating they are required to hold the meetings by court order, and that

---

[2] Defendants' senior leaders also know exactly how to convey a written message in an emphatic and forceful manner when they want to do so. *See, e.g.*, SUPPAPP0067-68 (Ex. 3) (letter from Mr. Samuelsen to President Trump); APP0034 (Ex. 2) (letter from Messrs. Pantoja and Garcia to Defendants' members entitled "NMB to American Workers: 'Drop Dead'" communicating a strong (and untrue) message); Dkt. No. 60-2, at APP0106 (letter from Messrs. Pantoja and Garcia to American president Robert Isom demanding American continue CBA negotiations).

they are required to allow management to be present by court order, thus conveying that the sole purpose of their presence is to satisfy an unwanted obligation unfairly imposed by this Court and implying that they personally have no interest in mechanics restoring the status quo. *See* APP0069 (¶ 8); APP0073 (¶ 8); APP0089 (¶ 10); APP0095 (¶ 6); APP0102 (¶ 6); SUPPAPP0015 (¶ 7); SUPPAPP0040 (¶ 7).

- The meetings have been extremely brief, with most lasting five minutes or less, and few lasting more than ten minutes. *See* APP0064 (¶ 3); APP0069 (¶ 11); APP0073 (¶ 7); APP0085 (¶ 11); APP0090 (¶ 14); APP0091 (¶ 26); APP0095 (¶ 8); APP0102 (¶ 11); APP0106 (¶ 7); SUPPAPP0010 (¶ 3); SUPPAPP0032 (¶ 2); SUPPAPP0037 (¶ 12); SUPPAPP0040 (¶ 6); SUPPAPP0050 (¶ 10). Defendants' leaders have often arrived abruptly without interacting with mechanics before or after, further communicating to mechanics they are simply there to fulfill an unfortunate TRO requirement, not to change mechanic behavior. *See* APP0065 (¶ 7); APP0073 (¶ 12); APP0080 (¶ 6); APP0085 (¶ 13); APP0089 (¶ 7); APP0091 (¶ 27); APP0095 (¶ 12); SUPPAPP0050 (¶ 7).

- At most of these meetings, Defendants have done nothing other than read a brief statement. Very few of these dozens of meetings included any non-scripted comment from senior Union leaders urging compliance with the TRO. *See* Dkt. No. 117 at 109-110; APP0076-77; APP0065 (¶ 10); APP0069 (¶ 6); APP0073 (¶ 9); APP0084-85 (¶ 9); APP0089 (¶ 10); APP0095 (¶ 8); APP0102 (¶ 8); APP0106 (¶ 9); SUPPAPP0011 (¶¶ 11-12); SUPPAPP0019 (¶ 6); SUPPAPP0037 (¶¶ 8, 10); SUPPAPP0040 (¶ 8); SUPPAPP0050 (¶¶ 8-9).

- Defendants have read these statements in a dull, monotone voice that has exposed Defendants' lack of commitment to securing compliance. *See* APP0065 (¶ 10); APP0069 (¶ 9); APP0073 (¶ 10); APP0081 (¶ 14); APP0085 (¶ 10); APP0089-90 (¶ 12); APP0095 (¶ 10); APP0102 (¶ 9); APP0106 (¶ 9); SUPPAPP0015 (¶ 8); SUPPAPP0028 (¶ 9); SUPPAPP0037 (¶ 11). Some of Defendants' chosen representatives have looked down at the paper from which they were reading, barely making eye-contact with the mechanics they purportedly were asking to comply. *See* APP0089-90 (¶ 12); APP0102 (¶ 9); SUPPAPP0011 (¶ 11); SUPPAPP0033 (¶ 7); SUPPAPP0050 (¶ 8).

- Defendants affirmatively have stated that they will not answer questions and, in most cases where questions were asked by the mechanics in attendance, simply have ignored those questions or reiterated that they would not answer questions. *See* APP0065 (¶ 9); APP0069 (¶ 7); APP0073 (¶ 8); APP0084 (¶ 8); APP0089 (¶ 10); APP0095 (¶ 6); APP0102 (¶ 10); APP0106 (¶ 8); SUPPAPP0003-04 (¶¶ 12, 20); SUPPAPP0011 (¶ 11); SUPPAPP0019 (¶¶ 10, 11); SUPPAPP0033 (¶ 7); SUPPAPP0040 (¶ 8); SUPPAPP0047 (¶ 5); SUPPAPP0050-51 (¶¶ 8, 17). Defendants' refusal to entertain questions from their members belies any suggestion that their meetings are intended to change behavior. If that were the case, it would be critical to ensure that mechanics did not have any remaining questions and, instead, fully understood the message. *See* APP0016.

- When mechanics have otherwise indicated they do not understand the message or made outbursts suggesting that they will not comply with the TRO, Defendants' leaders have

remained silent. *See* APP0066 (¶ 15); APP0080 (¶ 8); SUPPAPP0023 (¶ 5); SUPPAPP0028-29 (¶¶ 10, 21); SUPPAPP0042-43 (¶ 23). Again, had the true intent of these meetings been to stop the disruption and have their members comply with the TRO, the Union representatives surely would not have stood idly by while their members threatened to continue to disrupt the status quo. *See also* SUPPAPP0006 (¶ 33); SUPPAPP0019 (¶¶ 11-12).

These meetings thus have not communicated a "sincere, emphatic respect" for this Court, the RLA, and the TRO, as this Court's modified TRO requires. (Dkt. No. 111, at 5, ¶¶ (a), (b).)

## C. Defendants Have Expressly Sought To Undermine Compliance With The TRO.

The TRO, of course, prohibits any acts or statements that would undermine compliance with the Court's orders. In open defiance of the TRO, Defendants have published several communications that both discourage mechanics from complying with the TRO and, on their face, seek to incite mechanics to continue and even expand their concerted slowdown. Those communications clearly demonstrate the Unions' disdain for the TRO and signal to its members that the illegal work action should continue.

On July 15, 2019, Defendants published to its membership an open letter to the Federal Aviation Administration ("FAA") that purported to "advise [it] of a court order issued July 10, 2019 which implicates safety concerns," and "request[ed] that [the FAA] assign inspectors to all maintenance locations sufficient to ensure that the use of targeted productivity levels does not compromise the public safety or compliance with FAR regulations." APP0027 (Ex. 1). This is a direct affront to the TRO and the exact opposite of taking all reasonable steps to ensure that productivity is returned to the status quo.

Fundamentally, Defendants could have expressed any genuine safety concerns directly, and only, to the FAA. Instead, they demonstrated the pre-textual nature of those concerns, and their actual motive, by publishing the FAA letter to the full Union membership. They accompanied publication of the FAA letter with a notice advising their members that they were

filing a Motion for Reconsideration challenging the July 10 modifications to the TRO. APP0026-27 (Ex. 1). Even after this Court denied Defendants' Motion to Reconsider on July 16—noting that the Court does not "believe that the members of defendants do not have good enough judgment to know when they are doing something that would adversely affect the traveling public, as distinguished from taking actions to resume in an appropriate manner their normal work activities"—Defendants neither retracted these publications nor posted the July 16 order. (Dkt. No. 116.) Even now, the FAA letter, including Defendants' plan to seek reconsideration, remain on their website for all members to see. SUPPAPP0055 (¶ 5).

On July 17, 2019, Defendants issued a publication titled "NMB to American Workers: 'Drop Dead.'" The publication, signed by Messrs. Pantoja and Samuelsen, complained about the NMB's scheduling decisions and falsely accused American of influencing a decision the Unions believed would be unpopular with its members, asserting: "our hopes for meaningful negotiations were quickly dashed by the NMB at the apparent bidding of American." APP0034 (Ex. 2). The NMB's decisions regarding the scheduling of negotiation sessions are its own. APP0022 (¶ 3). But when Defendants tell their membership that American has "co-opted the NMB into its strategy of unconscionable delay," and American and the NMB's "dereliction of that duty [to move negotiations forward] is a national disgrace," they knowingly encourage their members to strike back at American by continuing and even ratcheting up their illegal activities. APP0034.

Then, on July 24, 2019, an Association video titled "Association to Parker / Get back to the table" was first released.[3] The video has since been published on several TWU and IAM

---

[3] The video has significantly higher production value than the senior Union leadership videos required by the TRO that Defendants prepared.

websites. SUPPAPP0053-54 (¶ 2). Rather than focusing on collective bargaining negotiations, the video begins with a message that blatantly defies the TRO: *"American Airlines' operation is failing. . . . Doug [Parker] blames American's mechanics. Maybe Doug should look at his management team."* SUPPAPP0059 (Ex. 1 at 2:7-11). With those words, Defendants are conveying that there is no concerted activity and that the Court's TRO wrongly blames mechanics for the operational disruptions experienced by American. In doing so, Defendants directly undermine the force of the TRO. *Id.*

And, finally, and perhaps most egregiously, on July 31, 2019, TWU International Vice President Gary Peterson—who testified at the trial that he had supposedly been working up to 20 hours a day every day to achieve TRO compliance—launched a series of missives that completely undermine any suggestion that mechanics must stop the concerted slowdown and return to the status quo. Tr. 190:24-191:25; SUPPAPP0065 (Ex. 2). Mr. Peterson falsely tweeted that "the percentage of out of service [aircraft] in June matches last year, which further proves there isn't a slowdown. Statistics don't lie but liars use statistics!" *Id.* Mr. Peterson also falsely tweeted, "where's the slowdown that mechanics are being sued over????" and "Are our passengers being played like pawns because of American's continuing leadership failures." *Id.* With these inflammatory messages, Mr. Peterson effectively told mechanics that his dozen TRO presentations were not sincere and mechanics need not take the TRO seriously.

### D. The IAM's Robocalling Does Not Comply With The TRO.

Continuing their "check-the-box" strategy, the IAM has handled the telephone calls required under the modified TRO in a perfunctory non-compliant fashion. On July 30, the IAM informed the Court that it used "efficient" robocalling technology with a recorded audio message from Mr. Pantoja to reach the 600 mechanics who did not attend in-person meetings in purported

compliance with paragraph (c) of the modified TRO. (Dkt. No. 127 at 6.)  While that approach may have been time-saving for the IAM, robocalling does not allow for personal interaction and provides the recipient with no opportunity to ask questions or engage in a dialogue with the caller to clarify the message.  The difference in force and effect between a recorded phone call and a personal call from a senior Union official as required by the TRO is significant, as American has told Defendants. (*See* Dkt. 114 at 9 n.4.)  Indeed, the IAM has no means of even verifying whether the 600-plus members who did not attend a TRO meeting listened to the robocall and have received the message required by the TRO.  Efficiency, of course, is not the goal of the Court's TRO; effectiveness is.  The IAM's decision to use this shortcut, instead of requiring its senior leaders to place these calls personally, is yet another violation of the TRO.

### E.  Defendants' Required Videos Do Not Comply With The TRO.

The videos Defendants have released in purported compliance with the TRO also have been non-compliant.  Defendants have released videos of Mr. Pantoja, Mr. Samuelsen, and Mr. Garcia.  *See* APP0035-52 (Exs. 3-5).  In the video by Mr. Pantoja, he boldly states that violation of the TRO by members could subject them to "discipline by American and fines by the unions," instead of "fines *or discipline* by" the Unions (not American), as the TRO provides.  APP0040 (Ex. 3).  Moreover, the message in that video, as well as in Mr. Garcia's and Mr. Samuelsen's videos, was read in an uninspired monotone, with Messrs. Garcia and Pantoja each clearly reading from a piece of paper.  *See* APP0035-52 (Exs. 3-5).  The absence of "authoritative forcefulness" sends a clear message—that their messages are required by the Court, but not embraced by Defendants.

### F.  Defendants' Requests For Acknowledgements Do Not Comply With The TRO.

Defendants originally suggested to this Court that American, and not Defendants, should

distribute and obtain signed TRO acknowledgement forms from Defendants' members as required by Paragraph (f) of the TRO. (Dkt. Nos. 112 at 10-11; 114 at 9-10.) Following this Court's rejection of Defendants' attempt to transfer responsibility to American, Defendants began holding meetings to distribute and obtain signed copies of the acknowledgement forms. Nothing about these largely cursory meetings comply with the TRO.

Although mechanics have repeatedly expressed significant confusion about the TRO and the forms they are being asked to sign, Defendants have demonstrated blatant indifference as to whether their members understand the message. In addition, at certain of these meetings, mechanics are told by Defendants to direct any questions to American management because the Union will not be answering any—a direct and improper attempt to transfer Defendants' obligations under the TRO to American. SUPPAPP0019 (¶¶ 10-11); SUPPAPP0023 (¶¶ 5, 9); SUPPAPP0025 (Ex. A); SUPPAPP0028 (¶ 10); SUPPAPP0042-43 (¶¶ 20-23); SUPPAPP0047 (¶ 5). These meetings and the mechanics' questions provide Defendants a perfect opportunity to explain what the TRO means and how mechanics are expected to return to normal behavior, but Defendants have refused to answer those questions. SUPPAPP0019 (¶¶ 10-11); SUPPAPP0023 (¶ 5); SUPPAPP0028 (¶ 10); SUPPAPP0042-43 (¶¶ 20-23).

And when a mechanic in Charlotte, North Carolina asked IAM General Chair Sean Ryan (one of the signatories to the March 8 letter encouraging the job action) what would happen if he refused to sign an acknowledgement form, Mr. Ryan replied sarcastically with a chuckle that he was "not a police officer." SUPPAPP0006 (¶ 33). In response, the mechanic stated, "well, that answers that then." *Id.* This mocking treatment of the TRO by a Union official significantly undermines TRO compliance and suggests to mechanics that they should not take the meetings seriously, while expressly conveying that they do not have to sign the acknowledgment form if

they do not want to do so. *Id.* This instance standing alone warrants a contempt finding.

### G. Defendants Have Not Complied With The TRO's Requirement To Take All Reasonable Actions To Return Productivity To Status Quo.

Since the Court issued the TRO on June 14, Defendants have failed to take all reasonable steps to return overnight productivity to status quo levels, and, as a result, overnight productivity remains significantly below status quo levels. Indeed, as Defendants' compliance declarations make expressly clear, despite the TRO's requirement that Defendants take all reasonable actions to return overnight productivity to normal, Defendants have not taken a single action that is not specifically listed in the TRO. (Dkt. Nos. 117, 118, 121, 124, 127, 129, 130.) Given Defendants' knowledge regarding its membership, it simply cannot be that Defendants are unable to conceive of any actions to return productivity to normal other than those specifically enumerated by the Court in the modified TRO. And, of course, as detailed above, Defendants have undertaken each of those enumerated actions in a non-compliant manner.

## II. American Has Repeatedly Alerted Defendants That They Are Failing To Comply.

American has, on a daily basis, provided Defendants with detailed updates regarding two key metrics in American's operations—the number of unscheduled aircraft out of service at 7 a.m. and overnight productivity. SUPPAPP0070-71 (¶ 2). American also has been proactive in informing Defendants of their failures to comply with the TRO. Unfortunately, American's requests for compliance have been met with Defendants' steadfast refusal to comply.

On the morning of July 12, 2019, after American managers observed Defendants' initial meetings with mechanics on the evening of July 11, American's counsel wrote to Defendants' counsel to address how these meetings failed to comply with the TRO, and to urge Defendants to change their non-compliant approach. APP0018 (Ex. 2). American's counsel stated that these meetings consisted simply of individuals indicating they were there because of a court order,

stating they would not take any questions, and then briefly reading from a script. (*Id.*) American's counsel also notified Defendants that these perfunctory meetings constituted the same non-compliant and ineffective "check-the-box" approach that resulted in American seeking modification to the TRO in the first place. (*Id.*) American also explained that Mr. Samuelsen violated the TRO by telling mechanics to "be safe" in his meeting in Miami. (*Id.*) In response, Defendants refused to change their approach, while casting blame elsewhere, arguing that, "[g]iven the abysmal state of employee morale at American Airlines," Union leaders were concerned question sessions would create a distraction. APP0017 (Ex. 2). Defendants begrudgingly agreed to instruct Mr. Samuelsen not to use the phrase "be safe" in the future, but protested that Mr. Samuelsen did not violate the TRO by doing so. (*Id.*)

American responded on July 13 by again explaining that Defendants' approach was not compliant with the TRO. APP0015 (Ex. 2). American also explained that Mr. Pantoja made comments during his meeting in Washington, D.C. that not only undermined TRO compliance, but directly violated the TRO, and asked Defendants to conduct a new meeting in D.C. that complied with the TRO. APP0016 (Ex. 2). American also explained why Defendants' stated reasons for not taking questions were unconvincing: a "question and answer setting is inherently part of a group meeting to ensure an adequate understanding of the message conveyed." (*Id.*)

Defendants thereafter became more adamant and aggressive. Instead of agreeing to do everything possible to comply with this Court's order, Defendants responded that "[i]t will serve us best if you do not again falsely accuse TWU of starting any job action," and "[d]o not expect John [Samuelsen] to use the words you select. We will not apologize for legally permissible speech, even as you seek to censor our union president." APP0013-14 (Ex. 2).

On July 31, 2019, soon after Defendants began holding meetings for the specific purpose

of obtaining acknowledgment forms required by paragraph (f) of the modified TRO, American's

counsel again wrote to Defendants' counsel informing them that Defendants' representatives

continued to refuse to take or answer questions about the TRO or the acknolwedgement forms.

SUPPAPP0081 (Ex. 2). Rather, Defendants' representatives were directing mechanics to ask

their managers these questions, in an attempt to shift the responsibility to American and in

deriliction of their duty to make all reasonable efforts to stop the slowdown. *Id.* American's

counsel requested that the Union representatives be equipped with appropriate information so

that they could ensure that mechanics understand how to comply with the TRO appropriately.

*Id.* Counsel for the TWU did not respond and the IAM's counsel denied any obligation to have

its representatives respond to mechanics' questions. SUPPAPP0080 (Ex. 2).

Also, as demonstrated in detail in American's Response to Defendants' Compliance

Declarations (Dkt. No. 122), Defendants' declarations, which were required to apprise this Court

of Defendants' progress, have been misleading and exaggerated. Mr. Pantoja's July 17, 2019

declaration, for example, stated that each IAM representative gave the same presentation,

without acknowledging the additional comments made by Mr. Pantoja during his meeting in

Washington, D.C. (Dkt. No. 117 at 7-8.) Similarly, while Mr. Peterson's declaration purported

to include a "summary of what TWU leaders said at the meetings," it did not identify

Mr. Samuelsen's comment to mechanics to "work safe." (Dkt. No. 117 at 84.) Moreover, none

of these reports address how Union leaders are conveying the message in a dull monotone,

through short meetings that often consist solely of Union leaders reading from a piece of paper or

their phone and ignoring the questions and outbursts of their audience. American filed its

response to Defendants' compliance declarations to identify the shortcomings of these meetings

and to provide Defendants with a roadmap to compliance. (*See* Dkt. No. 122.) Defendants, however, have continued with their non-compliant approach.

## III.   American's Operations Have Not Returned to The Status Quo.

Not surprisingly, in the eight weeks since this Court issued the TRO, Defendants' lackadaisical and non-compliant actions have been wholly insufficient to restore American's operations to normal. American has seen only limited incremental improvement in certain of its operational metrics, which American believes has been influenced by the countermeasures American instituted and the efforts of American's team members. (Tr. 44:22-45:20.) And, in any event, those metrics, including the productivity metric specifically recited in the modified TRO, remain at unacceptable levels, and maintenance-related cancellations and delays continue to be far worse than the status quo required by the TRO and the RLA, causing continuing devastating harm to American and the public on a daily basis.

Productivity Has Not Returned To The Status Quo

Last summer, the overnight work productivity rate averaged 77.5%. SUPPAPP0090 (¶ 8). Before the TRO was granted (May 21-June 13), that figure was 70.6%, and, at the time the Court modified the TRO, the overnight productivity rate actually had worsened from the pre-TRO rate to 70.2%. SUPPAPP0091 (¶ 8). Since the Court modified the TRO, the productivity rate has only increased by 3.2 percentage points, which is less than half of the 7.3 percentage point difference from last summer and is statistically significant at the 99% confidence level— i.e., the likelihood that this is the result of random as opposed to continued concerted changes in behavior since issuance of the TRO is less than 1%. *Id.*

Aircraft Out Of Service At 7 A.M. Have Not Returned To The Status Quo

The average number of unscheduled AOS at 7 a.m. in the summers of 2017 and 2018 was 42. SUPPAPP0093 (¶ 11). In the pre-TRO summer period of this year (May 21 through June

14), unscheduled AOS at 7 a.m. averaged 54.2. SUPPAPP0094 (¶ 11). From the date of the

TRO to the present (June 15 through August 11), that average has decreased only slightly to

almost 50, which continues to represent a statistically significant difference from the prior

summers at the 99% confidence level. *Id.* Moreover, since June 14, 2019, the number of

unscheduled AOS at 7 a.m. has been higher than the average in the summers of 2017 and 2018

on almost 90% of the days. *Id.* Since the Court issued the TRO, Defendants' members have

been responsible for 13.5 unscheduled AOS at 7 a.m. each day above what one would otherwise

expect to see—which is statistically significant at the 99% level. *Id.*; SUPPAPP0102 (Ex. 6).

The continuing disruption caused by the slowdown, however, is even greater than

reflected by comparing AOS data to the last two summers. As explained during trial in this case,

from October 1, 2016 to February 4, 2019, American averaged 36 unscheduled AOS per day (Tr.

36:1-5; Ex. 45 ¶ 42), and its plan for this summer, based on detailed historical data and its

summer pre-pay maintenance program, was 35 unscheduled AOS per day at 7 a.m. (Tr. 36:1-5.)[4]

MELs Have Not Returned To The Status Quo

During the summers of 2017 and 2018, the average number of daily open MELs was 435.

SUPPAPP0093 (Ex. 2). In the summer period of 2019 prior to this Court issuing the TRO, that

number was 526. SUPPAPP0092 (¶ 9). Since the date of the TRO to the present, the average

number of daily open MELs has been 548, which is over 100 more than the 435 average of daily

open MELs during the summers of 2017 and 2018. *Id.* This is statistically significant at the 99%

level of confidence. SUPPAPP0093 (¶ 10); SUPPAPP0102 (Ex. 6).

---

[4] American's targeted goal of 35 unscheduled AOS at 7 a.m. is consistent with the regression
analysis presented at trial. Indeed, while the slowdown behavior since June 14 has to date been
measured against various averages from the summers of 2017 and 2018, regression analysis
demonstrates that—but for the illegal slowdown—the expected averages for unscheduled AOS at
7 a.m. after June 14 of this year (the date of the TRO) is 36.2. SUPPAPP0094 (¶ 11 n.17).

Cancellations Have Not Returned To The Status Quo

The average number of maintenance cancellations in the summers of 2017 and 2018 was

14.4 per day.  SUPPAPP0096 (Ex. 4).  Since July 2, 2019, American has averaged 22

maintenance cancellations per day—17 of which are statistically attributable to slowdown

behavior.  SUPPAPP0095-96 (¶¶ 12-13, Ex. 4).  Defendants' members are thus responsible for

more than 80% of all maintenance-related cancellations since July 2, 2019, which is statistically

significant at the 99% level of confidence.  SUPPAPP0096 (¶ 13); SUPPAPP0102 (Ex. 6).

Prolonged Delays Have Not Returned To The Status Quo

In the summers of 2017 and 2018, the average number of prolonged maintenance delays

of two hours or more was 13.  SUPPAPP0098 (Ex. 5).  In the summer period of 2019 prior to

this Court issuing the TRO, that number was 16 per day.  *Id.*  Since the Court issued the TRO on

June 14, the number of prolonged maintenance delays of two hours or more is 17.1.  *Id.*  Indeed,

since June 14, almost 30% of all such prolonged delays are attributable to changes in behavior of

Defendants' members, which is statistically significant at the 99% level.  SUPPAPP0102 (Ex. 6).

Resulting Impact To The Public

Since the Court issued the TRO on June 14, the slowdown has affected more than

170,000 additional passengers—over 130,000 of whom have had their flight cancelled and the

remaining 40,000 experiencing prolonged delays of two hours or longer.  SUPPAPP0096 (¶ 11);

SUPPAPP0097 (¶ 14); SUPPAPP0098 (¶ 15).

## **ARGUMENT**

### **I.     Defendants Should Be Held In Contempt.**

In civil contempt proceedings, "the basic proposition [is] that all orders and judgments of

courts must be complied with promptly."  *Maness v. Meyers*, 419 U.S. 449, 458 (1975).  An

order issued by a court with jurisdiction over the subject matter and person must be obeyed until

it is reversed. *See, e.g., W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber,* 461 U.S. 757, 766 (1983); *United States v. United Mine Workers,* 330 U.S. 258, 293 (1947).

"A movant in a civil contempt proceeding bears the burden of establishing by clear and convincing evidence: 1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order." *American Airlines, Inc. v. Allied Pilots Ass'n,* 228 F.3d 574, 581 (5th Cir. 2000) (quoting *Martin v. Trinity Indus., Inc.,* 959 F.2d 45, 47 (5th Cir. 1992)); *see also F.T.C. v. Trudeau,* 579 F.3d 754, 763 (7th Cir. 2009). "The contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order." *American,* 228 F.3d 574 at 581 (*citing N.L.R.B. v. Trailways, Inc.,* 729 F.2d 1013, 1017 (5th Cir. 1984)); *Walker v. Ctr. for Food Safety,* 667 F. Supp. 2d 133, 137 (D.D.C. 2009) ("even when compliance is difficult; the contemnor must show that it has done everything in its power to comply with the court's order").

Here, a finding of civil contempt is warranted because there is an order in place that requires certain conduct of Defendants but, as American has clearly shown, Defendants have knowingly failed to comply with that order. The failure of Defendants to adopt and promote a commitment to compliance, the failure of Defendants' senior-most leaders to participate in a forceful and authoritative manner as required by the TRO, and Defendants' perfunctory meetings, blatant cross-messaging—in videos, publications, and statements made at the very meetings where they are required by paragraphs (a), (b) and (e) of the modified TRO to show a "sincere and emphatic" respect for the TRO—and readily-apparent disdain for the TRO demonstrate that the Defendants have done no more than pay lip-service to their compliance obligations. (Dkt. No. 111 at 2-3, ¶¶ (a), (b), (e); *see supra* at pp. 4-14.) And as Defendants well know, because of their refusal to comply, the disruption to commerce and operations has

continued, with devastating effect on both American and the traveling public in direct contravention of Section 2, First of the RLA. SUPPAPP0098 (¶ 15).

American has repeatedly made clear to Defendants that their actions are not compliant with the TRO, and their members' behavior is not returning to normal. Defendants have been made well-aware that their perfunctory meetings held without entertaining questions or doing anything more than reading from the TRO are insufficient. *See, e.g.,* APP0012-19. They have also received daily emails from American informing them of the minimal progress than has been made towards normalizing operations. APP0002-03 (¶ 2); APP0005-10; SUPPAPP0070-71 (¶ 2). Defendants' response has been to disagree in the same perfunctory manner in which they are holding their meetings, and to refuse to alter their methods despite being told directly by American and in filings with this Court that their efforts are insufficient and American's operations have hardly taken a turn toward normal. *See, e.g.,* APP0012-19.

Defendants therefore have failed to comply with the TRO's mandate "to take *all* reasonable steps within [their] power" to stop the slowdown, including, but not limited to, actually complying with the specific requirements of the modified TRO. *See American,* 228 F.3d at 582 (upholding contempt finding based on union's "minimalist, non-authoritative directive that was merely accompanied by a verbatim quotation of the TRO"); *American,* 53 F. Supp. 2d at 932 (only when the union issued a "personal plea" from its president, along with clear directives without cross-messaging did the slowdown actually abate).

Instead of endeavoring to determine and take effective steps to return to normal behavior and operations, Defendants have merely gone through empty motions to create the impression of compliance, without actually intending to stop the illegal slowdown. Their effort has been plainly designed only to "check the box" of compliance by claiming to have taken the specific

steps enumerated by the TRO, while at the same time ignoring the mandate to "take all reasonable steps" to stop the illegal behavior. The Fifth Circuit has found that such disregard for the true intent and purpose of a Court's injunction is grounds for a contempt finding. *See American*, 228 F.3d at 582 (finding contempt of the requirement to take "all reasonable steps" where the union communication was "so lacking in authoritative forcefulness that [it] either [was] not heard at all . . . or [was] discounted as being merely stage lines parroted for the benefit of some later judicial review.").

Defendants have also continued to publish statements attacking American for its safety practices and outsourcing requirements, blaming American's management for the operational disruptions and the NMB for doing its statutorily-mandated job, and claiming American lied to obtain the TRO. This is a blatant violation of the TRO and demonstrates Defendants' true contemptuous attitude—that the slowdown will and should continue until Defendants get what they want in the collective bargaining process. *See* APP0021-23 (¶¶ 2, 3); APP0026-27; APP0034. But Defendants do not have the right to condition compliance with the RLA and the TRO on achievement of their bargaining goals—indeed, the law and the TRO is designed to prevent such an attempt to create bargaining leverage by engaging in a concerted disruption of operations and commerce. *See Chi. & N.W. Ry. Co.*, 402 U.S. at 577, 581. In doing so, they have allowed their members to continue their concerted illegal slowdown, instead of taking all reasonable steps to use Defendants' knowledge and power to stop what they started.

In a contempt proceeding under these circumstances, a union may be held responsible for the conduct of its members if it has condoned or ratified their activities. *See Black Diamond Coal Co. v. Local Union No. 8460*, 597 F.2d 494, 495 (5th Cir. 1979) ("[T]he circumstances surrounding the strike may create an inference that the Union condones or ratifies the illegal

activity and the Union will be held responsible by its failure to take measures to end the strike

. . . The Union can be held in contempt . . . if the strike was conducted or encouraged by its

members functioning as a union, by its agents acting within their apparent authority, or by those

whose acts the Union can be held to have ratified by its inaction.").

A union ratifies its members' activities when its efforts to end those activities "are so

minimal that the Union's approval or encouragement may be inferred." *See United States Steel*

*Corp. v. United Mine Workers*, 598 F.2d 363, 365 (5th Cir. 1979); *American*, 228 F.3d at 579;

*see also United Air Lines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers*, 243 F.3d 349,

366 (7th Cir. 2001) (United "presented evidence of the kind that we have expressly suggested

would establish a union's responsibility for authorizing or ratifying a work action"); *see also*

*New York Times Co. v. Newspaper & Mail Deliverers' Union*, 740 F. Supp. 240, 243 (S.D.N.Y.

1990). Thus, minimal union efforts to stop their members' illegal activities support this

inference when they are "foreseeably ineffective." *See U.S. Steel*, 598 F.2d at 366; *see also*

*Consol. Coal Co. v. Local 1702, United Mineworkers*, 683 F.2d 827 (4th Cir. 1982) (union and

union officials held in civil contempt of temporary restraining order for taking only foreseeable

ineffective steps to end strike); *Island Creek Coal Co. v. Local No. 2232, United Mine Workers*,

732 F. Supp. 666, 673 (W.D. Va. 1990) (union liable for damages flowing from wildcat strike it

took "feeble" and "foreseeably ineffective" measures to end).

Defendants' "feeble" and "foreseeably ineffective" measures—from its senior leaders

ignoring their obligations under the TRO, to perfunctory meetings lasting only a few minutes

with no questions allowed, to robocalling, to lackluster videos—predictably have not brought

their members back in line. The membership is displaying a flagrant rejection of this Court's

authority, and Defendants simply shrug it off and make excuses for conduct that contravenes the

law. Because they have not taken all reasonable steps to stop the slowdown, Defendants have

condoned their mechanics' unlawful behavior through their inaction. Under these circumstances,

a contempt order is necessary in order to hold Defendants accountable for their refusal to take

effective steps to stop the illegal slowdown as required by the TRO.

Defendants' continued flaunting of the TRO requirements undermines this Court's

authority and the authority of the federal courts to enforce the RLA. If allowed to continue, the

Defendants' illegal behavior would eviscerate and render meaningless Section 2, First, enabling

Defendants to inflict devastating harm to American and the public, and could allow other unions

to undertake similar illegal efforts in future collective bargaining, all without penalty.

## II. Both Compensatory And Coercive Civil Contempt Sanctions Are Appropriate.

Judicial sanctions in civil contempt proceedings may be employed either to coerce the

defendant into compliance with the court's order or to compensate the complainant for losses

sustained. *See United Mine Workers*, 330 U.S. at 303-04; *Int'l Union, United Mine Workers v.*

*Bagwell*, 512 U.S. 821, 829 (1994) ("A contempt fine accordingly is considered civil and

remedial if it either 'coerce[s] the defendant into compliance with the court's order, [or] . . .

compensate[s] the complainant for losses sustained.'") (quoting *United Mine Workers*, 330 U.S.

at 303-04); *American*, 228 F.3d at 585 ("Judicial sanctions in civil contempt proceedings, may in

a proper case, be employed for either or both of two purposes: to coerce the defendant into

compliance with the court's order, and to compensate the complainant for losses sustained.").

The power to grant compensatory civil relief is the remedial aspect of the district court's

full contempt power. *See N.L.R.B. v. Concordia Elec. Co-Op, Inc.*, No. 95-60404, 1999 WL

1411474, at *9 (5th Cir. Nov. 9, 1999) ("Civil contempt is remedial in nature and its purpose is

to benefit the complainant. [T]he proper aim of judicial sanctions for civil contempt is 'full

remedial relief,' that such sanctions should be 'adapted to the particular circumstances of each

case' and that the only limitation upon the sanctions imposed is that they be remedial or coercive but not penal.") Not only can the district court protect its own authority via criminal sanctions, and coerce compliance with its orders via civil sanctions, it also can compensate a party put to expense by another party's non-compliance. *See, e.g., McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949) ("The measure of the court's power in civil contempt proceedings is determined by the requirements of full, remedial relief."); *American*, 228 F.3d at 585 ("district court 'has broad discretion in the assessment of damages in a civil contempt proceeding,'").

Here, both compensatory and coercive civil contempt sanctions are appropriate given Defendants' disregard for the TRO.  American also should receive its attorneys' fees and costs incurred in bringing this action. *See Dow Chem. Co. v. Chem. Cleaning, Inc.*, 434 F.2d 1212, 1215 (5th Cir. 1970) ("There are contempt cases in abundant number holding that a court has discretion to award reasonable attorney's fees and other expenses necessary to make an innocent party whole."); *see also Concordia Elec. Co-Op, Inc.*, 1999 WL 1411474, at *9.

## CONCLUSION

For these reasons, American respectfully requests that this Court hold Defendants in contempt and award American its damages and attorneys' fees in an amount to be determined at hearing to compensate it for the losses it has incurred because of Defendants' failure to comply with the TRO.

Respectfully submitted,

Dee J. Kelly, Jr. (S.B. # 11217250)
Lars L. Berg (S.B. # 00787072)
Elizabeth A. Cuneo (S.B. # 24100166)
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Tel.: (817) 332-2500
Fax: (817) 878-9280
dee.kelly.2@kellyhart.com
lars.berg@kellyhart.com
elizabeth.cuneo@kellyhart.com


Robert A. Siegel (pro hac vice)
Mark W. Robertson (pro hac vice)
Sloane Ackerman (pro hac vice)
Rachel S. Janger (pro hac vice)
O'Melveny & Myers LLP
7 Times Square
New York, New York 10036
Tel.: (212) 326-2000
Fax: (212) 326-2061
rsiegel@omm.com
mrobertson@omm.com
sackerman@omm.com
rjanger@omm.com

**ATTORNEYS FOR PLAINTIFF
AMERICAN AIRLINES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of August, 2019, I filed the foregoing document with the clerk of the court and the electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

Lars L. Berg